UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KATHRYN DIRCKS,            )
BARRY DIRCKS,             )
                         )
            *Plaintiffs*,  )
                         )
        vs.              )        No. 1:21-cv-00451-JMS-MG
                         )
INDIANA DEPARTMENT OF CHILD )
SERVICES, *et al*.        )
                         )
            *Defendants*.  )

## ORDER

*Pro se* Plaintiffs Kathryn Dircks ("Kathryn") and Barry Dircks ("Barry") filed this civil

rights lawsuit[1] concerning a series of events that began on March 4, 2019 that resulted in Kathryn

being involuntarily committed, Barry engaging in a standoff with local law enforcement, and their

minor children, T.D. and N.D., being temporarily removed from Kathryn and Barry's custody in

connection with child welfare proceedings.  Plaintiffs filed this wide-ranging lawsuit asserting

more than 28 disparate claims against 107 defendants whose connections to Plaintiffs vary greatly,

ranging from medical malpractice claims against doctors and nurses related to Kathryn's treatment

during her commitment, a defamation claim against an individual for Facebook comments, Fourth

Amendment search and seizure claims against members of law enforcement related to the standoff

with Barry, and legal malpractice claims related to Kathryn and Barry's representation in child

welfare proceedings.  Plaintiffs were able to round up an eye-popping 107 defendants because

---

[1] As discussed in the Court's prior Order to Show Cause, [Filing No. 201], Kathryn and Barry also purported to file this lawsuit on behalf of their minor children, T.D. and N.D., but the Seventh Circuit prohibits parents from advancing claims on behalf of their minor children *pro se*. Therefore, the term "Plaintiffs" in this Order refers only to Kathryn and Barry.

they apparently sued every individual and organization that appeared on Kathryn's medical records, child welfare records, and law enforcement records related to the incidents, without regard to any particular defendant's level of participation in the events.[2]

Pending before the Court and ripe for review are ten Motions to Dismiss filed by the following groups of Defendants: (1) the Zionsville Defendants,[3] [Filing No. 124]; (2) the Delamater Defendants,[4] [Filing No. 126]; (3) Defendant Jason Potts,[5] [Filing No. 128]; (4) the Boone County Defendants,[6] [Filing No. 130]; (5) the Whitestown Defendants,[7] [Filing No. 132];

---

[2] The Court is mindful that the Seventh Circuit has explained that "[u]nrelated claims against different defendants belong in different suits." *Owens v. Godinez*, 860 F.3d 434, 436 (7th Cir. 2017) (quoting *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)); *see also Antoine v. Ramos*, 497 F. App'x 631, 635 (7th Cir. 2012) (stating that the "district court should have rejected [plaintiff's] attempt to sue 20 defendants in a single lawsuit raising claims unique to some but not all of them") (citing *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012); *Owens v. Hinsley*, 635 F.3d 950, 952 (7th Cir. 2011); *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)). But, for reasons of judicial economy the Court will rule on the pending Motions to Dismiss before undertaking any action to sever.

[3] The "Zionsville Defendants" consists of Defendants the Town of Zionsville, Jason Potts, Samuel Dennemann, Bradley Kiefer, Marius Klykken, Aaron Shook, Drake Sterling, Charles White, and Bennii Weldy.

[4] The "Delamater Defendants" refers to Defendants Attorney Joseph Delamater and the law firm Razumich & Delamater, P.C.

[5] In addition to the motion filed by the Zionsville Defendants, Defendant Potts separately filed his own motion.

[6] The "Boone County Defendants" consists of Defendants the Boone County Board of Commissioners, the Boone County Council, Thomas Santelli, Robert Clutter, Jonathon Barnes, Michael Beard, Robert Bonds, Thomas Beard, Austin Bonty, Christopher Burcham, Jack Callahan, Thomas Cameron, Ken Conley, Jon Cravens, Brad Dunn, Craig Fouts, Gabriel Frietsche, Erick Frith, Wesley Garst, Christopher Gipson, Leon Golladay, Anthony Harris, Robert Hatfield, Christopher Helmer, Jeffrey Keller, Ryan Musgrave, Michael Nielsen, Taylor Nielsen, Scott Pell, Jason Reynolds, Breanna Shively, Brian Stevenson, Clinton Stewart, Matthew Williams, Rebekah McClure, and Lauri Thompson.

[7] The "Whitestown Defendants" includes Defendants the Town of Whitestown, Jacob King, and

(6) the Lebanon Defendants,[8] [Filing No. 134]; (7) the Anonymous Doctor Defendants,[9] [Filing No. 135]; (8) the DCS Defendants,[10] [Filing No. 139]; (9) the Thorntown Defendants,[11] [Filing No. 141]; and the Anonymous Medical Defendants,[12] [Filing No. 147].

In total, Plaintiffs allege 14 federal civil rights "counts," each with numerous sub-claims within each count, and 14 state-law counts under supplemental jurisdiction.

## I.
### STANDARDS OF REVIEW

Two standards are relevant to evaluate the Motions to Dismiss.   The DCS Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).   All other moving parties

---

Blayne Root.

[8] The "Lebanon Defendants" refers to Defendants the City of Lebanon, Ted Boling, Ben Phelps, Austin Scott, Ryan Williamson, David Edwards, Charles Batts, Michael Baird, Joe Caldwell, Brian Cope, and Adam Dickerson.

[9] The "Anonymous Doctor Defendants" refers to Defendants Anonymous Doctor A and his employer, Anonymous Specialists A, as well as Anonymous Doctors C and D, who have joined in Anonymous Doctor A's Motion.   [Filing No. 138; Filing No. 203.]   These Doctors are identified anonymously in the Second Amended Complaint pursuant to the Indiana Medical Malpractice Act because Plaintiffs' claims against them remain pending before a medical review panel.

[10] The "DCS Defendants" consists of Defendants the Indiana Department of Child Services ("DCS"), Jessica (Pruett) Hernandez-Blanco, Alexandra Dillman, Angela Jones, Lindsey Bruce, Nobuhle Mamba-Harding, Amber Hedges, Courtney (Hall) Long, Michael McNear, and Jami Nickerson.

[11] The "Thorntown Defendants" refers to Defendants the Town of Thorntown and Frank Clark.

[12] The "Anonymous Medical Defendants" refers to Defendants Anonymous Corporation A, Anonymous Hospital A, Anonymous Center A, Anonymous Doctor B, Anonymous Doctor D, Anonymous Doctor F, Anonymous Nurses 1-16, and Anonymous Social Workers 1-5, and Sharonda Reed.   Except for Defendant Reed, these defendants are identified anonymously in the Second Amended Complaint pursuant to the Indiana Medical Malpractice Act because Plaintiffs' claims against them remain pending before a medical review panel.

seek dismissal under Rule 12(b)(6) only.

Rule 12(b)(1) requires a district court to dismiss an action when it lacks authority to consider and decide the dispute. Just like a Rule 12(b)(6) motion to dismiss, a court considering a Rule 12(b)(1) motion accepts as true the well-pleaded factual allegations in the complaint, drawing all reasonable inferences in favor of the plaintiffs. *See Ctr. For Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). If jurisdiction is not evident from the face of the complaint, a court may also consider extrinsic evidence to determine whether it has authority to hear the claims. *See Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

Under Rule 12(b)(6), a party may move to dismiss a claim that does not state a right to relief. The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). In reviewing the sufficiency of a complaint, a court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019). A Rule 12(b)(6) motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the

4

speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Furthermore, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (internal citations and quotation marks omitted). The liberal construction afforded *pro se* filings "relates to both the *pro se* plaintiff's factual allegations and their legal theories." *White v. City of Chicago*, 2016 WL 4270152, at *13 (N.D. Ill. Aug. 15, 2016). Although *pro se* parties are subject to less stringent pleading standards, "[i]t also is well established that *pro se* litigants are not excused from compliance with procedural rules." *Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009). And the Supreme Court has made clear that it has "never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *McNeil v. United States*, 508 U.S. 106, 113 (1993).

## II.
### BACKGROUND

The following are the factual allegations contained in the Second Amended Complaint, (the "SAC") that are relevant to Plaintiffs' claims, which, consistent with the standards of review articulated above, the Court must accept as true only for purposes of deciding the pending Motions to Dismiss.

### A.   The Dircks Family

Kathryn and Barry are a married couple who reside in Boone County, Indiana with their two minor children, T.D. and N.D. [Filing No. 122 at 4; Filing No. 122 at 20.] At the time of

the incidents giving rise to this lawsuit, T.D. was four years old and N.D. was 18 months old. [Filing No. 122 at 4.]  Barry is a member of The Church of Jesus Christ of Latter-Day Saints ("LDS").  [Filing No. 122 at 20.]   About a decade ago, Barry was involved in a standoff with law enforcement that resulted in Barry being handcuffed.  [Filing No. 122 at 29.]  Barry was not arrested or charged with a crime following that incident.  [Filing No. 122 at 29.]   In the wake of that incident, Barry has been advised never to speak with law enforcement or to allow law enforcement into his home without an attorney.   [Filing No. 122 at 29.]

### B.  Kathryn is Temporarily Committed for Treatment

The incident that precipitated the series of events culminating in this lawsuit is Kathryn's involuntary psychiatric commitment, which lasted for a period of 18 days.

During the early hours of March 4, 2019, just before 3:00 a.m., a family member (not Barry) took Kathryn to Anonymous Hospital A for treatment for an acute mental-health condition. [Filing No. 122 at 21.]  Anonymous Hospital A presented Kathryn with intake and consent forms, but staff prevented Kathryn from fully reading the paperwork.  [Filing No. 122 at 22.]   After Kathryn requested that address and phone number changes be made on the forms, Defendant Sharonda Reed took the paperwork away from Kathryn and "a consent was signed on behalf of Kathryn by Reed stating Kathryn 'refused.'"  [Filing No. 122 at 22.]  Hospital staff gathered vitals, took blood, and obtained historical information from Kathryn, and eventually Anonymous Doctor C asked that hospital social workers evaluate Kathryn.  [Filing No. 122 at 23.]   As part of that process, Anonymous Social Worker 5 contacted Barry via phone and interviewed him. [See Filing No. 122 at 23.]

Anonymous Doctor C signed a "Physician's Emergency Statement" declaring "that Kathryn may be mentally ill and dangerous or gravely disabled due to [Kathryn]'s delusional behavior." [Filing No. 122 at 24.]   Anonymous Doctor C reported that Kathryn believed that "people [were] after her and her family." [Filing No. 122 at 24.]   Shortly thereafter, Anonymous Social Worker 5 completed an "Application for Emergency Detention of Mentally Ill Person," stating that "Kathryn was dangerous to herself because she was brought in with delusional behavior believing others will harm her and she was refusing to tell staff her address, phone numbers, or any identifiers." [Filing No. 122 at 24.]

At around 8:00 a.m. that same day, Kathryn was transferred from Anonymous Hospital A to Anonymous Center A "on authorization of Anonymous Doctor C, Anonymous Doctor F, and Anonymous Social Worker 5." [Filing No. 122 at 25.]   At Anonymous Center A, Anonymous Doctors B and D assumed care of Kathryn and had her blood taken again. [Filing No. 122 at 25.] The doctors and nurses at Anonymous Center A ordered and administered medication to Kathryn. [See Filing No. 122 at 31.]   According to Kathryn, she took this medication against her will because she was frightened. [Filing No. 122 at 31-32; Filing No. 122 at 42.]   The next day, March 5, 2019, Kathryn was moved from a 20-bed unit at Anonymous Center A to an 8-bed unit "where there is no choice in food offered and only a small hallway is available to get exercise." [Filing No. 122 at 43.]   Anonymous Center A also increased Kathryn's medication. [Filing No. 122 at 45.]

On March 6, 2019, Anonymous Doctor D completed a "Physician's Statement" stating that Kathryn was "suffering from unspecified psychosis, was expressing suicidal ideation, was in danger of coming to harm because of an inability to provide for food, clothing, shelter, or other

essential human needs," and concluding that "Kathryn had a substantial impairment of obvious deterioration in judgment, reasoning, or behavior that resulted in her inability to function independently." [Filing No. 122 at 49.]   This statement was filed with a state court in support of a request to obtain Kathryn's temporary involuntary commitment under Indiana law.   Doctor D's findings were contrary to other medical records in which Kathryn denied suicidal thoughts and treatment notes stating that Kathryn was not a danger to herself.   [Filing No. 122 at 49-50.]

The state court held a hearing on Kathryn's involuntary commitment on March 11, 2019. [Filing No. 122 at 54-55.]   Anonymous Doctor D testified at the hearing, and the court ordered Kathryn involuntarily committed for 90 days and ordered her "to take all medications prescribed." [Filing No. 122 at 55.]   Kathryn continued to be observed at Anonymous Center A and was administered medication, including Klonopin, Zyprexa, and Ativan, which she alleges she took each time against her will and without her consent.   [*See, e.g.*, Filing No. 122 at 56.]   Kathryn was released from Anonymous Center A on March 22, 2019 but was still subject to the 90-day commitment order and was required to attend therapy.   [Filing No. 122 at 59-60.]

### C.   The Standoff at the Dircks Home

Turning back to the morning of March 4, 2019, once Kathryn was transferred to Anonymous Center A, Anonymous Social Worker 5 contacted DCS for a wellness check of T.D. and N.D.   [Filing No. 122 at 25-26.]   Social Worker 5 told DCS intake specialist Angela Jones that Kathryn had not eaten, drank, or slept for three days and that Kathryn would not allow her vitals to be taken.   [Filing No. 122 at 26.]   Social Worker 5 further relayed that Barry "was paranoid and kept a small artillery in the home" and that Barry "reported he does not sleep unless two people are guarding the home with rifles."   [Filing No. 122 at 26.]   Social Worker 5 told Ms.

Jones that "Barry reported that Kathryn was possessed and discussed Satan when talking about her." [Filing No. 122 at 26.]   These details were "fabricated and misrepresented several of Barry's statements" to Social Worker 5.   [Filing No. 122 at 26.]   Social Worker 5 also relayed to Ms. Jones that Social Worker 5 was unaware if anyone was at the Dircks home with T.D. and N.D., even though Barry had told Social Worker 5 that his brother and sister were with T.D. and N.D. at the home.   [Filing No. 122 at 26.]

Ms. Jones then contacted DCS's local Boone County office regarding her call with Social Worker 5.   [Filing No. 122 at 27.]   DCS case manager Alexandra Dillman contacted Boone County's central dispatch to request law enforcement assistance for a wellness check at the Dircks home, reporting to dispatch that Barry can "apparently become aggressive."   [Filing No. 122 at 28.]   The Boone County Sheriff's Office (the "BCSO") sent Deputy Jonathon Barnes and Corporal Matthew Williams to accompany Ms. Dillman and another DCS case manager, Jessica Pruett, to the Dircks' home.   At around 10:00 a.m., Deputy Barnes and Corporal Williams knocked on the door and window of the home, but Barry did not open the door for the officers and instead asked if they had a warrant.   [Filing No. 122 at 28.]   When Deputy Barnes and Corporal Williams responded that they did not have a warrant, Barry told them that they were trespassing and that he would be contacting an attorney.   [Filing No. 122 at 28.]

As Barry began attempting to contact an attorney, several more police cars arrived, and the Boone County highway department placed barricades "at the end of the road" pursuant to a request from Deputy Barnes.   [Filing No. 122 at 30.]   BCSO Captain Jeffrey Keller called and texted Barry asking to talk to him, but Barry refused.   [Filing No. 122 at 31.]   Additional members of the BCSO and other nearby local law enforcement agencies arrived at the scene, including Boone

County Sheriff Michael Nielsen.   Sheriff Nielsen texted Barry and told him that law enforcement wanted to check on T.D. and N.D. and asked Barry to send the children out with Barry or someone else.   [Filing No. 122 at 32.]   Barry refused and continued to attempt to seek an attorney.   [Filing No. 122 at 32-33.]

At around 1:19 p.m., members of Boone County's Special Response Team ("SRT") and Crisis Negotiation Team ("CNT") were called to the scene.   By around 1:30 p.m., Jason Potts, the Battalion Chief for the Zionsville Fire Department and a member of the SRT, arrived at the scene and began conducting a drone search over the Dircks' home and outbuildings.   [Filing No. 122 at 33.]   Chief Potts did not have a search warrant.   [Filing No. 122 at 33.]

At about 1:45 p.m., while law enforcement gathered near the Dircks' home, DCS case manager Courtney (Hall) Long opened a juvenile miscellaneous ("JM") case in Boone County Circuit Court and sought an order from the court requiring Barry and Kathryn to produce T.D. and N.D.   [Filing No. 122 at 34.]   A magistrate judge issued the following Order to Compel, authorizing DCS and law enforcement to enter the Dircks home to determine the welfare and safety of all individuals and to interview T.D. and N.D.

10

19-BCSO-0265 - Boone County Sheriffs Office
Page 1 of 1

| STATE OF INDIANA | ) | IN THE BOONE CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF BOONE | ) | CAUSE NUMBER:   06C01-1903-JM-000084 |

IN RE: THE MATTER OF
A Dircks
A CHILD ALLEGED TO BE
A CHILD IN NEED OF SERVICES

**FILED**
March 4, 2019
BOONE COUNTY COURTS
SB

**ORDER TO COMPEL**

The Court having reviewed the Verified Motion to Compel and the Affidavit attached thereto, now GRANTS the Motion to Compel.

Father, Barry Dircks and/or Mother, Kathryn Dircks are ordered to allow the Boone County Sheriff's Department and the Indiana Department of Child Services Family Case Managers to enter the home and the property located at 7650 S. 50 E, in Lebanon, Boone County Indiana to determine the welfare and safety of all individuals, including all children in the home and are further ordered to produce the child(ren) A. Dircks and B. Dircks for interview.
Law enforcement and DCS are authorized to enter onto the property to verify the safety and well being of the child(ren) any all means necessary and appropriate.

So ordered this   **March 4, 2019**

RECOMMENDED:                                         APPROVED:

_Magistrate Sally E. Berish_                          _The Honorable Lori Shein_ SB
                                                      Judge, Boone Circuit Court

[Filing No. 76-1.]   The motion was not served on Barry or Kathryn.   [Filing No. 122 at 36.]

As part of the SRT and CNT response, an armored personnel carrier drove around Plaintiffs' property.   [Filing No. 122 at 38.]   Law enforcement officers also aimed sniper rifles at Plaintiffs' home as part of the SRT and CNT response.   [Filing No. 122 at 78.]

At around 4:20 p.m., Barry spoke with attorney Joseph Delamater.   [Filing No. 122 at 139.]   Barry told Attorney Delamater that he "believed [that] the actions being done by the BCSO and DCS were illegal, [that Sheriff] Michael Nielsen was corrupt, and [that Barry] planned to initiate a lawsuit."   [Filing No. 122 at 39.]   Attorney Delamater contacted Boone County Central Communications and told them that he was Barry's lawyer and that he did not know if Barry had

11

a mental breakdown.   [Filing No. 122 at 39.]   Attorney Delamater and Sheriff Nielsen then began

negotiating "a surrender plan."   [Filing No. 122 at 39.]

   Just after 5:00 p.m., Attorney Delamater called Barry and told him that the court had issued

the Order to Compel.   [Filing No. 122 at 40.]   At that point, "Barry informed [Attorney]

Delamater he would comply with the Order to Compel and all were welcome to enter the residence

now [that] he had an attorney to advise, and DCS and BCSO had legal paperwork."   [Filing No.

122 at 40.]   Attorney Delamater further advised Barry that "if he did not bring the kids down to

the end of the road immediately" and permit the children to stay overnight at the home of a local

LDS bishop who was close to the Dircks family, law enforcement officers were "going to bust in

his door."   [Filing No. 122 at 40.]

   Barry agreed to Attorney Delamater's request, and at about 7:20 p.m., T.D. and N.D. were

placed in a BCSO vehicle and taken to the bishop's house.   [Filing No. 122 at 41.]   DCS case

supervisor Michael McNear interviewed T.D. and N.D. while they were being driven to the

bishop's house.   [Filing No. 122 at 41.]   T.D. told Mr. McNear that she felt safe at home with her

parents and that no one had hurt T.D. or N.D.   [Filing No. 122 at 41.]   Mr. McNear and Ms.

Dillman did not observe any marks or bruises on the children.   [Filing No. 122 at 41-42.]   T.D.

and N.D. were placed in the bishop's home and the BCSO began additional patrol and monitoring

of the bishop's home.   [Filing No. 122 at 42.]

### D.   Proceedings Related to the Temporary Removal of T.D. and N.D.

   On March 5, 2019—the day after the standoff—DCS filed a Petition Alleging Children to

be Children in Need of Services for each child (the "CHINS cases").   [Filing No. 122 at 44.]   An

initial hearing on the CHINS cases was scheduled for the following day, March 6, 2019, at 9:30

a.m.   [Filing No. 122 at 44-45.]   Attorney Delamater told Barry that he was unable to attend the March 6 hearing because of a conflict, but that Barry should "go into court and let them know that you're going to be hiring counsel, and that … you just would like to request another date" so that Attorney Delamater could appear with him.   [Filing No. 122 at 44.]   Kathryn, still receiving treatment at Anonymous Center A, was not served with notice of the CHINS proceedings.   [Filing No. 122 at 46.]

Barry appeared *pro se* at the CHINS hearing the next day, during which the magistrate judge "authorized the detention of the children, suggested Barry undergo a psychological evaluation like [Kathryn]," and appointed Rebekah McClure and Lauri Thompson to serve as Court-Appointed Special Advocates ("the CASA Defendants") to represent T.D. and N.D in the proceedings.   [Filing No. 122 at 46.]   The magistrate judge ordered the placement of T.D. and N.D. at the bishop's home in the custody Barry's mother, Shirley Dircks, who had recently arrived from Utah.   [Filing No. 122 at 46.]

The magistrate judge also permitted Barry to visit T.D. and N.D. at the bishop's home, however BCSO Captain Keller informed Corporal Williams, who was stationed at the bishop's home, that Barry was granted supervised visitation only on the condition that he first report to the local DCS office.   [Filing No. 122 at 47.]   Immediately after the initial hearing, at around 12 noon, Barry arrived at the bishop's home, and Corporal Williams asked Barry if he had reported to the DCS office, and Barry responded that "he was not needed [at the DCS office] and proceeded to go inside to comfort his children."   [Filing No. 122 at 47.]   Corporal Williams advised Captain Keller that Barry was in the home with the children, and Boone County DCS Director Nobuhle Mamba-Harding emailed the magistrate judge, *ex parte*, advising that Barry was with the children

13

outside of the presence of Shirley Dircks, which Ms. Mamba-Harding asserted was a requirement for visitation by Barry.   [Filing No. 122 at 147.]   The magistrate judge scheduled an emergency hearing for 2:00 p.m. that day.   [Filing No. 122 at 48.]   The emergency hearing "only lasted a few minutes[,] and Barry was not permitted to speak."   [Filing No. 122 at 48.]   Kathryn, still at Anonymous Center A, was not notified of the emergency hearing.   [Filing No. 122 at 48.]   The magistrate judge ordered T.D. and N.D. to be placed in foster care rather than with Barry's mother at the bishop's house.   [Filing No. 122 at 48.]

The following day, March 7, 2019, Barry retained Attorney Julie Camden with the law firm of Camden & Meridew to represent him in the CHINS cases.   Barry asked Attorney Camden to file an appeal of the order placing T.D. and N.D. in foster care, but Attorney Camden told Barry that appealing the CHINS case or filing a motion to get T.D. and N.D. back in his custody would take too long.   [Filing No. 122 at 50.]

In the meantime, T.D. and N.D. were placed in a foster home.   [Filing No. 122 at 48.]   On March 8, 2019, DCS forensically interviewed T.D. under the direction of DCS case manager Pruett and "without notice to Kathryn or Barry."   [Filing No. 122 at 52.]   T.D. underwent a second forensic review four days later.   [Filing No. 122 at 56.]   The interviews "were partially comprised of sexual education."   [Filing No. 122 at 82.]

On March 11, 2019, DCS held a Child and Family Team Meeting ("CFTM") attended by Barry, Barry's sister, Shirley Dircks, Attorney Camden, and DCS case managers Hall, Dillman, and Jami Nickerson.   [Filing No. 122 at 55.]   Attorney Camden requested the return of T.D. and N.D. or that Barry be allowed to visit them, but this request was denied by the DCS case workers. [Filing No. 122 at 55.]   The next day, on March 12, 2019, DCS case managers Dillman and Amber

14

Hedges conducted a search of the Dircks home, "without a court order, and determined it to be appropriate with working utilities and plenty of food." [Filing No. 122 at 56.]

Barry agreed to DCS's request that he undergo a drug screening and a psychological exam. [Filing No. 122 at 55.] Barry's drug screening was negative, and the psychological exam did not reveal any concerns and concluded that Barry "does not present as a threat to himself or others and is fully capable of raising his children without outside intervention." [Filing No. 122 at 57.] After DCS received the psychological findings on March 14, 2019, T.D. and N.D. were returned to Barry, but the CHINS cases remained pending. [Filing No. 122 at 58.]

DCS case manager Nickerson performed an unannounced home visit on April 4, 2019. [Filing No. 122 at 61.] During the visit, Ms. Nickerson told Kathryn that if Kathryn and Barry would enter a "safety agreement," with DCS, DCS would close out its file. [Filing No. 122 at 61.] Attorney Camden advised Barry and Kathryn to agree to a safety agreement. At a CFTM on April 11, 2019, case manager Nickerson noted that the family was functioning well and did not have Kathryn and Barry enter a safety agreement. [Filing No. 122 at 62.]

On April 30, 2019, DCS moved to dismiss the CHINS cases without prejudice, and the motion was granted. [Filing No. 122 at 63.]

### E.  State Court Appeal of the JM and CHINS proceedings

On December 3, 2019, Barry and Kathryn, through counsel, filed in the Indiana trial court a motion for relief from judgment or, in the alternative, a petition for writ of habeas corpus (the "Trial Rule 60(B) Motion"). The trial court denied the Trial Rule 60(B) Motion, and Barry and

Kathryn appealed.   The Indiana court of appeals affirmed the trial court in a written decision,[13]

finding as follows.

> [Kathryn and Barry] assert their due process rights were violated by multiple errors, including that Mother was not served with process, DCS did not obtain authority to file the CHINS petitions, the court had improper communications with the Sheriff and in receiving an email from DCS, the children's initials were not correctly stated in the Orders to Compel, the order dismissing the CHINS petition was signed by the Magistrate, and the March 11, 2019 order incorrectly stated Father waived his right to counsel. Parents argue they "do not want DCS left with the option of resurrecting the same allegations in a subsequent CHINS petition ...."
>
> ***
>
> The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty or property without a fair proceeding. *Matter of E.T.*, 152 N.E.3d 634, 640 (Ind. Ct. App. 2020) (citing *Lawson v. Marion Cty. Office of Family & Children*, 835 N.E.2d 577, 579 (Ind. Ct. App. 2005)).   Due process is essentially the opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* (citing *Matthews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893 (1976)). Although due process is not dependent on the underlying facts of the particular case, it is nevertheless flexible and calls for such procedural protections as the particular situation demands. *Id.* (citing *Lawson*, 835 N.E.2d at 580).
>
> To the extent Parents do not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.
>
> To the extent Parents challenge the Orders to Compel, Ind. Code § 31-32-13-7 provides: "If: (1) the juvenile court determines on the juvenile court's review of the record that an emergency exists; or (2) the moving party demonstrates by sworn testimony or affidavit that an emergency exists; the juvenile court may issue an emergency order without a hearing."… DCS attached an affidavit to its motions to compel which set forth DCS's concerns with Parents' mental health needs and Father's statements.   In denying Parents' Trial Rule 60(B) motion, the trial court found, "[e]ven though DCS does not explicitly use the word 'emergency' in its Motions to Compel, the Court finds as a matter of law that DCS demonstrated that an emergency existed which justified the Court granting the Orders compelling

---

[13] The Court can take judicial notice of state-court decisions.   *Smith v. Housing Auth. of S. Bend.*, 867 F. Supp.2d 1004, 1009 (N.D. Ind. 2012) (citing *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1138 n.14 (7th Cir. 2008)).

Father and/or Mother [to] produce the children for an interview." … Although Mother was hospitalized, the court found that Father's counsel advised him of the court's Orders to Compel, the orders required Father "and/or" Mother to permit entry into the residence and produce the children, and Father complied with the orders. *** Additionally, Ind. Code § 31-32-13-8 provides in part that an emergency order is "valid for not more than seventy-two (72) hours, excluding Saturdays, Sundays, and legal holidays," and, in any event, the court found Father complied with the Orders to Compel, and the CHINS petitions were dismissed. Based upon the record and under these circumstances, reversal of the Orders to Compel or a finding they were void on due process grounds is not warranted.

To the extent Parents challenge the Order on Motion to Dismiss the CHINS petitions, we note the order was entered before there was any evidentiary hearing. As to any irregularities, while DCS filed its Request for Authorization to File a Petition and its CHINS petition at the same time on the afternoon of March 5, 2019[], *see* Ind. Code § 31-34-9-1 (requiring DCS counsel to request the court to authorize the filing of a CHINS petition), and filed its preliminary inquiry report the following morning[], we note the trial court's March 6, 2019 order authorizing the filing of the CHINS petition expressly stated the court considered the preliminary inquiry report and found probable cause to believe the children were CHINS. *See* Ind. Code § 31-34-9-2 (providing the court shall consider the preliminary inquiry and the evidence of probable cause and authorize the filing of a petition if the court finds probable cause to believe that the child is a CHINS).

The record establishes that, while Mother was not served, Father appeared for the initial and detention hearing, he allowed DCS to see the children, DCS performed a home inspection and found the home to be appropriate, and the children were returned to Father on March 14, 2019. Additionally Mother was involuntarily committed to [Anonymous Center A] and was not released until after the children were returned to Father, Mother testified that she met with and hired an attorney at the end of March 2019 who represented her until the dismissal in April 2019, DCS stated in its motion to dismiss that Mother and Father were voluntarily participating in services, and the CHINS petitions were dismissed on April 30, 2019. As to Father's testimony regarding seeing the Sheriff in the courtroom and the court's statement there were no criminal charges, the record does not demonstrate that Father was not afforded a fair proceeding. The court heard from Father and the children's paternal grandmother and ordered that the children be placed with the grandmother at the pastor's home and that Father have supervised visitation. Although the court held an emergency hearing following a DCS report that Father had, within hours, violated its visitation order and placed the children in foster care, Father apologized, the children were released to Father the following week, and we cannot say under the circumstances the court's immediate action upon receipt of the report from DCS did not constitute an emergency action or deprived Parents of due process.

In addition, while the court's written March 11, 2019 order included a statement that Father had waived counsel, the transcript of the initial and detention hearing reveals the court recognized that Father had retained counsel, informed him that his attorney needed to enter an appearance, and stated it would set a status hearing for the following week which would allow Father's attorney to be present and any orders would be reviewed at the status hearing. The court also reviewed the CHINS petitions, Father indicated he understood the allegations, and the court entered a preliminary denial of the allegations on Father's behalf.   We also note the statement of DCS's counsel at the February 24, 2020 hearing that "DCS cannot come back and file a new CHINS Petition based on the same set of facts that they have previously filed." [] We also cannot conclude the Order on Motion to Dismiss was void or Parents were deprived of due process because it was signed by the Magistrate or because the order, which referred to the CHINS cause numbers, mistakenly referred to termination proceedings.

*Matter of T.D, et al. v. Ind. Dep't of Child Servs.*, 161 N.E.3d 1238 (table), 2020 WL 6636354 at *4-5 (Ind. Ct. App. 2020*), transfer denied sub nom. N.D. v. Ind. Dep't of Child Servs.*, 165 N.E.3d 80 (Ind. 2021).

### F.   The Dircks Seek Records

On June 25, 2019, Kathryn and Barry sent a variety of public records requests to different public entities, including a request to the BCSO for "all body camera footage, notes, email correspondence with DCS, Anonymous Hospital A, Anonymous Center A, internal BCSO email correspondences, copies of all telephonic records, internal policies and procedures for deployment of SRT and a list of all SRT members." [Filing No. 122 at 65.]   The next day, Barry and Kathryn followed up their public records requests with litigation hold letters.   [Filing No. 122 at 65.] Plaintiffs also submitted tort claim notices to the Boone County Commissioners and the BCSO on August 29, 2019.   [Filing No. 122 at 66.]

On August 7, 2019, Kathryn contacted Attorney Clutter, who represented the BCSO, to inquire about the status of the body camera records.   [Filing No. 122 at 66.]   Attorney Clutter

responded that he would address Plaintiffs' request when he had available resources.   [Filing No. 122 at 66.]

The Boone County Board of Commissioners held a meeting on August 19, 2019, during which Attorney Clutter stated that he and Sheriff Nielsen "had been working on establishing the cost of video reproduction for public records requests" and that "an ordinance would be drafted and presented to the Boone Council." [Filing No. 122 at 66.]  During a September 10, 2019 Boone County Council meeting, Attorney Clutter and Sheriff Nielsen made a presentation regarding the cost of redacting body camera footage and requested the Council pass an ordinance requiring that citizens pay $500 per video, even though Indiana law caps the fee at $150 per video. [Filing No. 122 at 67.]   Nevertheless, the Council passed the $500-per-video ordinance.   [Filing No. 122 at 67.]

Plaintiffs again contacted Attorney Clutter on September 23, 2019 about the body camera footage that they had requested.   [Filing No. 122 at 67.]   Attorney Clutter told them that they would need to pay the fee first, which given the number of videos requested by Plaintiffs, amounted to about $10,000.   [Filing No. 122 at 27.]

In addition, Plaintiffs made "repeated request[s]" to DCS for "JM and CHINS[] records, including but not limited to, unredacted emails, T.D. and N.D.'s medical records, [and] the video files from both of T.D.'s forensic interviews."   [Filing No. 122 at 81.]   DCS employees Mamba-Harding and McNear denied Plaintiffs' requests.   [Filing No. 122 at 81.]

### G.   Barry and Kathryn's Facebook Interactions

On April 4, 2019, Zionsville Fire Department Engineer Bennii Weldy contacted Barry via Facebook and "attempted to persuade Barry, through intimidation, not [to] sue [Boone County

Sheriff] Michael Nielsen."   [Filing No. 122 at 61.]   Barry alleges that Ms. Weldy intimidated him by stating that if Barry went public or sued that "the media either would not put his story out or would twist his words, pick him apart, and make him look like he is anti-law enforcement"; that "T.D. and N.D. will not have friends"; and that "others will treat Kathryn differently because they would learn of her mental health commitment."   [Filing No. 122 at 61.]

More than a year later, on September 5, 2020, Thomas Santelli made a post on Facebook in which he falsely "accused Barry of shooting out Santelli's truck window," falsely "accused Barry of having a criminal conviction," and "threatened Barry by stating he [Santelli] serves on certain task forces."   [Filing No. 122 at 71.]

**H.   This Lawsuit**

Plaintiffs filed their original Complaint in this Court on February 26, 2021.   [Filing No. 1.]   Plaintiffs then amended their Complaint twice, filing the now-operative SAC on July 1, 2021. [Filing No. 122.]   Plaintiffs have taken a kitchen-sink approach to pleading, asserting numerous claims and claims-within-claims against large swaths of defendants.   In the SAC, Plaintiffs assert the following federal claims:

- Count I – 42 U.S.C. § 1983 unreasonable search claim under the Fourth Amendment related to the drone search of Plaintiffs' property during the standoff on March 4, 2019 and home inspections performed by DCS case managers on March 12 and 14, 2019.   Plaintiffs also include related failure-to-intervene claims and *Monell* claims.   [Filing No. 122 at 72-74.]

- Count II – 42 U.S.C. § 1983 Fourth Amendment unreasonable seizure claims on behalf of T.D. and N.D.   [Filing No. 122 at 74-78.]

- Count III – 42 U.S.C. § 1983 Fourth Amendment unreasonable seizure claim on behalf of Barry.   Plaintiffs also include related failure-to-intervene claims and *Monell* claims in this count.   [Filing No. 122 at 78-80.]

20

- Count IV – 42 U.S.C. § 1983 Fourth Amendment property seizure claim relating to Plaintiffs' requests for body camera footage and JM and CHINS records.   [Filing No. 122 at 80-82.]

- Count V – 42 U.S.C. § 1983 substantive due process claim related to the removal of T.D. and N.D. and the forensic interview of T.D.   [Filing No. 122 at 82-83.]

- Count VI – 42 U.S.C. § 1983 procedural due process claims related to JM and CHINS cases and the $500-per-video ordinance.   [Filing No. 122 at 83-84.]

- Count VII – 42 U.S.C. § 1983 First Amendment retaliation claims related to the removal of T.D. and N.D. and First Amendment redress claims related to access to body camera footage and records.   [Filing No. 122 at 84-85.]

- Count VIII – Conspiracy to obstruct justice and to violate Plaintiffs' constitutional rights under 42 U.S.C. §§ 1985(2) and 1985(3) by alleging that Attorney Delamater conspired with Sheriff Nielsen and BCSO Major Stevenson to prevent Barry from having effective counsel in the JM and CHINS proceedings.   [Filing No. 122 at 86.]

- Count IX – Failure-to-prevent conspiracy claims under 42 U.S.C. § 1986 against numerous Defendants because they failed to prevent the conspiracy identified in Count VIII.   [Filing No. 122 at 86-87.]

- Count X - Conspiracy to obstruct justice and to violate Plaintiffs' constitutional rights under 42 U.S.C. §§ 1985(2) and 1985(3) by alleging that certain DCS Defendants conspired with Anonymous Doctor D to draft a letter that Anonymous Doctor D signed finding Kathryn unable to participate in the DCS investigation and thereby denying Kathryn her substantive and procedural due process rights.   [Filing No. 122 at 87-88.]

- Count XI – Conspiracy to obstruct justice and violate Plaintiffs' constitutional rights under 42 U.S.C. §§ 1985(2) and 1985(3) by alleging that certain DCS Defendants conspired with hospital staff at Anonymous Hospital A to "make Kathryn appear mentally incompetent in order to obstruct justice in the JM and CHINS cases," which resulted in constitutional violations.   [Filing No. 122 at 88-89.]

- Count XII – Conspiracy to obstruct justice and violate Plaintiffs' rights under 42 U.S.C. §§ 1985(2) and 1985(3) by alleging that DCS case manager Dillman conspired with Anonymous Social Worker 3 to "prevent[] Kathryn from having any knowledge of the JM and CHINS cases," "prevent[] Kathryn from retaining an attorney to represent her interests in the JM and CHINS cases," and "prevent[] Kathryn from testifying and/or to otherwise present evidence in the JM and CHINS cases."   [Filing No. 122 at 89.]

- Count XIII – 42 U.S.C. § 1986 claim against some of Kathryn's medical-care providers for not preventing the conspiracies identified in Counts X, XI, and XII. [Filing No. 122 at 90-91.]

- Count XIV – Conspiracy claim under 42 U.S.C. § 1985(3) against Attorney Camden for conspiring with the Boone County Commissioners and/or the Boone County Council to make Attorney Camden a witness in this litigation and thus unable to represent Plaintiffs. [Filing No. 122 at 91.]

Plaintiffs also assert the following state-law claims in the SAC:

- Counts II and III – False imprisonment claims related to the standoff and removal of T.D. and N.D. [Filing No. 122 at 74; Filing No. 122 at 78.]

- Count XV – Malicious prosecution claim related to the JM and CHINS cases. [Filing No. 122 at 91-92.]

- Count XVI – Abuse of process claim related to the JM and CHINS cases. [Filing No. 122 at 92-93.]

- Count XVII – Frivolous litigation claim related to the JM and CHINS cases. [Filing No. 122 at 93.]

- Count XVIII – Legal malpractice claim against the Delamater Defendants. [Filing No. 122 at 93-94.]

- Count XIX – Legal malpractice claim against Defendants Julie Camden and the law firm of Camden & Meridew, P.C. (the "Camden Defendants"). [Filing No. 122 at 94-96.]

- Count XX – Defamation claim against Thomas Santelli for Facebook comments about Barry. [Filing No. 122 at 96.]

- Count XXI – Intentional infliction of emotional distress claim related to the standoff and removal of T.D. and N.D. [Filing No. 122 at 96-97.]

- Count XXII – Medical malpractice claims related to Kathryn's care. [Filing No. 122 at 97-98.]

- Count XXIII – False imprisonment claims against Kathryn's medical-care providers. [Filing No. 122 at 98.]

- Count XXIV – Assault and battery claims against Kathryn's medical-care providers. [Filing No. 122 at 99.]

22

- Count XXV – Negligent training, supervision, and retention claims related to Kathryn's medical care.   [Filing No. 122 at 100-102.]

- Count XXVI – Negligent infliction of emotional distress claims against Kathryn's medical-care providers.   [Filing No. 122 at 102.]

- Count XXVII – Intentional infliction of emotional distress claims against Kathryn's medical-care providers.   [Filing No. 122 at 103.]

- Count XXVIII – Respondeat superior claims against the employers of Kathryn's medical-care providers.   [Filing No. 122 at 103-104.]

In addition to monetary damages, the SAC seeks relief in the form of orders requiring the BCSO, DCS, and medical-care providers to provide Plaintiffs with certain requested records. [Filing No. 122 at 104-105.]

### III.
#### SUBJECT-MATTER JURISDICTION

Concerned about potential subject-matter jurisdiction issues, the Court invited the parties to address whether this Court has jurisdiction over Plaintiffs' claims under the *Rooker-Feldman* doctrine.   [Filing No. 106.]   Only the DCS Defendants assert that the doctrine applies to deprive the Court of jurisdiction at this stage of the proceedings,[14] and the DCS Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(1) on this ground.

The DCS Defendants argue that the claims asserted against them in this case, including that they conspired to achieve certain results in the CHINS cases, are inextricably intertwined with state-court orders.   [Filing No. 140 at 10-11.]   They argue that Plaintiffs' alleged injuries with respect to the DCS Defendants stem directly from DCS case managers' conduct following the

---

[14] Some Defendants assert that the doctrine might apply to preclude some claims, but further evidence about the underlying state-court proceedings is necessary for the Court to be able to adjudicate that issue.   [*See, e.g.*, Filing No. 125 at 16; Filing No. 131 at 2 n.1; Filing No. 136 at 13; Filing No. 142 at 3-4; Filing No. 145; Filing No. 148 at 6.]

CHINS proceeding on March 6, 2019, such that claims relating to their conduct necessarily involves an analysis of the propriety of the state court's orders.   [Filing No. 140 at 11.]   The DCS Defendants also cite to Plaintiffs' Trial Rule 60(B) Motion and argue that Plaintiffs "had ample opportunity to be heard by the state court regarding certain claims" and therefore the *Rooker-Feldman* doctrine deprives the Court of jurisdiction.   The DCS Defendants further argue that Plaintiffs are simply trying to recast issues litigated in state court as violations of federal law. [Filing No. 140 at 13.]

In response, Plaintiffs argue that the *Rooker-Feldman* doctrine does not preclude their claims because they are not asking this Court to overturn a state-court judgment.   [Filing No. 150 at 4.]   Plaintiffs also point out that they are alleging conspiracies, which they contend are not barred by the *Rooker-Feldman* doctrine.   [Filing No. 150 at 9.]

In reply, the DCS Defendants cite the state appellate court order rejecting the procedural due process claims raised by Plaintiffs in their Trial Rule 60(B) Motion.   [Filing No. 186 at 4.] They say that Plaintiffs are simply trying to relitigate issues already decided by the state courts. [Filing No. 186 at 4.]

Under the *Rooker-Feldman* doctrine, a federal district court lacks jurisdiction to review the decisions of state courts in civil cases.   *See Gilbert v. Ill. Bd. of Educ.*, 591 F.3d 896, 900 (7th Cir. 2010).   More specifically, the doctrine precludes federal courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments" that "invit[e] district court review and rejection of those judgments."   *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).   The Seventh Circuit has explained that the doctrine "bars federal claims in two instances.   The first involves a plaintiff's request of a federal district court to

24

overturn an adverse state-court judgment.  The second, and more difficult instance involves federal claims that were not raised in state court or do not on their face require a review of a state court's decision." *Brown v. Bowman*, 668 F.3d 437, 442 (7th Cir. 2012) (citing *Taylor v. Fed. Nat'l Mortg. Ass'n*, 374 F.3d 529, 532-33 (7th Cir. 2004)).   In the second instance, which is the scenario presented here, prior case law holds that "*Rooker-Feldman* will act as a jurisdictional bar if those claims are 'inextricably intertwined' with a state court judgment."  *Id.* (quoting *Taylor*, 374 F.3d at 533).   The Seventh Circuit has recently tightened the meaning of "inextricably intertwined" by instructing courts to focus on the "vital question" of "whether the federal plaintiff seeks the alteration of a state court's judgment."  *Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018).

Thus, the *Rooker-Feldman* doctrine is narrow and "does not apply just because a state judgment is relevant (or even decisive) in a federal case." *McCormick v. Goebel*, 2020 WL 2197858, at *3 (N.D. Ind. May 6, 2020).   Rather than the subject-matter jurisdictional bar posed by the *Rooker-Feldman* doctrine, principles of issue preclusion are implicated when a state court has rendered findings relevant to the claims presented in federal court.   The Seventh Circuit has explained: "If a contention in federal litigation is intertwined with the state litigation only in the sense that it entails a factual or legal contention that was, or could have been, presented to the state judge, then the connection between the state and federal cases concerns the rules of preclusion, which are not jurisdictional and are outside the scope of the *Rooker-Feldman* doctrine." *Milchtein*, 880 F.3d at 898.

Here, the answer to the "vital question" is that Plaintiffs are not asking the Court to reverse or alter a state court judgment.  *See id.* at 898.   Thus, their claims fall outside the narrow scope

of the *Rooker-Feldman* doctrine.   *See id.*; *see also Sanders v. Ind. Dep't of Child Servs.*, 806 F. App'x 478, 481 (7th Cir. 2020) (citing *Milchtein* to conclude that a claim that DCS manufactured charges of neglect does not implicate the *Rooker-Feldman* doctrine).   However, as intimated in the parties' briefing on subject-matter jurisdiction, certain aspects of Plaintiffs' claims do implicate the non-jurisdictional matter of issue preclusion.   Those arguments will be considered in analysis of the Rule 12(b)(6) motions below.

In summary, the Court determines that the *Rooker-Feldman* doctrine does not preclude Plaintiffs' claims, and thus the Court has jurisdiction to entertain the pending Rule 12(b)(6) Motions to Dismiss.   The DCS Defendants' Motion to Dismiss, [Filing No. 139], is **DENIED** to the extent it seeks dismissal on lack of subject-matter jurisdiction grounds.

## IV.
### FEDERAL CLAIMS

Turning to the Rule 12(b)(6) arguments, the Court begins with Plaintiffs' federal claims because the state-law claims are dependent upon the Court's exercise of supplemental jurisdiction. 28 U.S.C. § 1367.

### A.   Civil Rights Conspiracy Claims (Counts VIII, IX, X, XI, XII, XIII, XIV)

Plaintiffs bring six counts alleging that various combinations of defendants conspired to obstruct justice and deprive Plaintiffs of their constitutional rights under 42 U.S.C. §§ 1985(2) and (3) and that other defendants failed to prevent such conspiracies under 42 U.S.C. § 1986.   These claims are the only federal claims asserted against the many medical-care providers and the lawyers and law firms sued by Plaintiffs.

Defendants all generally argue that these claims do not meet the pleading standard because Plaintiffs' allegations of conspiracies are conclusory, omitting any allegations showing a meeting

of the minds, and because Plaintiffs have not sufficiently alleged that class-based discrimination motivated any alleged conspiracy.   [*See, e.g.*, Filing No. 125 at 13-14; Filing No. 133 at 16-17; Filing No. 137 at 7-8; Filing No. 140 at 28-29; Filing No. 148 at 25-27.]   They further argue that because the underlying conspiracy claims fail, the failure-to-prevent conspiracy claims must likewise fail.   [Filing No. 125 at 13-14; Filing No. 129 at 7-8; Filing No. 137 at 8-9; Filing No. 140 at 29; Filing No. 148 at 27.]

In response, Plaintiffs argue that they "pled that an agreement was in place and the purpose of the agreement" and that Kathryn's medical records will show that Barry was identified as a member of the LDS Church.   [Filing No. 163 at 2.]   They further contend that although not pled in the SAC, evidence in this case will show that law enforcement personnel referred to Barry's religion during the standoff.   [Filing No. 165 at 17.]   They say their allegations are sufficient because they "have alleged the parties to the conspiracy, the general purpose of the conspiracy, and the proximate date of the conspiracy."   [Filing No. 165 at 16-17.]

To state claims under both § 1985(2) and § 1985(3), a plaintiff must allege, among other things, a class-based discriminatory animus for denying access to courts in the case of § 1985(2) and for depriving the plaintiff of equal protection and privileges and immunities under the law in the case of § 1985(3).   *Kowalski v. Boliker*, 893 F.3d 987, 1000-01 (7th Cir. 2018).   The alleged conspirators must be acting "at least in part" because of plaintiff's membership in a protected class. *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272, 275 (1993).   In other words, 42 U.S.C. § 1985 claims are reserved for conspiracies "motivated by animus on the basis of race or another identifiable class" to prevent the statute from becoming an "all-purpose conspiracy statute."   *Snyder v. Smith*, 7 F. Supp. 3d 842, 870 (S.D. Ind. 2014) (citing *United Bhd. of*

27

*Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 838-39 (1983)).
Accordingly, a plaintiff "must allege facts specific enough to suggest the existence of this type of
motivation underlying [a] [d]efendant's actions." *Tucovic v. Hogan*, 2011 WL 3421418, at *4
(N.D. Ind. Aug. 4, 2011).   A successful § 1985 claim is a prerequisite to a § 1986 failure-to-
prevent claim.   *See Grimes v. Smith*, 776 F.2d 1359, 1363 n.4 (7th Cir. 1985).

Here, Plaintiffs allege in a conclusory fashion that each of the alleged conspiracies were
undertaken because "Barry is a member of the LDS Church and/or because of Kathryn and Barry's
alleged mental illness." [Filing No. 122 at 86-91.]   First, the Seventh Circuit has held that
disabled persons, including disabilities attributable to mental illness, do not constitute a protected
class under § 1985.   *D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1486 (7th Cir. 1985); *Gillo v. Gary
Cmty. Sch. Corp.*, 2016 WL 4592200, at *20 (N.D. Ind. Sept. 2, 2016).

Second, and perhaps more to the point, Plaintiffs do not plead facts showing that
Defendants' actions are attributable to Barry's religious beliefs or Kathryn and Barry's mental
condition sufficient to meet the pleading standard of *Iqbal* and *Twombly*, which requires a plaintiff
to plead "factual allegations [that] plausibly suggest an entitlement to relief" to a degree that rises
"above the speculative level." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)
(quoting *Iqbal*, 556 U.S. at 681 and *Twombly*, 550 U.S. at 555).   "The plausibility standard is not
akin to a probability requirement, but it asks for more than a sheer possibility." *Iqbal*, 556 U.S.
at 678 (internal quotation marks omitted).

Plaintiffs cannot cross the plausibility threshold by simply lodging conspiracy-type
allegations and then conclusively stating, without any factual support, that the conspiracies were
motivated by religious affiliation or some other protected characteristic.   Plaintiffs' conclusory

allegations, without any factual allegations that the alleged conspirators decided to deprive Plaintiffs of legal rights because of Barry's religious affiliation or the couple's mental illnesses, are insufficient.   *See, e.g.*, *Ma v. CVS Pharmacy, Inc.*, 833 F. App'x 10, 14 (7th Cir. 2020) (finding complaint "lacks allegations permitting an inference that the alleged conspirators had a racial or other class-based motive"); *Browne v. Waldo*, 2021 WL 325871, at *5 (N.D. Ind. Feb. 1, 2021) ("[Plaintiff's] conclusory statements that she was discriminated against, without factual allegations showing that this was due to her race or gender, are insufficient.").   The absence of a plausibly pled discriminatory motive sinks Plaintiffs' conspiracy claims.   Therefore, Plaintiffs' 42 U.S.C. § 1985 claims (Counts VIII, X, XI, XII, and XIV) and § 1986 claims (Counts IX and XIII) must fail.

For all of the above reasons, Defendants' Motions to Dismiss, [Filing No. 124; Filing No. 126; Filing No. 128; Filing No. 130; Filing No. 132; Filing No. 134; Filing No. 125; Filing No. 139; Filing No. 141; Filing No. 147], are **GRANTED** as to Counts VIII, IX, X, XI, XII, XIII, and XIV.   Furthermore, while Attorney Camden filed an Answer to the SAC, rather than moving to dismiss, the Court *sua sponte* dismisses Count XIV—the only federal claim asserted against her— for these same reasons.   *See Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997) ("*Sua sponte* 12(b)(6) dismissals are permitted, provided that a sufficient basis for the court's action is evident from the plaintiff's pleading.").

### B.   Section 1983 Claims (Counts I, II, III, IV, V, VI, VII)

The Court will now turn to the remaining federal claims in Counts I, II, III, IV, V, VI, and VII, addressing each in turn.   Each of these seven counts asserts claims under 42 U.S.C. § 1983, which requires a plaintiff to plausibly allege (1) that an action taken by a defendant deprived the

29

plaintiff of a right protected by the Constitution or laws of the United States, and (2) that the defendant acted under color of state law.   *See Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019).

### 1.   *§ 1983 Claims Against DCS*

As a preliminary matter, DCS is not a "person" subject to suit under 42 U.S.C. § 1983.   It is a state agency and is not a person that can be liable for money damages under § 1983.   *See Will v. Mich. Dep't of Soc. Servs.*, 491 U.S. 58, 64 (1989); *Boston v. Ind. Dep't of Child Servs.*, 2021 WL 795452, at *3 (S.D. Ind. Mar. 2, 2021).   Furthermore, as a state agency, DCS enjoys immunity under the Eleventh Amendment.   *Williams v. Ind. Dep't of Child Servs.*, 2019 WL 3003906, at *2 (N.D. Ind. July 9, 2019) ("For the purposes of *Monell* liability, DCS is a state agency and it is well-settled that the Eleventh Amendment prohibits the Court from exercising jurisdiction over it."). This immunity applies to agencies of the state, regardless of the form of relief sought.   *MCI Tel. Corp. v. Ill. Bell. Tel. Co.*, 222 F.3d 323, 336 (7th Cir. 2000).

For these reasons, Plaintiffs' federal claims against DCS must be dismissed.   Therefore, the DCS Defendants' Motion to Dismiss, [Filing No. 139], is **GRANTED** as to the 42 U.S.C. § 1983 claims asserted against it.

### 2.   *Count I – Fourth Amendment Unreasonable Search*

In Count I, Plaintiffs allege three distinct Fourth Amendment search claims based on: (1) the drone search on March 4, 2019; (2) the March 12, 2019 DCS home search; and (3) the March 14, 2019 DCS home search.

### a.   **The Drone Search**

Plaintiffs allege that Zionsville Fire Battalion Chief Jason Potts' flying of a drone over the

Dircks' home and property on March 4, 2019 constituted an illegal search under the Fourth Amendment and that Potts performed the search at the direction of Sheriff Nielsen and BCSO Major Stevenson. [Filing No. 122 at 72-73.] Plaintiffs further allege a failure-to-intervene claim against BCSO Deputies Jonathon Barnes, Anthony Harris, Jeffrey Keller, and Matthew Williams for not stopping the drone search. [Filing No. 122 at 72-74.] Plaintiffs also assert *Monell* claims against the BCSO (*i.e.*, Sheriff Nielsen in his official capacity) for: (1) a CNT policy calling for tight containment of scene to buy time; and (2) inadequate training and policies related to DCS assessments. [Filing No. 122 at 73.] Plaintiffs also allege a *Monell* claim against the Town of Zionsville for inadequate training and policies in connection with DCS assessments. [Filing No. 122 at 73.]

Chief Potts asks the Court to dismiss this claim, contending that aerial observation of an individual's home and curtilage is not a "search" within the meaning of the Fourth Amendment because there is no expectation of privacy as it relates aerial views of property. [Filing No. 129 at 3.] He says that Plaintiffs' claim does not allege that he flew the drone "anywhere other than publicly navigable airspace," and therefore Plaintiffs had no reasonable expectation of privacy. [Filing No. 129 at 3.] Defendant Potts also vaguely suggests that Plaintiffs have not sufficiently alleged that he was a state actor for purposes of liability under 42 U.S.C. § 1983 when he flew the drone. [Filing No. 129 at 2.]

The Boone County Defendants also move to dismiss the claims against Sheriff Nielsen, Major Stevenson, and Deputies Barnes, Harris, Keller, and Williams and incorporate the same lack of "search" argument set forth by Chief Potts, arguing that the drone flight constituted "nonintrusive surveillance" from a place open to the public. [Filing No. 131 at 13.] The Boone

County Defendants also contend that the Order to Compel authorized law enforcement to enter Plaintiffs' property by "all means necessary" to effectuate the order, and that using a drone to effectuate this order was reasonable.   [Filing No. 131 at 13.]   Furthermore, the Boone County Defendants argue that because the drone search claim fails, the failure-to-intervene claims must fail because there is no underlying constitutional deprivation.   [Filing No. 131 at 13-14.]   They contend that the lack of an underlying constitutional deprivation is also fatal to Plaintiffs' *Monell* claims against the BCSO.   [Filing No. 131 at 14.]   Also as to the *Monell* claims, the Boone County Defendants contend that "Plaintiffs don't allege how the stated customs and policies of the [BCSO] caused a fire battalion chief of another public entity to utilize a drone to conduct surveillance on the Dircks' house."   [Filing No. 131 at 14.]

The Zionsville Defendants move to dismiss Count I as well, reinforcing the argument that Chief Potts' drone flight did not constitute a "search," and further noting that Plaintiffs do not allege where exactly the drone was flown, including whether it was flown on or over Plaintiffs' property. [Filing No. 125 at 4-5.]   As for the *Monell* claim, the Zionsville Defendants maintain that Plaintiffs have not met the pleading standard under *Iqbal* and *Twombly*.   [Filing No. 125 at 9-10.]

Plaintiffs respond to the motions with counter arguments.   [Filing No. 165; Filing No. 169; Filing No. 172.]   They argue that Chief Potts was operating the drone not as any citizen but as the Battalion Chief for the Zionsville Fire Department and is therefore a state actor for purposes of § 1983.   [Filing No. 169 at 2.]   Plaintiffs also cite federal law (14 C.F.R. § 107.31) and state law (Ind. Code § 35-33-5-9) and assert that Chief Potts violated these provisions when he flew the drone outside his visual line of site, challenging his assertion that the drone was in permissible airspace.   They say that these regulations distinguish this case from other Fourth Amendment

cases finding that aerial flights above property were not searches because these regulations give Plaintiffs a reasonable expectation of privacy as to the airspace over their home.   [Filing No. 169 at 2-3.]   Plaintiffs also argue that the Order to Compel permitting law enforcement to enter the premises does not defeat their claim because the drone search occurred **before** the Order to Compel was issued.   [Filing No. 169 at 3.]   With regards to the *Monell* claims, Plaintiffs respond that a failure to maintain a formal policy may form the basis of a *Monell* claim.   [Filing No. 172 at 2.]

In reply, Chief Potts argues that the Indiana Code provision cited by Plaintiffs is not applicable to him because he is not a law enforcement officer, but rather a member of a fire department.   [Filing No. 185 at 3.]   Chief Potts further contends that he did not need a warrant for the drone search because he had a reasonable suspicion that the well-being of children was at issue, and the search was objectively reasonable.   [Filing No. 185 at 3-4 (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000)).]   He also reiterates his position that a drone aerial search is not a search for purposes of the Fourth Amendment.[15]   [Filing No. 185 at 5.]   The Boone County Defendants reply by reiterating that the aerial search is not a Fourth Amendment search, [Filing No. 180 at 3], and the Zionsville Defendants reiterate that Plaintiffs have not alleged that the drone was flown on or over their property, [Filing No. 181 at 1].

### i.   Illegal Search Claim against Chief Potts, Sheriff Nielsen, and Major Stevenson

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. amend. IV.

---

[15] Chief Potts also appears to raise a half-hearted qualified immunity defense in his reply brief. [Filing No. 185 at 6.]   However, arguments raised for the first time in a reply brief are waived. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019).   In addition, the argument is not sufficiently developed for the Court's consideration at this time.

"Warrantless searches 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Edwards*, 769 F.3d 509, 513 (7th Cir. 2014) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). Law enforcement did not seek a warrant for the drone here, and Defendants do not argue that an exception to the warrant requirement applies for purposes of their Fed. R. Civ. P. 12(b)(6) motions.   Therefore, the issue before the Court is whether a Fourth Amendment search occurred.

A search under the Fourth Amendment occurs "either when the government physically intrudes without consent upon a constitutionally protected area in order to obtain information," or "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Tuggle*, 4 F.4th 505, 512 (7th Cir. 2021).   The area "immediately surrounding and associated with the home," also known as the "curtilage" of the home, is afforded the broadest protections from searches.   *Florida v. Jardines*, 569 U.S. 1, 6-7 (2013) (citations and quotation marks omitted).   That is so because the "curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (citations and quotations omitted).

In *Dow Chemical Co. v. United States*, 476 U.S. 227 (1986), the Supreme Court held "that the taking of aerial photographs of [a 2,000-acre] industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment." *Id.* at 239.   The Court acknowledged that at that time (in 1986), "the technology of photography has changed in this century," *id.* at 231, and that "[i]t may well be ... that surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant," *Id.* at 283.   The Court then concluded that the

34

photographs of the commercial property in that case were "not so revealing of intimate details as to raise constitutional concerns." *Id.*   In support of that conclusion, the Court noted that "[t]he mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems" because the aerial photography cameras did not raise the "far more serious questions" presented by a device that could "penetrate walls or windows so as to hear and record confidential discussions." *Id.* at 238-39.

On the same day that the Supreme Court issued the *Dow Chemical* decision, the Court held in *California v. Ciraolo*, 476 U.S. 207 (1986), that law enforcement officers did not violate the Fourth Amendment when they observed and photographed the defendant's marijuana plants in a field while flying 1,000 feet overhead in a private plane. *Id.* at 209-10.   The Court explained that although the defendant may have demonstrated a subjective expectation of privacy by erecting fences around the area where the plants were growing, society was not prepared to accept that expectation as reasonable because the government surveilled "within public navigable airspace ... in a physically nonintrusive manner." *Id.* at 213.   In other words, "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *Id.* at 213-14.

A few years after *Dow Chemical* and *Ciraolo*, the Supreme Court issued its decision in *Florida v. Riley*, 488 U.S. 445 (1989), in which the Court found that police observation of a greenhouse within a home's curtilage from a helicopter passing at an altitude of 400 feet did not violate the Fourth Amendment.   The Court stated that "the home and its curtilage are not necessarily protected from inspection that involved no physical invasion" and that, "[a]s a general proposition, the police may see what may be seen from a public vantage point where [they have]

a right to be." *Id.* at 449 (internal quotation marks omitted).   Accordingly, the defendants' expectation of privacy was "not reasonable and not one that society is prepared to honor."  *Id.* (internal quotation marks omitted).

The SAC alleges that Chief Potts, at the direction of Sheriff Nielsen and Major Stevenson, conducted "a drone search of the Plaintiffs' residence and outbuildings" that involved an "intentional search of each window of Plaintiffs' residence and outbuildings" and was "outside of Potts'[] visual line of sight," in violation of federal aerial drone regulations and contrary to Indiana law regarding law enforcement's use of drones.   [Filing No. 122 at 33.]   These allegations distinguish this case from the scenarios presented in *Dow Chemical*, *Ciraolo*, and *Riley*.   *Dow Chemical* and *Ciraolo* are distinguishable because those cases involved airplanes in navigable commercial airspace and commercial property (an industrial facility and a field).   Although *Riley* involved a home's curtilage, it is distinguishable because like the planes at issue in *Dow Chemical* and *Ciraolo*, the helicopter was in airspace where helicopters were allowed to fly.   Here, Plaintiffs have plausibly alleged that the drone was operated in a manner that is not in compliance with federal and state aerial regulations.   Although noncompliance with federal aviation regulations does not itself establish a Fourth Amendment violation, such regulations are relevant to what a person might reasonably expect to occur overhead.  *See Long Lake Twp. v. Maxon*, 2021 WL 1047366, at *6 (Mich. Ct. App. Mar. 18, 2021) (holding that law enforcement aerial drone flights were searches under the Fourth Amendment).

Furthermore, drones are inherently different in character than helicopters and airplanes. They can navigate at lower heights and into intimate spaces, providing views of curtilage not otherwise available from a public vantage point—*i.e.*, into spaces where an individual would

36

reasonably expect privacy.   Indeed, the Seventh Circuit recently observed, in a case concerning law enforcement's use of stationary pole cameras, that drone technology and its increasingly widespread use would undoubtedly raise thorny issues for courts under the Fourth Amendment. *Tuggle*, 4 F.4th at 527-28 ("Today's pole cameras will be tomorrow's body cameras, protracted location tracking using automatic license plate readers, drones, facial recognition, Internet-of-Things and smart devices, and so much more that we cannot even begin to envision.  … [T]hat technological growth will predictably have an inverse and inimical relationship with individual privacy from government intrusion, presenting serious concerns for Fourth Amendment protections.") (internal alterations and quotation marks omitted).

With no bright-line rules about drone use under the Fourth Amendment, the answer to the question of whether a search occurred depends on the analytical "touchstone" of whether Plaintiffs had a "reasonable expectation of privacy" in the areas accessed by the drone.  *See Ciraolo*, 476 U.S. at 211.  This is a fact-intensive inquiry.  The Court finds that Plaintiffs have plausibly alleged that the drone search intruded upon their reasonable expectation of privacy as to the curtilage surrounding their home with allegations that the drone was able to provide views of Plaintiffs' windows and around their home and outbuildings in a manner not otherwise accessible to the public.  Whether Plaintiffs can ultimately prove that a Fourth Amendment search and violation occurred will depend on the evidence, including heights and locations achieved by the drone during its flight, but at this juncture, the Court cannot say that they have failed to plausibly allege a claim.

The Court rejects Chief Potts' contention that Plaintiffs have not sufficiently pled that he was acting under the color of state law.   When an individual acts at the direction of a government

agent, the search implicates the Fourth Amendment.  *See Skinner v. Railway Labor Execs. Ass'n*, 489 U.S. 602, 614-15 (1989).   Plaintiffs allege that Chief Potts arrived at the scene in aid of a law enforcement response being led by the BCSO "with a SRT callout."   [Filing No. 122 at 33.]   Such allegations are sufficient to allege that Chief Potts was a state actor.

Likewise, Chief Potts' invocation of the "reasonable suspicion" standard in his reply brief is misguided.   The reasonable suspicion standard applies to seizures and pat-downs of individuals, not searches of a home and its curtilage.  *See Terry v. Ohio*, 392 U.S. 1, 27 (1968).   The reference to "reasonable suspicion" in *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), relates to a substantive due process claim concerning the removal of children, not a search of a home and its curtilage.  *Id.* at 1019.

Finally, the state court's issuance of the Order to Compel does not bar this claim from going forward because Plaintiffs' SAC alleges that the Order to Compel was issued after Chief Potts began his drone search.

Having found that Plaintiffs have pled a Fourth Amendment claim for the drone search, the Court turns to the individual involvement of the three defendants identified by Plaintiffs: Chief Potts, Sheriff Nielsen, and Major Stevenson.   For a defendant to be held liable under 42 U.S.C. § 1983, he or she must have been personally involved in the constitutional violation.  *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018).   A high-ranking official cannot be held liable under § 1983 simply because he or she oversees operations or supervises lower-ranking actors.  *See Burks v. Raemish*, 555 F.3d 592, 596 (7th Cir. 2009).   A defendant will be deemed to have sufficient personal responsibility for a violation if it occurred "at a defendant's direction" or with his "knowledge or consent."  *Mitchell*, 895 F.3d at 498.

Here, Chief Potts' involvement is obvious—he operated the drone.   Plaintiffs allege that Sheriff Nielsen and Major Stevenson were involved because they "directed and conspired with Potts" to conduct the drone search.   [Filing No. 122 at 72.]   Plaintiffs also allege that Chief Potts was "assisting BCSO with a SRT callout" and that he provided the video of the drone flight to BCSO.   [Filing No. 122 at 33-34.]   These allegations, while minimal, are sufficient to allege that Sheriff Nielsen and Major Stevenson participated in the drone search by directing Chief Potts to conduct the aerial search as part of the SRT response.   *See Mitchell*, 895 F.3d at 498.

Therefore, the Boone County Defendants', [Filing No. 130], the Zionsville Defendants', [Filing No. 124], and Chief Potts', [Filing No. 128], Motions to Dismiss are **DENIED** with respect to the individual § 1983 claims in Count I against Chief Potts, Sheriff Nielsen, and Major Stevenson related to the drone search.

ii.   Failure to Intervene

The Seventh Circuit has held that "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994).   "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if [1] that officer had reason to know … that any constitutional violation has been committed by a law enforcement official; *and* [2] the officer had a realistic opportunity to prevent the harm from occurring." *Id.* (emphasis original).

Plaintiffs allege that BCSO Deputies Barnes, Harris, Keller, and Williams failed to intervene in connection with the drone search, but at no point in the SAC do Plaintiffs allege that these defendants were involved in or otherwise had knowledge of the drone search or allege facts

describing how they had an opportunity to prevent the drone search.   Plaintiffs only provide the conclusory allegation that "Barnes, Harris, Keller, and Williams failed to intervene in the unreasonable drone search."   [Filing No. 122 at 72.]   The only allegations potentially addressing these defendants and the drone search is that they had responded to the scene at the time of the drone search.   [*See* Filing No. 122 at 28; Filing No. 122 at 30; Filing No. 122 at 32.]   There is not even an allegation that any of these defendants observed the drone, let alone that any could have or should have intervened.   As the Seventh Circuit has explained, "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).   *See also* *Atkins v. Hasan,* 2015 WL 3862724, at *2 (N.D. Ill. June 22, 2015) (dismissing claims that offered "no clues as to whether, for the particular conduct described, plaintiffs assert that each and every one of the defendants engaged in that conduct").   Plaintiffs have not pled facts describing how Deputies Barnes, Harris, Keller, and Williams could have stopped the drone search from occurring or what conduct was wrongful.

Therefore, the Boone County Defendants' Motion to Dismiss, [Filing No. 139], is **GRANTED** with respect to the Count I failure-to-intervene claims against BCSO Deputies Barnes, Harris, Keller, and Williams.

### iii.   *Monell* Claims

Plaintiffs also assert *Monell* claims against the Town of Zionsville and Sheriff Nielsen in his official capacity.   The claim against Sheriff Nielsen is treated as a claim against the BCSO. *See* *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008); *Zencka v. Lake Cnty., Ind.*, 2016 WL 2984285, at *2 (N.D. Ind. May 24, 2016).   The case of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny provide three ways in which a municipality's policy, practice,

and customs can violate an individual's civil rights: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (citation and internal quotation marks omitted).   Furthermore, to be liable, a municipality's policy, practice, or custom must cause the constitutional violation—*i.e.*, be the "moving force" behind the alleged constitutional deprivation.  *Grieveson*, 538 F.3d at 771.   "This rigorous causation standard requires a direct causal link between the challenged municipal actions [or inactions] and the violation of the plaintiff's constitutional rights." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (internal alterations and quotation marks omitted).  To survive a motion to dismiss, a plaintiff's *Monell* allegations must allow the court "to draw the reasonable inference that the [municipality] maintained a policy, custom, or practice" that caused the deprivation of plaintiff's rights.  *McCauley*, 671 F.3d at 618 (internal quotation marks omitted).

Plaintiffs here allege that the BCSO's official CNT policy of "achiev[ing] tight containment" to "buy time" to "gain a tactical advantage" caused the unconstitutional drone search. [Filing No. 122 at 73.]  They further allege that the BCSO is liable under *Monell* because of two alleged customs: (1) "not providing adequate training for joint assessments with DCS regarding Child Abuse or Neglect Intake Reports ('CA/N Intake Reports')"; and "(2) not maintaining a policy of procedures with the local DCS office regarding joint assessments of CA/N Intake Reports." [Filing No. 122 at 73.]   Plaintiffs likewise allege that the Town of Zionsville is liable under *Monell*

for the same two customs of not providing training or policies regarding CA/N Intake Reports. [Filing No. 122 at 73.]

As for the BCSO policy of CNT obtaining "tight containment," Plaintiffs do not set forth allegations that plausibly suggest that the policy *caused* the drone search.   *See Johnson v. Cook Cnty.*, 526 F. App'x 692, 695 (7th Cir. 2013) (dismissing *Monell* claim where plaintiff failed to sufficiently allege that a jail's practice of not sufficiently supervising inmates was the "moving force" behind plaintiff's sexual assault while in jail).   Instead, they simply identify a policy, which has nothing to do with searches, much less drone searches, and conclusively allege that it caused the alleged deprivation.   Such conclusory allegations are insufficient to survive a Rule 12(b)(6) motion.   *See, e.g.*, *Carmona v. City of Chicago*, 2018 WL 306664, at *3 (N.D. Ill. Jan. 5, 2018) ("Plaintiff cannot merely generally allege that the City broadly had a policy that led to officer misconduct—he must allege some factual details about the nature of the policy and how that policy led to his alleged constitutional violation.")

Plaintiffs' claims concerning the BCSO's and the Town of Zionsville's alleged "customs" of not providing adequate training and procedures for CA/N Intake Reports fail for the same reason—they fail to plausibly allege that the customs caused the unconstitutional drone search. The allegations are mere boilerplate, fail to articulate what specific training and procedures were lacking, and fail to support an inference that the alleged lack of training and written procedures caused the drone search.   Furthermore, when it comes to "customs" under *Monell*, a plaintiff "must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).   "At the pleading stage, then, a plaintiff pursuing this theory must allege facts that permit the reasonable

inference that the practice is so widespread so as to constitute a governmental custom." *Id.*   The SAC fails to do so.   It does not provide examples of other Zionsville officers or BCSO deputies taking actions similar to the drone search complained of here.   And, "[m]ore importantly," Plaintiffs "do[] not plausibly allege that such examples exist."   *See id; see also Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) (explaining that "isolated acts of misconduct will not suffice").

Plaintiffs' citation to *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017), to argue that the BCSO's and the Town Zionsville's failure to have formal policies and procedures regarding CA/N Intake Reports gives rise to a *Monell* claim is misplaced.   It is true that inaction can give rise to a *Monell* claim if it "reflects a conscious decision not to take action," *id.* at 381, but the Seventh Circuit has made clear that in such instances a plaintiff still must plead facts to satisfy the causation requirement, *Dean*, 18 F.4th at 236 (describing causation as an "indispensable perquisite[]").

In sum, Plaintiffs' *Monell* allegations are boilerplate and conclusory.   Plaintiffs have merely "repeated all of the trigger words required of a *Monell* claim" without underlying facts that connect the policy to the alleged deprivation.   *See Carmona*, 2018 WL 306664, at *4 (alteration and quotation mark omitted).

Therefore, the Court **GRANTS** the Zionsville Defendants' Motion to Dismiss, [Filing No. 124], and the Boone County Defendants' Motion to Dismiss, [Filing No. 130], with respect to the *Monell* claims asserted against the BCSO and the Town of Zionsville related to the drone search.

**b.   The March 12, 2019 Home Search**

Plaintiffs next contend that a March 12, 2019 home search performed by DCS case

managers Alexandra Dillman and Amber Hedges was an illegal search.   Plaintiffs allege that DCS case managers "Dillman and Hedges searched and inspected Kathryn and Barry's residence without a court order[] and determined it to be appropriate with working utilities and plenty of food." [Filing No. 122 at 56.]   They further allege that Dillman and Hedges "searched Plaintiffs' residence under duress," and that "Kathryn was never notified of the search and did not consent to the search." [Filing No. 122 at 73.]

The DCS Defendants move to dismiss this claim, arguing the home inspection was lawful because by this time, T.D. and N.D. were subjects of CHINS proceedings.   [Filing No. 140 at 24-25.]   Given the children's status, the DCS Defendants argue, it is not unreasonable for the Dircks household to be subject to unannounced inspections, and therefore the DCS Defendants are entitled to qualified immunity. [Filing No. 140 at 25.]

Plaintiffs respond that while the Order to Compel authorized entry into the home, that order expired prior to the March 12, 2019 search, and "the court never issued another order granting the Defendants access." [Filing No. 166 at 4.]   They further argue that the search of the residence was not reasonable. [Filing No. 166 at 3-4.]

In reply, the DCS Defendants reiterate that Plaintiffs have not pled a claim that the home search violated clearly established law, and therefore they are entitled to qualified immunity. [Filing No. 186 at 6.]

The Seventh Circuit has made clear that it is unconstitutional for child services caseworkers to search a home without a warrant, court order, probable cause, consent, or exigent circumstances. *See Brokaw*, 235 F.3d at 1010 n.4; *Doe v. Heck*, 327 F.3d 492, 509-10 (7th Cir. 2003).   Plaintiffs tacitly acknowledge in their SAC that Barry consented to the search of his home but then allege

that he permitted it under "duress."[16]   [Filing No. 122 at 73.]   The SAC states that Barry knew of the scheduled March 12 visit and had "asked [Attorney] Camden to be present during the search but she told him it was not necessary," allegations which are inimical with duress.   [Filing No. 122 at 56.]   Indeed, the SAC does not detail the manner in which Ms. Dillman and Ms. Hedges were able to enter Plaintiffs' home if they did not have consent.   Plaintiffs allege no facts or circumstances about the alleged duress and instead only plead duress in the most conclusory fashion.   [Filing No. 122 at 73 ("Dillman and Hedges searched Plaintiffs' residence under duress and without a court order on March 12, 2019.").]   To meet the *Iqbal* and *Twombly* plausibility standard, a plaintiff must "provide some specific facts to support the legal claims asserted in the complaint."   *McCauley*, 671 F.3d at 616 (internal quotation marks and alteration omitted).   "The degrees of specificity required is not easily quantified, but 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.'"   *Id.* (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

The conclusory pleading offered by Plaintiffs here does not meet the plausibility standard set forth in *Iqbal* and *Twombly* because it does not present a story that holds together.   Plaintiffs here conclusively allege, without any details, that permission for the search was provided under duress.   That is not enough post *Iqbal* and *Twombly*.   *See, e.g.*, *Worst v. City of Chicago*, 2011 WL 3349818, at *3 (N.D. Ill. Aug. 2, 2011) (dismissing Fourth Amendment claims where "[a]lthough Plaintiffs allege in a conclusory fashion that the permission was given under duress, Plaintiffs have not alleged allegations to plausibly suggest duress").   Furthermore, Kathryn's

---

[16] Even though the DCS Defendants did not raise the consent issue in the clearest of manners, the Court is permitted to *sua sponte* dismiss a claim under Fed. R. Civ. P. 12(b)(6).   *Ledford*, 105 F.3d at 356.

consent was not needed.  *See United States v. Duran*, 957 F.2d 499, 503 (7th Cir. 1992) ("[T]he consent of one who possesses common authority over the premises is valid as against the absent, nonconsenting person with whom that authority is shared.") (internal alterations and quotation marks omitted).

Therefore, the Court **GRANTS** the DCS Defendants' Motion to Dismiss, [Filing No. 139], with respect to the March 12, 2019 search.

### c.  The March 14, 2019 Home Search

Finally, Plaintiffs allege that on March 14, 2019—the day T.D. and N.D. were returned to Plaintiffs—DCS case managers Dillman and Pruett illegally searched Plaintiffs' home.  This claim suffers from similar pleading problems as the alleged March 12, 2019 home search.  The sum of the allegations regarding this alleged search is as follows:  "Dillman and Pruett searched Plaintiffs' residence again on March 14, 2019, despite finding two days prior the home was appropriate.  Kathryn and Barry were not present during the search, did not consent to the search, and were not notified of the search."  [Filing No. 122 at 73.]  Plaintiffs provide no information about how Ms. Dillman and Ms. Pruett were able to gain access to the home if entry was not permissive, nor what was searched or how the alleged search was conducted.  Given the conclusory nature of Plaintiffs' allegations about this purported search, *Iqbal* and *Twombly* also require dismissal of this claim.

Therefore, the Court **GRANTS** the DCS Defendants' Motion to Dismiss, [Filing No. 139], with respect to the claims concerning the March 14, 2019 search.

### 3.  *Count II – Fourth Amendment Seizure of T.D. and N.D.*

Count II contains two claims: (1) an unreasonable seizure claim[17] under the Fourth Amendment related to the seizure of T.D. and N.D. when they were taken from the home on March 4, 2019 until the emergency hearing on March 6, 2019; and (2) excessive force claims relating to the law enforcement presence and use of sniper rifles during the stand-off, as well as an allegation that after the emergency hearing on March 6, 2019, T.D. and N.D. were restrained with excessive force.  [Filing No. 122 at 74-78.]  Also purportedly included within Count II is a failure-to-intervene claim against numerous individuals and *Monell* claims alleging that the BCSO, the City of Lebanon, the Town of Zionsville, the Town of Whitestown, and the Town of Thorntown are liable for inadequate training related to DCS assessments.   [Filing No. 122 at 78.]

T.D. and N.D.'s claims belong to them, not their parents.   And, as explained in a prior Order to Show Cause issued by this Court, [Filing No. 201], Barry and Kathryn cannot represent their minor children *pro se*.  *See Elustra v. Mineo*, 595 F.3d 699, 705 (7th Cir. 2010).   Counsel have not appeared on behalf of T.D. and N.D.   As the Court has explained in a separate order, T.D.'s and N.D.'s claims, including those asserted in Count II, are dismissed without prejudice.

### 4. Count III – Fourth Amendment Seizure of Barry

This count alleges that Barry was subject to an unreasonable seizure[18] under the Fourth Amendment on March 4, 2019 when law enforcement responded to his home with SRT and CNT teams.   Barry alleges that he was "seized" within the meaning of the Fourth Amendment by the

---

[17] Plaintiffs also purported to assert a state-law false imprisonment claim in Count II on behalf of T.D. and N.D which is also dismissed without prejudice.

[18] Plaintiffs also assert a false imprisonment claim in Count III but have since withdrawn that claim as to all Defendants except the Boone County Defendants and the Lebanon Defendants. [Filing No. 169 at 5; Filing No. 171 at 5; Filing No. 172 at 4.]

following actions: (1) Sheriff Nielsen and BCSO Major Stevenson calling the SRT and CNT teams to his home; (2) Sheriff Nielson, BCSO Major Stevenson, and Deputy Barnes placing barricades on the road near his home; (3) the use of an armored personnel carrier; (4) Sheriff Nielsen, BCSO Corporal Brad Dunn, and BCSO Captain Jeffrey Keller communicating with Barry via text message; (5) BCSO Sergeant Christopher Burcham, BCSO Sergeant Ryan Musgrave, Lebanon Police Sergeant Ted Boling, and Zionsville Police Officer Aaron Shook aiming sniper rifles at Barry's home; (6) Chief Potts utilizing the drone to search his property; and (7) Sheriff Nielsen ordering that Barry be surveilled until March 6, 2019.   [Filing No. 122 at 78-79.]   Plaintiffs further allege that the use of an armored personnel carrier and the presence of snipers were unreasonable.   [Filing No. 122 at 78-79.]   Also included within Count III is a related failure-to-intervene claim against numerous individuals and *Monell* claims alleging that the BCSO, the City of Lebanon, the Town of Zionsville, and the Town of Whitestown are liable for inadequate training and policies related to DCS assessments.   [Filing No. 122 at 79-80.]

### a.   Seizure Claim Against Sheriff Nielsen, Stevenson, Barnes, Dunn, Keller, Burcham, Musgrave, Boling, Shook, and Potts

In their Motion to Dismiss, the Boone County Defendants argue that Barry was not "seized" under the Fourth Amendment.   [Filing No. 131 at 15.]   They argue that sending out specialty law enforcement units and texting do not amount to seizures.   [Filing No. 131 at 15-16.]   And they contend that, while a display of weapons, such as the sniper rifles alleged in the SAC, could potentially result in a seizure, Barry has pled himself out of this claim by elsewhere acknowledging that he understood that he was free to leave his home, and, indeed, law enforcement officers wanted him to do so.   [Filing No. 131 at 16.]   Under the totality of these circumstances, the Boone County Defendants argue, Barry was not seized.   [Filing No. 131 at 16.]

The Lebanon Defendants argue in their Motion to Dismiss that, with respect to Sergeant Boling, Barry has pled himself out of his claim by elsewhere in the SAC making it clear that Barry knew he was free to come out of his house, and in fact, law enforcement wanted him to do so to check on the minor children. [Filing No. 136 at 11.] The Lebanon Defendants argue that it is unreasonable for Barry to believe he was not free to leave when law enforcement expressly told him that their sole reason for being present at the scene was to check on T.D. and N.D. [Filing No. 136 at 11-12.]

As for Officer Shook, the Zionsville Defendants also argue that Barry has pled himself out of a claim by elsewhere alleging that law enforcement officials told Barry that "they just wanted to talk, ask[ed] for the Plaintiffs' children to be sent outside, [and] t[old] Barry car seats were available for the children (to freely leave the home)." [Filing No. 125 at 8.] These allegations, the Zionsville Defendants argue, show that Barry was not restricted in his movement. [Filing No. 125 at 8.]

Chief Potts argues that, if anything, the use of the drone was a search (as Plaintiffs allege in Count I), not a seizure. [Filing No. 129 at 5-6.] He argues the allegations against him in Count III are insufficient to plead a seizure under *Iqbal* and *Twombly*. [Filing No. 129 at 6.]

Plaintiffs respond by disputing that Barry was free to leave the premises, noting that the SAC alleges that Barry received other communications from law enforcement stating that they wanted to "discuss the situation 'that had been going on with his wife,'" and that they "needed to make sure there was 'nothing criminal here.'" [Filing No. 165 at 6.] Plaintiffs further argue that even if Defendants wanted Barry to come out of the house rather than stay inside, Barry was seized because "Defendants were controlling the movements of the occupants of Plaintiffs' home."

[Filing No. 165 at 6.]   Although not alleged in the SAC, Plaintiffs further contend that body camera evidence will show "Sheriff Nielsen stating [that] Barry was not allowed to come out of the house without his permission and [that] at one point [Sheriff Nielsen] intended to handcuff the adults when they came out of the residence."   [Filing No. 165 at 6-7.]   Plaintiffs also cite *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020), for the proposition that law enforcement officers should approach mentally ill people differently than those suspected of crimes.   [Filing No. 165 at 8.]

In reply, the Boone County Defendants point out that Barry was not aware of statements derived from body camera footage at the time of the incident, and these alleged statements are irrelevant to the determination of whether Barry was seized.   [Filing No. 180 at 4.]   They reiterate that the allegations in the SAC reveal that law enforcement wanted Barry to come out of the house, not stay in it.   [Filing No. 180 at 4.]

In their reply, the Lebanon Defendants argue that Plaintiffs' allegations fall below the pleading standard because the SAC "does not plead how long in terms [of] seconds, minutes or hours [Officer] Boling pointed a gun at the house" nor does it plead "Boling's position or physical distance from the house when the gun was pointed" and "does not even plead that Barry saw the gun and was therefore deterred from coming outside the house."   [Filing No. 183 at 4-5.]

The Zionsville Defendants and Chief Potts reply that the drone did not restrict Barry's movement, nor have Plaintiffs pled as much.   [Filing No. 181 at 1-2; Filing No. 185 at 7.]

i. <u>Seizure</u>

For a plaintiff to state a Fourth Amendment seizure claim, he must plausibly allege that (1) the defendant's conduct constituted a "seizure," and (2) the seizure, if one occurred, was

"unreasonable." *See Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994). An officer's conduct "may be unreasonable, unjustified, or outrageous, but it is not prohibited by the Fourth Amendment unless it involves a seizure." *Price v. Marion Cnty. Sheriff's Dep't*, 2013 WL 5321260, at *6 (S.D. Ind. Sept. 23, 2013) (citing *Kernats*, 35 F.3d at 1177).

"A seizure occurs when, considering all of the circumstances, a reasonable person would not feel free to leave, decline the officers' requests, or otherwise terminate the encounter." *United States v. Palomino-Chavez*, 761 F. App'x 637, 642 (7th Cir. 2019). In *United States v. Mendenhall*, 446 U.S. 544 (1980), the Supreme Court applied a multi-factor test to assess whether, from an objective perspective, a police interaction overcame an individual's free will, resulting in a seizure. Relevant factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. The Seventh Circuit has also considered "whether the officers made statements intimating that [the individual] was a suspect of a crime, or informed the suspect that he or she was free to leave." *Palomino-Chavez*, 761 F. App'x at 642 (internal quotation marks omitted). Furthermore, "when a seizure is accomplished by a show of authority, submission is required." *Smith v. City of Chicago*, 3 F.4th 332, 340 (7th Cir. 2021); *see also United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("While an officer's application of physical force always constitutes a seizure, a 'show of authority' alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority.").

A home standoff situation like that at issue here does not fit neatly into the free-to-leave and submission paradigms because: (1) the individual at the center of the standoff has no intention

of leaving the home; and (2) the refusal to acquiesce to orders to leave the home suggests the individual has not "submitted" to authority.

The most relevant Seventh Circuit authority located by this Court addressing some of these questions is *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994), which, unfortunately does not provide clear answers.   In *Kernats*, a landlord obtained an order of possession from a state court and ordered the tenants to leave the premises.   *Id.* at 1173.   When they failed to leave, the landlord called police.   *Id.* at 1174.   Police Officer O'Sullivan arrived at the premises and ordered the tenants to leave by the end of the day or face arrest.   *Id.*   Fearing, arrest, they complied, but filed a civil rights suit alleging that Officer O'Sullivan unreasonably seized them.   *Id.*   On a motion to dismiss, the district court found that the plaintiffs had not alleged a seizure and dismissed the suit.   On appeal, the Seventh Circuit could not agree regarding whether a seizure had occurred, but nonetheless concluded that the claim could be properly dismissed on qualified immunity grounds because of the lack of precedent.   *Id.* at 1181 ("[T]aking into account the totality of our inquiry, we cannot say that the law is clear that O'Sullivan's command, coupled with an arrest threat, constituted a seizure under the Fourth Amendment.").   Before reaching that conclusion, however, the Seventh Circuit reviewed seizure law and found "two overarching themes" from the cases: "(1) the nature and degree of official inducement, and (2) the extent of the restriction on the citizen's desired freedom of movement."   *Id.* at 1178.

District courts in the Seventh Circuit have reached differing conclusions regarding whether a standoff situation is a seizure when an individual does not attempt to leave the home.   In *Estate of Escobedo v. City of Fort Wayne*, 2008 WL 1971405 (N.D. Ind. 2008), the court, in ruling on a summary judgment motion, held that establishing a perimeter around an individual's apartment

during a standoff was a seizure.   The court found that "[a] reasonable person would certainly have been threatened by the presence of snipers, armor-clad [emergency response team] officers carrying shotguns, pistols, or submachine guns, a mobile command center next to the apartment building, and numerous uniformed officers around the building." *Id.* at *21.   These "circumstances ... indicat[ed] a seizure, even where the person did not attempt to leave." *Id.* (citing *Mendenhall*, 446 U.S. at 554).   The court framed the free-to-leave question as to whether the barricaded individual was "immediately confined to a small space with no viable means of otherwise terminating the encounter." *Id.* at *23.   The court held that the individual "yielded or submitted because he was unable to move about as he wished as a result of police intentionally applying means (officers, [Emergency Response Team], armored car, tear gas) to restrain his freedom of movement." *Id.* at *23.   The court likened this behavior to "when an individual's submission to a show of governmental authority takes the form of passive acquiescence." *Id.* (citing *Brendlin*, 551 U.S. at 255).

On the other hand, in *Price v. Marion Cnty. Sheriff's Dep't*, 2013 WL 5321260 (S.D. Ind. Sept. 23, 2013), the court, in considering a summary judgment motion, found that no seizure occurred when law enforcement surrounded the plaintiff's home because the plaintiff never actually submitted to officers' orders to exit his home. *Id.* at *7.   The court found that the officer "did not limit [the plaintiff's] desired movement to give rise to a seizure; instead, [plaintiff] freely moved from the driveway, to the backyard, to inside the house, to the front porch, and ultimately to the basement." *Id.* at *8.   And the court noted that the officers were stationed far away such that plaintiff had access to "the entire residence and its surrounding curtilage." *Id.* at *8.   The court distinguished *Escobedo* as follows:

First, the magnitude and length of response by the police in *Escobedo* far dwarfs the response at issue here.   The standoff in *Escobedo* lasted for hours, with extensive negotiations, and ultimately led to police entering the apartment by force. By contrast, Price never engaged in controlled talks but instead shouted obscenities, hurled projectiles, and lit the house on fire.   Because of this defiant behavior, police were never able to enter the Residence.   At bottom, Price's behavior was anything but a form of "passive acquiescence"; rather, he actively resisted arrest.

Moreover, Price's situation involved an intense, unstable environment which lasted a fraction of the time in *Escobedo.*

*Id.* at *8-9.

Here, the circumstances are more like those present in *Escobedo* than those in *Price*. Plaintiffs allege that law enforcement showed authority by virtue of a robust law enforcement presence, roadblocks leading up to the house, and pointing sniper guns in the direction of the home as part of a saga that lasted for hours.   Plaintiffs also allege that an armored personnel carrier was at their property.   Furthermore, Plaintiffs allege that Barry received communications from law enforcement that they needed to make sure there was "nothing criminal here," suggesting that Barry was being investigated for a crime and that Barry and the children should come out of the home.   Under these circumstances, Plaintiffs have plausibly alleged that a reasonable person would not feel free to go about his or her business.   *See Mendenhall*, 446 U.S. at 554.   Even though Barry did not attempt to leave, these allegations plausibly allege that a reasonable person would have interpreted these actions by law enforcement as confining Barry to his property for the duration of the standoff with "no viable means of otherwise terminating the encounter."   *See Escobedo*, 2008 WL 1971405, at *21.   And, like *Escobedo*, Plaintiffs have plausibly alleged that Barry "yielded or submitted" to law enforcement because he was "unable to move about as he wished as a result of police."   *Id.* at *23; *see also Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002) ("The district court concluded that Mr. Lekan was not seized, because by

barricading himself in his home he never submitted to official authority.   This conclusion was in error.   There can be little question under the circumstances that Mr. Lekan was not free to leave.").

Therefore, at this preliminary pleading stage, Plaintiffs have plausibly alleged that Barry was seized within the meaning of the Fourth Amendment.

However, to the extent that Plaintiffs are alleging that the drone search and police surveillance of Barry following the March 4, 2019 standoff constitutes seizures, the Court rejects those claims.   First, as discussed with respect to Count I above, the Court agrees with the Zionsville Defendants and Chief Potts that the drone flight is more properly characterized as a search, not a seizure.     In any event, Plaintiffs do not provide any facts that plausibly suggest that the drone flight restricted Barry's comings and goings.   Second, surveillance by following Barry's vehicle is not a seizure, *see, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991) (seizure requires a "show of authority" and submission), and Plaintiffs do not provide facts plausibly suggesting that this alleged surveillance restricted Barry's movements.   These aspects of Plaintiffs' claim are **DISMISSED** because Plaintiffs have not plausibly alleged that these actions constituted a seizure.

ii.   Reasonableness

A Fourth Amendment inquiry does not end with a finding of a seizure, a plaintiff must also plausibly allege that the seizure was unreasonable.   *See Kernats*, 35 F.3d at 1177.   "[A] seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy."   *Brokaw*, 235 F.3d at 1010 (internal quotation marks and citation omitted).

Here, the state court issued an Order to Compel, which authorized law enforcement, in carrying out the order to "enter the home and property … to determine the welfare and safety of all individuals," by "any [and] all means necessary and appropriate."   [Filing No. 76-1.] However, the Court lacks information about the timeline of when the court issued the Order to Compel and the events giving rise to Barry' seizure.   Barry's seizure may well have been reasonable, but those facts are not before the Court on the Motions to Dismiss.

For the above reasons, Barry's unlawful seizure claim will proceed as to Defendants Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, Sergeant Musgrave, Sergeant Boling, and Officer Shook related to the extensive police presence, communications, barricades, use of armored personnel carrier, and display of rifles during the standoff on March 4, 2019.   The Boone County Defendants' Motion to Dismiss, [Filing No. 130], the Lebanon Defendants' Motion to Dismiss, [Filing No. 134], and the Zionsville Defendants' Motion to Dismiss, [Filing No. 124], are **DENIED** as to Count III with respect to Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, Sergeant Musgrave, Sergeant Boling, and Officer Shook.   Captain Potts' Motion to Dismiss, [Filing No. 128], is **GRANTED** as to Count III, and the Boone County Defendants' Motion to Dismiss, [Filing No. 130], is **GRANTED** as to claims concerning post-March 4, 2019 surveillance of Barry.

> ### b.   <u>Failure-to-Intervene Claim Against Michael Beard, Bonds, Cravens, Fouts, Golladay, Harris, Hatfield, Taylor Nielsen, Reynolds, Shively, Stewart, Williams, Edwards, Phelps, Scott, Williamson, King, Root, Dennemann, Kiefer, Klykken, Sterling, and White</u>

Plaintiffs allege that these Defendants, all law enforcement officers, "either individually participated [in] or failed to intervene in the seizure of Barry even though they knew Barry was

not under criminal investigation." [Filing No. 122 at 79.]   As discussed above in connection with the failure-to-intervene claim in Count I, such conclusory allegations cannot withstand a motion to dismiss.  *See Atkins,* 2015 WL 3862724, at *2.   Plaintiffs provide no details about what each of these Defendants knew about what other law enforcement officers were doing or what they could have done to prevent Barry's seizure and instead allege they are "unable to plead any further supporting facts" because they lack documentation or body camera footage.  [Filing No. 122 at 79.]   But such a contention does not relieve Plaintiffs from their pleading obligations, and therefore this claim will be dismissed.

The Motions to Dismiss, [Filing No. 124; Filing No. 130; Filing No. 132; Filing No. 134], are **GRANTED** with respect to Count III's failure-to-intervene claims against Defendants Michael Beard, Bonds, Cravens, Fouts, Golladay, Harris, Hatfield, Taylor Nielsen, Reynolds, Shively, Stewart, Williams, Edwards, Phelps, Scott, Williamson, King, Root, Dennemann, Kiefer, Klykken, Sterling, and White.

### c.  *Monell* **Claims**

Plaintiffs also assert *Monell* claims in relation to Barry's seizure against the BCSO (*i.e.*, Sheriff Nielsen in his official capacity), the City of Lebanon, the Town of Whitestown, and the Town of Zionsville.  [Filing No. 122 at 79-80.]   Plaintiffs allege that each of these municipalities are liable under *Monell* because of two alleged customs: (1) "not providing adequate training for joint assessments with DCS regarding Child Abuse or Neglect Intake Reports ('CA/N Intake Reports')"; and (2) "not maintaining a policy of procedures with the local DCS office regarding joint assessments of CA/N Intake Reports."  [Filing No. 122 at 79-80.]

Plaintiffs face the same pleading shortfalls here as they did with respect to Count I's *Monell*

claims.   Plaintiffs have failed to plausibly allege that the customs caused the deprivation at issue.

The allegations are mere boilerplate (in fact, they are identical to the allegations in Count I), fail

to articulate what specific training and procedures were lacking, and fail to support the inference

that the alleged lack of training and written procedures caused the seizure of Barry.   Nor have

Plaintiffs provided allegations that the complained of deprivation was not an isolated incident.

*See Palmer*, 327 F.3d at 596.

Therefore, the Court **GRANTS** the Motions to Dismiss, [Filing No. 124; Filing No. 130;

Filing No. 132; Filing No. 134], with respect to the *Monell* claims asserted in Count III against the

BCSO, the City of Lebanon, the Town of Whitestown, and the Town of Zionsville.

### 5.   Count IV – Fourth Amendment Seizure of Property

Count IV alleges that certain officials seized Plaintiffs' property in violation of the Fourth

Amendment.   Specifically, Plaintiffs allege that: (1) Sheriff Nielsen, the Boone County

Commissioners, the Boone County Council, and Boone County Attorney Clutter withheld body

camera footage that Barry and Kathryn requested under Indiana public records laws; and (2) DCS

employees Ms. Mamba-Harding and Mr. McNear have refused to give Barry and Kathryn certain

records concerning DCS's investigation, "including but not limited to, unredacted emails, T.D. and

N.D.'s medical records[,] and the video files from both of T.D.'s forensic interviews."   [Filing No.

122 at 80-82.]

The Fourth Amendment protects "[t]he right of the people to be secure in their … papers

[] and effects against unreasonable … seizures" absent a warrant and probable cause.   U.S. Const.

amend. IV.   "A 'seizure' of property occurs when there is some meaningful interference with an

58

individual's possessory interests in that property." *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 513 (7th Cir. 2020) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).   The threshold question is whether a plaintiff has plausibly alleged facts sufficient to support an inference that the plaintiff has a possessory interest in the seized items.   *Id.*

This claim stumbles right out of the blocks.   The sought-after records are not Plaintiffs' property for purposes of the Fourth Amendment.   Public records, by definition, belong to the public, not to individuals, and the records held by DCS belong to the agency.   The Indiana statutes identified by Plaintiffs in their brief, [Filing No. 165 at 8-9], do not confer a property right in public or agency records to individuals, and Plaintiffs have not cited (nor has this Court located) any case finding an individual property interest in such records for purposes of the Fourth Amendment. Furthermore, the statute cited by Plaintiffs concerning individuals to whom DCS can disclose records regarding the abuse and neglect of a child—Ind. Code § 31-33-18-2(8)—makes clear that parents do not have an a right to access unredacted records.   *Id.* (authorizing disclosure to "[e]ach parent, guardian, custodian, or other person responsible for the welfare of a child named in a report or record … with protection for the identity of reporters and other appropriate individuals").   In any event, application of the Fourth Amendment analytically makes no sense in this context. Plaintiffs cannot plausibly assert that Defendants need a warrant and probable cause to keep the information sought by Barry and Kathryn.

Plaintiffs' real complaint is that these Defendants allegedly did not follow Indiana's public records laws and laws concerning who is permitted to access DCS investigation records. However, these claims are not actionable here because 42 U.S.C. § 1983 "protects plaintiffs from constitutional violations, not violations of state laws."   *Scott v. Edinburg*, 346 F.3d 752, 760 (7th

Cir. 2003).   "A violation of a state statute is not a *per se* violation of the federal Constitution," and "[t]he federal government is not the enforcer of state law." *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001); *see also Coleman v. Cumberland Police Dep't*, 2010 WL 2735623, at *3 (S.D. Ind. July 9, 2010) ("Whether the defendants responded properly or not [to a request under Indiana public records law], and even if the defendants did not respond at all, the dispute is not actionable under 42 U.S.C. § 1983.").

Therefore, the Motions to Dismiss, [Filing No. 130; Filing No. 139], are **GRANTED** as to Count IV.

### 6.   *Count V – Substantive Due Process Rights Related to Familial Relations*

Plaintiffs allege that their substantive due process rights to familial relations were violated when: (1) T.D. and N.D. were removed from Barry and Kathryn's care from March 4, 2019 until the court-ordered placement on March 6, 2019; and (2) DCS officials conducted forensic interviews with T.D. on March 8 and March 12, 2019, which Plaintiffs allege were "partially comprised of sexual education." [Filing No. 122 at 82-83.]   Plaintiffs assert Count V against: (1) DCS employees Ms. Dillman, Ms. Hall, Ms. Jones, Ms. Mamba-Harding, Mr. McNear, and Ms. Pruett; (2) CASA Defendants McClure and Thompson; (3) every named law enforcement officer from the BCSO, Lebanon Police, Zionsville Police, and Whitestown Police (comprising 44 individual defendants in total); (4) five members of Lebanon's Fire Department; and (5) Chief Potts.   Plaintiffs also purport to assert failure-to-intervene claims by stating that all of these defendants either "individually participated or failed to intervene" in the removal of T.D. and N.D. and the interviews of T.D.   [Filing No. 122 at 82.]

The Court pauses to note that Plaintiffs do not allege that their substantive due process rights were violated when the state court ordered T.D. and N.D. removed from their care (and ultimately placed in foster care) following the March 6, 2019 hearing.

In their Motion to Dismiss, the DCS Defendants contend that T.D. and N.D. were not removed from Plaintiffs' care because on March 4, 2019, Barry agreed to temporarily place T.D. and N.D. with the bishop.   [Filing No. 140 at 20.]   Second, even if Barry did not consent, the DCS Defendants argue that they are entitled to qualified immunity because the DCS employees reasonably believed probable cause or exigent circumstances existed because the DCS caseworkers believed that T.D. and N.D.'s "physical or mental condition [would] be seriously impaired or seriously endangered if [they] [were] not immediately taken into custody."   [Filing No. 140 at 22 (quoting Ind. Code. § 31-34-2-3(a)(1)).]   As for the forensic interview of T.D., the DCS Defendants say that they are entitled to quasi-judicial immunity because, by the time those interviews were conducted, T.D. had been adjudicated a CHINS and therefore the interview was completed pursuant to a judicial order.   [Filing No. 140 at 24.]

Plaintiffs respond to the DCS Defendants by arguing that Barry did not voluntarily consent to the removal of T.D. and N.D. because he was deceived and coerced into doing so.   [Filing No. 166 at 6-7.]   Plaintiffs say that Attorney Delamater advised Barry that "the children had to be brought to the end of the road and that they had to stay the night at the bishop's home."   [Filing No. 166 at 7.]   They further respond that the case workers "did not have any facts at the time of removal to believe T.D. and N.D. faced an immediate threat of abuse" supporting probable cause or exigent circumstances.   [Filing No. 166 at 7.]   Plaintiffs say that contrary to the DCS Defendants' representation, T.D. and N.D. were never adjudicated CHINS, [Filing No. 166 at 11],

and further that quasi-judicial immunity does not extend to the interviews of T.D. because DCS employees Ms. Dillman, Ms. Hall, Ms. Mamba-Harding, Mr. McNear, and Ms. Pruett "did not have judicial authority to interview T.D.," [Filing No. 166 at 15].

In reply, the DCS Defendants reiterate that Barry consented to the removal of T.D. and N.D. to the bishop's home, and, in any event, they are entitled to qualified immunity because Plaintiffs' allegations do not show they violated a clearly established right.   [Filing No. 186 at 6-7.]   They also respond that Plaintiffs do not allege that the DCS Defendants coerced Barry into allowing the children to stay at the bishop's house.   [Filing No. 186 at 10.]   Finally, they reiterate that under these allegations, it was reasonable for DCS employees to believe that probable cause existed to remove the children, therefore qualified immunity applies.   [Filing No. 186 at 10.]

As for the law enforcement and fire officials, the Boone County Defendants likewise argue that Barry voluntarily surrendered T.D. and N.D. on March 4, 2019 for placement at the bishop's home.   [Filing No. 131 at 18.]   Second, they assert that because T.D. and N.D. can assert a Fourth Amendment seizure claim, that is the appropriate claim rather than a substantive due process claim. [Filing No. 131 at 18-19.]   The Whitestown Defendants also assert that the allegations show that Barry permitted T.D. and N.D. to stay with the bishop, and, in any event, the intervention was justified.   [Filing No. 133 at 13-14.]   Further, they contend that the two Whitestown police officers were not personally involved in any alleged substantive due process deprivation.   [Filing No. 133 at 13-14.]   The Lebanon Defendants assert that the SAC fails to sufficiently allege that any of the Lebanon police and fire officials were personally involved in the alleged deprivation. [Filing No. 136 at 8-9.]   The Zionsville Defendants and Chief Potts assert the same argument regarding lack of personal involvement in their respective Motions to Dismiss.   [Filing No. 125

at 10-11; Filing No. 129 at 6.]   In addition to the above arguments, the CASA Defendants assert that they are entitled to absolute immunity as court-appointed advocates.   [Filing No. 131 at 11-12.]

In response to the arguments from law enforcement and fire officials, Plaintiffs dispute that Barry voluntarily consented to T.D. and N.D.'s removal.   Plaintiffs also contend that the separation of children from parents is properly analyzed under the Fourteenth Amendment's Substantive Due Process Clause, rather than the Fourth Amendment.   [Filing No. 165 at 10.] They contend that the information available to the law enforcement and fire defendants was insufficient to establish probable cause.   [Filing No. 171 at 6.]   In addition, Plaintiffs assert that the CASA Defendants are not entitled to immunity because they were paid rather than unpaid volunteers.   [Filing No. 165 at 10-11.]   They further contend that Plaintiffs' issues with the CASA Defendants—withholding parental and familial visitation in contravention of Indiana's Bill of Rights for Youth in Foster Care—were not done pursuant to a court order, and therefore immunity does not apply.   [Filing No. 165 at 11.]

In reply, the Boone County Defendants reiterate prior arguments, including that the individual officers were not personally involved in any purported deprivation of substantive due process.   [Filing No. 180 at 6.]   They also respond that the CASA Defendants are entitled to immunity and that the arguments advanced by the Plaintiffs—that there is a distinction between paid and unpaid and not following the Indiana's foster care procedures—are not supported by citation to any case law.   [Filing No. 180 at 2.]   Chief Potts and the Whitestown, Lebanon, and Zionsville Defendants reply by reiterating that the SAC does not sufficiently alleged that they were

personally involved in any alleged infringement of Plaintiffs' familial rights.   [Filing No. 181 at 1-2; Filing No. 182 at 4; Filing No. 183 at 1-2; Filing No. 185 at 9.]

### a.   The Removal of T.D. and N.D. to the Bishop's Home

"[T]he Fourteenth Amendment includes the right to associate with relatives, and therefore substantive due process includes the right to familial integrity." *Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012) (internal citation omitted).   However, "the right to family integrity is not absolute" and does not include the right to be free from child abuse or neglect investigations. *Thomas v. Starks*, 159 F. App'x 716, 717 (7th Cir. 2005).   Such investigations must be based on evidence "giving rise to a reasonable suspicion that a child has been abused or is endangered." *Id.* (citing *Brokaw*, 235 F.3d at 1019).

This claim also stumbles out of the blocks for a few reasons.

### (i)   Barry's Consent

The SAC acknowledges that Barry agreed to the removal of T.D. and N.D. to the bishop's home.   Specifically, Plaintiffs allege that "[Attorney] Delamater advised Barry [that] if he did not bring the kids down to the end of the road immediately and let them stay overnight at the bishop's house, [the] BCSO was going to bust in his door.   Barry … w[as] extremely frightened, and under duress complied with [Attorney] Delamater's legal advice."   [Filing No. 122 at 40.]   But, Attorney Delamater is not a state actor or otherwise acting at the direction of any of the named Defendants in Count V.   *See e.g.*, *Walton v. Neslund*, 248 F. App'x 733, 734 (7th Cir. 2007) (holding in the context of a § 1983 case that "a lawyer is not a state actor when he performs the traditional function of counsel to a defendant in a criminal case" and describing such a claim as

"patently frivolous").   The DCS Defendants, CASA Defendants, law enforcement, and fire officials had no obligation to further investigate the nature of Barry's consent.

Plaintiffs attempt to salvage this claim by pointing out that they have alleged that Attorney Delamater, Sheriff Nielsen, and Major Stevenson "conspired" to develop and implement a surrender plan to remove T.D. and N.D. from the home.   [Filing No. 166 at 7.]   But nothing in the SAC suggests that Sheriff Nielsen and Major Stevenson interfered with Barry's decision to relinquish T.D. and N.D.   Rather, the allegations suggest that Attorney Delamater conferred with law enforcement about how to bring the standoff to a conclusion and presented the proposal to Barry, to which Barry agreed.   [Filing No. 122 at 39-40.]

In any event, as to Chief Potts, the law enforcement officers, and the fire officials listed in Count V argue, Plaintiffs have failed to allege that these defendants were directly involved in the alleged deprivation of familial rights caused by the removal T.D. and N.D.   A defendant cannot be held liable under § 1983 unless he or she was personally involved in the alleged constitutional deprivation, which as to this claim, is coercing Barry into agreeing to release his children to the custody of the bishop and the decision to seek the children's removal from the home.   *See Johnson v. Rimmer*, 936 F.3d 695, 710-11 (7th Cir. 2019); *see also Ortiz v. City of Chicago*, 2010 WL 3833962, at *8 (N.D. Ill. Sept. 22, 2010) (holding that a defendant's "mere presence at the scene fails to provide the requisite personal involvement to support a false arrest claim").

Therefore, Defendants' Motions to Dismiss, [Filing No. 124; Filing No. 128; Filing No. 130; Filing No. 132; Filing No. 124; Filing No. 139], as to Count V are **GRANTED** as they relate to removing T.D. and N.D. from Plaintiffs' home and placing them with the bishop.

ii.   Failure to Intervene

Because the substantive due process claim as to the removal of T.D. and N.D. fails, so too do any related failure-to-intervene claims because there is no underlying constitutional deprivation.   *See Gill,* 850 F.3d at 342.

The failure-to-intervene claim fails for the additional reason that Plaintiffs have not met the *Iqbal* and *Twombly* pleading standard.   Plaintiffs merely allege that each of the defendants "failed to intervene in the seizure of T.D. and N.D.," [Filing No. 122 at 82], without any allegations about each defendant's knowledge of the alleged violation and allegations plausibly alleging each defendant had a realistic opportunity to prevent it.   *See id.*   As discussed above in connection with Counts I and III, such conclusory allegations cannot withstand a motion to dismiss a failure-to-intervene claim.   *See Atkins,* 2015 WL 3862724, at *2.

The Motions to Dismiss, [Filing No. 124; Filing No. 128; Filing No. 130; Filing No. 132; Filing No. 124; Filing No. 139], are **GRANTED** with respect to the Count V failure-to-intervene claims concerning the removal of T.D. and N.D.

### b.   The Interviews of T.D.

As noted above, the familial relations right in the Fourteenth Amendment is not absolute and yields to the government's interest in protecting children, "particularly where the children need to be protected from their own parents."   *Brokaw*, 235 F.3d at 1019 (quoting *Croft v. Westmoreland Cnty. Children & Youth Serv.*, 103 F.3d 1123, 1125 (3d Cir. 1997)).   And in the context of a child's education, "the mere exposure to ideas or principles that allegedly conflict with [the parents'] beliefs" is insufficient to state a substantive due process claim.   *See Jones v. Boulder Valley Sch Dist.*, 2021 WL 5264188, at *15 (D. Colo. Oct. 4, 2021).

The SAC establishes that the Order to Compel authorized DCS to interview T.D. and N.D. On March 6, 2019, prior to the interviews of T.D. on March 8 and 12, 2019, the state court entered an order "authorizing the filing of the CHINS petition" in which the court "expressly stated the court considered the preliminary inquiry report and found probable cause to believe the children were CHINS." *Matter of T.D.*, 2020 WL 6636354, at *5. Thus, by the time T.D. was interviewed by DCS employees (with the CASA Defendants present), a court in the State of Indiana had determined that the state had a compelling interest in protecting T.D. by way of an interview. In any event, Plaintiffs' allegation that their substantive due process rights were violated because the interviews with T.D. "were partially comprised of sexual education," [Filing No. 122 at 82], is insufficient to state a claim. Plaintiffs do not identify a case holding that mere exposure to a concept, such as sex, violates the Due Process Clause. *See Jones*, 2021 WL 5264188, at *15.

Even if such allegations did state a procedural due process claim, the CASA Defendants would be entitled to absolute immunity because they were present at the interviews pursuant to their appointment by the state court. Court-appointed advocates are immune of claims arising out of the scope of their court-appointed duties. *See Ratliff v. Todd/Johnson*, 2019 WL 2329324, at *4 (S.D. Ind. May 31, 2019). Plaintiffs' argument about a distinction between paid versus unpaid advocates is not supported by citation to any law.

Therefore, the DCS Defendants' and the Boone County Defendants' Motions to Dismiss, [Filing No. 130; Filing No. 139], are **GRANTED** with respect to Count V's allegations regarding the interviews of T.D.

*7. Count VI – Procedural Due Process Rights*

Count VI alleges that Plaintiffs' procedural due process rights were violated by the DCS Defendants, the CASA Defendants, and certain Boone County Defendants when: (1) DCS intake agent Jones requested a one-hour response time rather than a five-day response time after receiving allegations that the welfare of T.D. and N.D. may be in jeopardy; (2) DCS case manager Dillman falsely reported that Barry was "aggressive"; (3) DCS case manager Hall falsely reported that "Kathryn was belligerent and Barry had not eaten or slept"; (4) DCS case manager Dillman and BCSO Major Stevenson failed to serve the "Detainment Advisement on Kathryn and failed to serve it timely on Barry" for the March 6, 2019 hearing; (5) the DCS Defendants failed to serve Kathryn with process for the JM and CHINS cases; (6) Sheriff Nielsen, BCSO Captain Keller, and DCS's Mamba-Harding "engag[ed] in ex parte communications with the Magistrate presiding over the JM and CHINS matters"; and (7) the DCS Defendants did not follow the Indiana Bill of Rights for Youth in Foster Care with regard to parental visitation.   [Filing No. 122 at 83-84.]   Plaintiffs also allege the CASA Defendants failed to advocate for T.D. and N.D.   [Filing No. 122 at 84.]

Plaintiffs also include a seemingly unrelated claim against the Boone County Commissioners, the Boone County Council, Sheriff Nielsen, and Attorney Clutter, alleging that they "deprived the Plaintiffs of their procedural due process rights by conspiring to pass an illegal ordinance, in order to deter Plaintiffs from obtaining their property and pursuing this lawsuit," apparently referencing the body camera footage previously discussed in connection with Count IV.   [Filing No. 122 at 84.]

###### a.   The Temporary Removal of the Children

The Court first addresses Plaintiffs' list of alleged procedural deficiencies relating to the removal of T.D. and N.D.

The DCS Defendants contend that they are entitled to absolute immunity for actions or representations made during the state-court judicial proceedings.   [Filing No. 140 at 16-18.] Further, they argue that any claims related to service failures and notice issues that occurred in state court are barred by immunity because the state court proceedings went forward at the direction of the judge.   [Filing No. 140 at 18.]   They also argue that they are entitled to qualified immunity and that Plaintiffs have not sufficiently identified how each DCS employee is individually liable.   [Filing No. 140 at 25-27.]   The Boone County Defendants argue that any procedural obligations regarding service and notice rest with the DCS under Indiana law, not with BCSO employees.   The Boone County Defendants further argue that the CASA Defendants are entitled to absolute immunity because they acted within the scope of their appointment by the state court.   [Filing No. 131 at 11-12.]

In response, Plaintiffs cite Indiana statutes regarding the rights of children and parents in CHINS proceedings.   [Filing No. 166 at 16.]   They say that absolute immunity principles "do[] not protect a social worker from detaining children" and "do[] not protect a social worker from presenting knowingly false information in an affidavit to establish probable cause."   [Filing No. 166 at 17.]   Plaintiffs also cite an Indiana appellate case in which the court found that a father was deprived of due process when he did not receive notice of a CHINS proceeding and the termination of parental rights proceeding while he was incarcerated.   [Filing No. 166 at 18.]   In response to the Boone County Defendants, Plaintiffs acknowledge that Indiana law places the burden of

service on DCS but argue that in this instance, the BCSO employees are liable because Major Stevenson served the detention notice on Barry, Major Stevenson did not attempt service of the detention notice on Kathryn, and Sheriff Nielsen withheld service of the Order to Compel on Barry.

[Filing No. 165 at 12.]   Plaintiffs once again argue that the CASA Defendants are not entitled to immunity because they were paid rather than unpaid volunteers.   [Filing No. 165 at 10-11.]   They further contend that their complaints with the CASA Defendants—withholding parental and familial visitation in contravention of Indiana's Bill of Rights for Youth in Foster Care—are not related to a court order, and therefore immunity does not apply.   [Filing No. 165 at 11.]

In reply, the DCS Defendants point out that Plaintiffs' SAC acknowledges that they have already litigated these procedural claims, noting that the SAC contains the following paragraph:

> Specifically, Plaintiffs argued the [state trial court] did not have jurisdiction and the Orders are void because DCS never served [Kathryn], and thereby deprived her of the right to be heard and have counsel; DCS did not obtain authority to file the CHINS petitions according to state law; the Magistrate, DCS and [Sheriff] Nielsen participated in ex parte communications; the Order Authorizing the Taking child into Custody, the Order on Initial/Detention Hearing, and the Order on Motion to Dismiss were signed by the Magistrate and not approved by the Judge as was required by statute in 2019; and their liberties were constrained because it appeared the [JM] case and Order to Compel were still pending (to which DCS agreed), subjecting Plaintiffs to the continual compelling of letting DCS and BCSO enter their home at any time and/or interview T.D. and/or N.D.

[Filing No. 186 at 3-4 (quoting Filing No. 122 at 69).]   The DCS Defendants argue that this Court's consideration of Plaintiffs' procedural due process claims would necessarily involve "determining whether Boone County Circuit Court, the Indiana Court of Appeals, and the Indiana Supreme Court were wrong."   [Filing No. 186 at 4.]   The DCS Defendants also contend that none of the cited due process violations were clearly established, so, in any event, they are entitled to

70

qualified immunity.   [Filing No. 186 at 6-8.]   The Boone County Defendants reiterate that DCS, by statute, is responsible for service and notice issues.   [Filing No. 180 at 7.]

"The Due Process Clause of the Fifth and Fourteenth Amendments prohibits deprivation of life, liberty, and property without due process of law."   *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quotation omitted).   "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."   *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted).   To state a procedural due process claim, a plaintiff must plausibly allege (1) "deprivation of a protected interest," and (2) that plaintiff was provided "insufficient procedural protections surrounding that deprivation."   *Tucker v. City of Chicago*, 907 F.3d 487, 491 (7th Cir. 2018).   In the context of child welfare proceedings, the Seventh Circuit has stated that due process "at a minimum requires that government official not misrepresent the facts in order to obtain the removal of a child from his parents" and that "government officials will not remove a child from his home without an investigation and pre-deprivation hearing resulting in a court order of removal, absent exigent circumstances."   *Brokaw*, 235 F.3d at 1020.   The Seventh Circuit later clarified that "exigent circumstances" encompasses "probable cause to believe that the child is in imminent danger of abuse."   *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 486 (7th Cir. 2011).

As a preliminary matter, the SAC is not entirely clear as to what protected liberty or property interests Plaintiffs are alleging that Defendants deprived them of.   Count VI repeatedly refers to "procedural due process" without identifying the underlying protected liberty or property interest.   [*See* Filing No. 122 at 83-84.]   The Court rejects any claim being asserted by Plaintiffs that a procedural violation or error untethered to the deprivation of any liberty or property interest

is sufficient to allege a procedural due process claim.  *See Miller v. Dobier*, 634 F.3d 412, 415 (7th Cir. 2011) ("Without deprivation of liberty or property … there is no constitutional duty to provide due process.").   However, a liberal reading of the SAC suggests that Plaintiffs are alleging that they were deprived of their liberty interest in familial relations when Defendants kept T.D. and N.D. in their custody.   The Court will reasonably interpret Plaintiffs' SAC to allege that the temporary removal of their children from their care deprived of them of a liberty interest for which they were afforded insufficient process.

### i.   The CASA Defendants

Setting aside the issue of whether Barry and Kathryn have standing to complain about the performance of the CASA Defendants (Ms. McClure and Ms. Thompson) appointed to represent their children, the CASA Defendants are immune from Plaintiffs' complaints about their advocacy. Court-appointed special advocates are community volunteers who represent and protect the best interests of a child.  *See* Ind. Code § 31-9-2-28.   "Experts asked by the court to advise on what disposition will serve the best interests of a child in a custody proceeding need absolute immunity in order to be able to fulfill their obligations without worry of intimidation and harassment of dissatisfied parents."  *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009).   Court-appointed advocates are immune to claims arising within the scope of their court-appointed duties.  *See Ratliff*, 2019 WL 2329324, at *4.

Plaintiffs allege that the CASA Defendants, in the course of their duties were not sufficiently advocating that T.D. and N.D. have parental visitation.   The CASA Defendants are entitled to absolute immunity.   As such, the Court **GRANTS** the Boone County Defendants'

Motion to Dismiss, [Filing No. 130], Count VI as it relates to the performance of the CASA Defendants.

### ii.   One-Hour Versus Five-Day Response

Plaintiffs allege that DCS intake agent Jones "is liable" for "referring to the assessment needing a one-hour response when the assessment did not require a one-hour response time, but rather required a five-day response time."   [Filing No. 122 at 83.]   In short, Plaintiffs take issue with Ms. Jones checking the box calling for a one-hour response by DCS rather than a five-day response in Ms. Jones' summary report of her call with Social Worker 5.   However, Plaintiffs have no cognizable liberty or property interest to a particular classification, nor have they pled as much. *See Tucker*, 907 F.3d at 491.   Plaintiffs cite DCS policy to allege that because Social Worker 5's report did not involve accusations of abuse, a one-hour response time was not necessary, but this policy does not bestow a cognizable liberty or property interest on Plaintiffs.   *See, e.g.*, *Charleston v. Bd. of Trs. of Univ. of Ill. at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) ("[A] plaintiff does not have a federal constitutional right to state-mandated process.")   Therefore, Plaintiffs have failed to state a procedural due process claim relating to the response time.

The DCS Defendants' Motion to Dismiss, [Filing No. 139], is **GRANTED** with respect to the response-time aspect of Count VI.

### iii.   Indiana Bill of Rights for Youth in Foster Care

Plaintiffs next contend that certain DCS Defendants deprived them of procedural due process by "refusing to allow parental visitation pursuant to the Indiana Bill of Rights for Youth in Foster Care."   [Filing No. 122 at 84.]   Plaintiffs are apparently referring to a document posted on the DCS's website entitled "Indiana Bill of Rights for Youth in Foster Care," which according

to the document, is meant to provide youth with an understandable summary of their rights during DCS proceedings. "Indiana Bill of Rights for Youth in Foster Care," *available at* https://www.in.gov/dcs/files/Indiana_DCS_Bill_of_Rights_for_Youth_in_Care.pdf (last accessed Feb. 23, 2022). In a subsection labeled "Visitation," the document states as follows:

> **Visitation:**
> - We have the right to have a visit with parents and siblings within 48 hours after a CHINS placement.
> - We have the right to have regular visits with parents, siblings, and other relatives unless visitation is not in our best interests based on our individual needs. These visits should not be used as a reward or punishment for our behavior or the behavior of our parents or relatives.

*Id.* However, as discussed above, "a plaintiff does not have a federal constitutional right to a state-mandated process." *Charleston*, 741 F.3d at 773. Rather, the relevant question for courts is "what process the state provided and whether it was constitutionally adequate." *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990). On this front, Plaintiffs offer no allegations specific to the Bill of Rights for Youth in Foster Care or any inadequate procedures. To be sure, and as discussed in more detail below, Plaintiffs advance allegations about why process afforded them in connection with the temporary removal of their children was procedurally inadequate, but an alleged departure from the Bill of Rights for Youth in Foster Care document, standing alone, does not state a procedural due process claim.

Therefore, the Court finds that Plaintiffs have not plausibly alleged a due process claim related to the Indiana Bill of Rights for Youth in Foster Care and **GRANTS** the Boone County Defendants' and the DCS Defendants' Motions to Dismiss, [Filing No. 130; Filing No. 139], this aspect of Count VI.

iv.   <u>Alleged Misrepresentations</u>

As noted above, the Seventh Circuit has recognized that "no matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020.   Plaintiffs claim that: (1) DCS case manager Dillman falsely reported in her call to Boone County dispatch requesting assistance that Barry can "apparently become aggressive"; and (2) DCS case manager Hall falsely stated in her affidavit in support of the Motion to Compel that "Kathryn was belligerent" and that Barry "had not eaten or slept."

Descriptions of Barry as having the ability to become "aggressive" and Kathryn as "belligerent" are not misrepresentations of fact, but rather characterizations of Plaintiffs' respective demeanors.   Such characterizations cannot form the basis of a procedural due process claim.   *See Justice v. Justice*, 303 F. Supp.3d 923, 942 (S.D. Ind. 2018) ("Although Plaintiff again takes issue with [the] characterization of her as 'manipulative,' 'sneaky,' and 'a sociopath,' … this unfavorable view of [plaintiff] is not an affirmative misrepresentation of fact.").   Furthermore, case manager Dillman's statement was made in the context of seeking law enforcement assistance for the social workers visiting the Dircks home, not in the context of a statement to a court deciding whether the children should be removed.

That leaves Ms. Hall's statement in her affidavit accompanying the Motion to Compel that Barry (in addition to Kathryn) had not eaten or slept.   Of note, the Motion to Compel did not authorize removal of the children.   Rather, the Motion to Compel resulted in the Order to Compel, permitting entry on to the property to check on the welfare of the children and adults at the home. Barry later agreed to have the children spend the night at the bishop's home, and the Court held a

hearing on March 6, 2019, which Barry participated in, that resulted in the removal of the children. Thus, this alleged misrepresentation was not made "in order to obtain the removal of a child from his parents." *See Brokaw*, 235 F.3d at 1020. In any event, the misrepresented fact must be material. *See McHugh v. Ind. Family & Soc. Servs. Admin.*, 2008 WL 2225638 (S.D. Ind. 2008). The Court finds that Barry's eating and sleeping was not material to the removal of the children.

Therefore, the Court finds that Plaintiffs have not plausibly alleged a due process claim related to alleged misrepresentations. The DCS Defendants' Motion to Dismiss, [Filing No. 139], is **GRANTED** with respect to this aspect of Count VI.

v. <span style="text-decoration: underline">Service Issues and <em>Ex Parte</em> Communication</span>

Plaintiffs' due process complaints related to service issues and *ex parte* communication run headlong into the doctrine of issue preclusion. [19] "Issue preclusion prevents a party from relitigating an issue that it has previously litigated and lost." *Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002). Federal courts are obligated to give state court judgments "the same preclusive effect as would a court in the rendering state." *Id.* (internal quotation marks omitted). In Indiana, "issue preclusion bars subsequent litigation of the same fact or issue that was necessarily adjudicated in a former suit." *Miller Brewing Co. v. Ind. Dep't of State Revenue*, 903 N.E.2d 64, 68 (Ind. 2009). Under Indiana law, "[i]n determining whether issue preclusion is applicable, a court must engage in a two-part analysis: (1) whether the party in the prior action had a full and

---

[19] As discussed previously in this Order, the parties raise and dance around issue preclusion in the context of *Rooker-Feldman* arguments, even though their arguments are more appropriately labeled and analyzed under the rules of issue preclusion. The Court will consider such arguments in the context of issue preclusion. In any event, "a court may raise [issue preclusion] *sua sponte* … if it is plainly apparent from the face of the complaint." *Harris v. Huston*, 553 F. App'x 630, 634 (7th Cir. 2014).

fair opportunity to litigate the issue and (2) whether it is otherwise unfair to apply issue preclusion given the facts of the particular case." *Justice*, 303 F. Supp.3d at 939 (quoting *Angelopoulos v. Angelopoulos*, 2 N.E.3d 688, 696 (Ind. Ct. App. 2013)).

The Supreme Court has made clear that issue preclusion applies to § 1983 claims, giving state court decisions binding effect "when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to protect federal rights." *Allen v. McCurry*, 449 U.S. 90, 104 (1980). Issue preclusion applies even if the federal claim arose in the context of criminal proceedings or other involuntary proceedings, such as child welfare proceedings. *See id.* (holding that state court's denial of a plaintiff's motion to suppress on Fourth and Fourteenth Amendment grounds had a preclusive effect on plaintiff's subsequent § 1983 claim for unlawful search and seizure); *Justice*, 303 F. Supp.3d at 939 (holding that a state court's finding in CHINS proceeding precluded subsequent § 1983 claim premised on an illegal seizure of children). Issue preclusion operates as a bar in these instances because an individual claiming a federal right does not have an "unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all." *Allen*, 449 U.S. at 104.

Here, Plaintiffs had a full and fair opportunity in state court to litigate the procedural issues raised in their federal procedural due process claim. In fact, Plaintiffs did so in their Trial Rule 60(B) Motion. The Indiana Court of Appeals noted that Barry and Kathryn "asserted their due process rights were violated by multiple errors, including that [Kathryn] was not served with process, DCS did not obtain authority to file the CHINS petitions, the court had improper

communications with the Sheriff and in receiving an email from DCS, the children's initials were not correctly stated in the Orders to Compel, the order dismissing the CHINS petition was signed by the Magistrate, and the March 11, 2019 order incorrectly stated [Barry] waived his right to counsel." *In the Matter of T.D.*, 2020 WL 6636354, at *4. The appellate court determined that Barry and Kathryn's federal due process rights were not violated in connection with removing T.D. and N.D., *id.* at *4-5, and the Indiana Supreme Court denied Plaintiffs' petition for further review, *N.D. v. Ind. Dep't of Child Servs.*, 165 N.E.3d 80 (Ind. 2021).

Of note, Plaintiffs do not allege that the Trial Rule 60(B) Motion proceedings were insufficient such that Plaintiffs were denied the opportunity to fully and fairly litigate their due process claims related to the JM and CHINS proceedings.   "To satisfy the full and fair opportunity requirement, the prior state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause."  *Thomas v. Furge*, 175 F.3d 1021, at *1 (7th Cir. 1999) (unpublished) (internal quotation marks omitted).   To be sure, Plaintiffs advance allegations that the JM and CHINS proceedings themselves were procedurally problematic in various respects, but the inquiry for purposes of issue preclusion is whether the subsequent Trial Rule 60(B) Motion proceedings provided an opportunity for Plaintiffs to litigate their complaints about the JM and CHINS proceedings.   Plaintiffs do not allege that they were unable to fully litigate their Trial Rule 60(B) Motion.   Thus, issue preclusion bars Plaintiffs from relitigating the procedural due process issues previously addressed by the state court via Plaintiffs' Trial Rule 60(B) Motion.

Therefore, Plaintiffs are barred from relitigating the service and *ex parte* communication issues in this Court.   The Boone County Defendants' and DCS Defendants' Motions to Dismiss, [Filing No. 130; Filing No. 139], are **GRANTED** with respect to these aspects of Count VI.

### b.   Boone County Public Records Ordinance

The Court now turns to Plaintiffs' procedural due process claim related to the Boone County Defendants' public records ordinance.   The problem with this claim is that Plaintiffs have not alleged facts establishing the first element of a procedural due process claim: the deprivation of a protected liberty or property interest.   *See Tucker*, 907 F.3d at 491.   Liberally construing their allegations, Plaintiffs assert that they were deprived of access to public records.   But, as discussed in Count IV, Plaintiffs do not have a possessory interest in the public records, and therefore they are not Plaintiffs' property.   Nor do Plaintiffs have a liberty interest in the records. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (holding that the Fourteenth Amendment does not mandate a right of access to government information); *Bonnet v. Ward Cnty.*, 539 F. App'x 481, 483 (5th Cir. 2013) (holding plaintiff did not have a liberty or property interest in accessing county records); *Miramontes v. Zellerbach*, 2014 WL 793143, at *7 (C.D. Cal. Feb. 26, 2014) (holding that plaintiff had no liberty interest in accessing documents pursuant to California's public records laws); *Hulshof v. Jurkas,* 2006 WL 2943302, at *6 (W.D. Mich. Oct.13, 2006) (holding that plaintiff's allegations were insufficient to state Fourteenth Amendment due process claim based on denial of information request made under Michigan's public records laws because plaintiff had failed to identify a constitutionally protected life, liberty or property interest that was deprived by the defendants).   Plaintiffs have not cited a single case holding that Indiana's public records laws gives rise to a protected liberty interest.   Plaintiffs also do not allege what process

was denied to them or why the state's statutory procedures for accessing public records are insufficient.   It bears repeating that violations of state public records laws do not give rise to a federal claim.   *See Scott*, 346 F.3d at 760.   Therefore, this claim will also be dismissed.

For the foregoing reasons, the Boone County Defendants' Motion to Dismiss, [Filing No. 130], this aspect of Count VI is **GRANTED**.

### 8.   *Count VII – First Amendment Right to Redress / Retaliation*

In their final federal claim, Plaintiffs allege that a large swath of Defendants retaliated against them and violated their First Amendment rights to petition the government for redress. Plaintiffs allege their First Amendment rights were violated in four instances:

1.   During the March 4, 2019 standoff, Barry, "through [Attorney Delamater] and a mutual friend," advised Sheriff Nielsen that Barry believed that his actions were illegal and that he intended to file a lawsuit, and a long list of law enforcement, fire personnel, and DCS employees responded by participating in removing T.D. and N.D. from the home and pursing CHINS proceedings and "failing to intervene" to stop the removal of the children.   [Filing No. 122 at 84.]

2.   After the children were removed from Barry's care, Barry "notified some of the DCS Defendants he intended to sue," and DCS case managers responded to the threat by "prosecut[ing] the detention of the children, prosecut[ing] [CHINS] cases contrary to law, unnecessarily prolong[ing] the detention of T.D. and N.D., and refus[ing] to follow the Indiana Bill of Rights for Youth in Foster Care." [Filing No. 122 at 85.]

3.   In response to Barry's statement to Bennii Weldy that he was going to sue Sheriff Michael Nielsen, Ms. Weldy "made bullying statements in order to dissuade Kathryn and Barry from pursuing this lawsuit." [Filing No. 122 at 85.]

4.   When Plaintiffs sent litigation hold letters and tort claim notices, Sheriff Nielsen, Attorney Clutter, the Boone County Commissioners, and the Boone County Council responded by "conspir[ing] to enact an illegal body camera footage ordinance," thereby thwarting Plaintiffs' efforts to seek redress from the government through lawsuits. [Filing No. 122 at 85.]

While Plaintiffs title Count VII as "Violation of Right to Redress Government," [Filing No. 122 at 84], many of their claims are more appropriately described as First Amendment retaliation claims. Indeed, the parties cite retaliation case law in their briefs.

### a. Retaliation

A First Amendment retaliation claim requires a plaintiff to plausibly allege that: "(1) [he] engaged in activity protected by the First Amendment, (2) [he] suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was at least a motivating factor in the [d]efendant's decision to take the retaliatory action." *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021) (internal alterations and quotation marks omitted). A plaintiff must plausibly allege a causal link between the protected act and the alleged retaliation. *See Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty.*, 424 F.3d 659, 669 (7th Cir. 2005). "Both circumstantial evidence, like suspicious timing, ambiguous oral or written statements, or behavior or comments, and direct evidence, like near-admissions of retaliatory acts, may serve as proof of causation." *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 2021 WL 4263475, at *5 (N.D. Ill. Sept. 20, 2021) (internal quotation marks and citation omitted). At the pleading stage, a plaintiff must present a retaliation story that "holds together." *See id.*

### i. The Removal of T.D. and N.D.

Plaintiffs claim that DCS employees Dillman, Hall, McNear, Pruett, Sheriff Nielsen, every law enforcement officer that responded to the Dircks home, members of the Lebanon Fire Department, and Chief Potts retaliated against them by removing T.D. and N.D. because Barry told Sheriff Nielsen that Barry believed that Sheriff Nielsen's actions were illegal. This claim fails for several reasons. First, there was no deprivation because as discussed above, Barry agreed

to place T.D. and N.D. at the bishop's home.   Second, Plaintiffs do not plausibly allege causation. Plaintiffs' only allegation on this front is that because Barry told Sheriff Nielsen that he thought his actions were illegal prior to T.D. and N.D. being removed from the home, Barry's statement must have been what caused their removal.   Such an allegation falls short under *Iqbal* and *Twombly*.   A naked assertion that because event A occurred before event B, event A must have *caused* event B does not tell a story of retaliation that holds together.   This is especially true here, where officials were investigating the welfare of T.D. and N.D. long before Barry's alleged statement and, in fact, the statement was made in the context of the investigation.   Third, aside from Sheriff Nielsen, there is no allegation that any of the other long list of defendants were aware that Barry conveyed this statement or would have any reason to know that Barry's threat formed the basis of T.D. and N.D.'s removal.

For all of these reasons, the Court **GRANTS** the Motions to Dismiss, [Filing No. 124; Filing No. 128; Filing No. 130; Filing No. 132; Filing No. 134; Filing No. 139], related to Plaintiffs' claim that Defendants retaliated against them for Barry's statement to Sheriff Nielsen.

### ii.   Continued DCS Legal Action

Plaintiffs' claim that DCS employees Hall, Mamba-Harding, and McNear retaliated against them by proceeding with the CHINS cases because Barry "notified some of the DCS Defendants he intended to sue" also fails to satisfy the pleading standard.   Again, the only causal allegation is that Barry threatened to sue and subsequently the DCS Defendants continued on with the JM and CHINS proceedings.   This unadorned "A then B" causation allegation fails to tell a story that holds together.   This is especially true here, where a child welfare investigation was already underway before Barry's alleged statements were made in the context of those proceedings.

Furthermore, the DCS Defendants' pursuit of state court proceedings insofar as they took steps to present the case for decision by the court is entitled to absolute immunity.  *See Millspaugh v. Cnty. Dep't of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1176 (7th Cir. 1991) (finding social workers are entitled to absolute immunity in child welfare proceeding for actions that "induce[] the judge to act").   Plaintiffs' allegation that the DCS Defendants retaliated against them because Barry threated a lawsuit must be dismissed.

Therefore, the Court **GRANTS** the DCS Defendants' Motion to Dismiss, [Filing No. 139], this aspect of Count VII.

### iii.   Bennii Weldy

Plaintiffs next allege that after Barry told Zionsville Fire Department Engineer Weldy that Barry planned to sue Sheriff Nielsen, Ms. Weldy responded to Barry via Facebook Messenger and tried to convince him not to sue Sheriff Nielsen by telling Barry that if a lawsuit was filed, the media would pick apart Barry and his family, that his children would have no friends, and that Kathryn would be treated differently because the public would know of her mental illness and commitment.   [Filing No. 122 at 61.]   Plaintiffs allege that "Weldy made the bullying statements in order to dissuade Kathryn and Barry from pursuing this lawsuit" and that Plaintiffs decided against filing a tort claim notice with the Town of Zionsville because of Ms. Weldy's comments. [Filing No. 122 at 85.]

Although the exact nature of Plaintiffs' First Amendment claim against Bennii Weldy is not entirely clear, to the extent Plaintiffs are asserting a First Amendment retaliation claim, this claim also fails.   Plaintiffs do not allege that they suffered a deprivation in response to Barry's statement to Weldy, nor do they allege that Weldy threatened a deprivation.   They simply do not

like that Weldy told Barry that he should not file a lawsuit and identified possible consequences of filing suit. But their dislike of Weldy's statements do not equate to a deprivation. *See Novoselsky v. Brown*, 822 F.3d 342, 356-57 (7th Cir. 2016) (holding that "[u]nconstitutional retaliation by a public official requires more than criticism or even condemnation" and that "[r]etaliatory speech is generally actionable only in situations of threat, coercion, or intimidation that punishment, sanction, or adverse regulatory action will immediately follow") (internal quotation marks omitted). Plaintiffs' allegation that Weldy retaliated against them because Barry threated a lawsuit must be dismissed.

Therefore, the Zionsville Defendants' Motion to Dismiss, [Filing No. 124], is **GRANTED** to the extent Plaintiffs are alleging that Bennii Weldy retaliated against them in violation of the First Amendment.

### b.  Access to Courts

Plaintiffs' remaining First Amendment claims are best categorized as claims for denial of access to courts. The Supreme Court has recognized that "the right of access to courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983). Generally speaking, "[i]nterference with the right of court access by state agents who intentionally conceal the true facts about a crime may be actionable as a deprivation of constitutional rights under § 1983." *Rossi v. City of Chicago*, 790 F.3d 729, 734 (7th Cir. 2015) (citing *Bounds v. Smith*, 430 U.S. 817, 822 (1977)). For instance, "when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged." *Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995). A plaintiff needs to allege

84

facts showing that the obstruction of facts "so limited [the plaintiff's] ability to obtain legal redress to such degree that it constituted a denial of judicial access." *Id.*

"To pursue a viable claim of this type, the Seventh Circuit has set a high bar." *Lopez v. Sheriff of Cook Cnty.*, __F. Supp.3d__, 2020 WL 1530739, at *9 (N.D. Ill. Mar. 31, 2020), *aff'd*, 993 F.3d 981 (7th Cir. 2021). If a plaintiff was "personally involved in the events giving rise to a legal claim and thus knows all the facts of their case," access to court is generally not impaired by malfeasance by state actors to hide facts. *Id.* (citing *Rossi*, 790 F.3d at 734). The district court in *Lopez* cogently summarized the state of Seventh Circuit law on this point.

> In *Rossi*, for instance, the plaintiff was assaulted by several people, including an off-duty police officer. 790 F.3d at 732-33. When Rossi went so far as to report the name and address of the off-duty officer to the police, the investigating officer did nothing but file a false report with the wrong name and assert that he could not find the name in the police roster. *Id.* at 733. As a result, the investigation stalled for years and material evidence was lost. *Id.* But the Seventh Circuit concluded that Rossi's court-access right had not been violated because he "knew all of the relevant facts of his case and was free to pursue legal redress at all times." *Id.* at 736.

> Similarly, in *Thompson*, police had used excessive force on the plaintiff, then falsely omitted that fact from the police report of the incident. *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994). Again, though, there was no court-access violation because "the facts known to [the plaintiff] concerning the arrest were sufficient to enable him to promptly file the instant lawsuit[.]" *Id.* at 852. That is, the plaintiff could fully bring an excessive-force civil claim regardless of the content of the police report. And in *Vasquez*, the allegations went even farther; there, the police covered up the accidental shooting of a child, and the responsible officer was not identified until six months later, when an independent task force took over the investigation. *Vasquez*, 60 F. 3d at 329. Despite all that, the court again held that the family's access to the courts had not been impeded; even though it took six months, they were eventually able to uncover the relevant facts of the case. *Id.* In contrast, the Seventh Circuit did find that the right to court-access had been violated in *Bell* [*v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984)] But in that case, police had covered up a fatal police shooting by planting a knife in the victim's hand and then convincing the victim's family that the victim was actually the assailant, which ultimately prevented the family from "learn[ing] the facts of [the] case" and "rendered hollow" the family's attempt to pursue a wrongful death suit against the

city.  *Bell*, 746 F.2d at 1261.   But the plaintiffs in *Bell* did not have personal knowledge of the actual facts.

*Lopez*, 2020 WL 1530739, at *9-10.

Here, Plaintiffs claim that the Boone County Defendants thwarted their efforts to pursue civil rights litigation (*i.e.*, the very claims that are the subject of this lawsuit) because they "conspired" to prevent Plaintiffs from accessing body camera footage[20] of the March 4, 2019 standoff.   [Filing No. 122 at 85.]   And, they allege "[u]pon information and belief, some or all of the body camera footage has been deleted."   [Filing No. 122 at 85.]   These allegations fall well short of stating a First Amendment access-to-courts claim.   First, as set forth in great detail in the SAC, Plaintiffs—in particular, Barry—were active participants in the events of March 4, 2019. Barry has first-hand knowledge of any alleged constitutional deprivations from the law enforcement response to his home.   This case is not a scenario where Plaintiffs had no way of knowing facts giving rise to potential claims.   Second, Plaintiffs have not provided allegations regarding how the withholding of body camera footage thwarted them from pursuing their claims. Indeed, Plaintiffs *are* pursuing those claims; they are the subject of this lawsuit.   Thus, Plaintiffs have not plausibly alleged that they were denied judicial access by virtue of any alleged withholding of the body camera footage.

To the extent Plaintiffs are alleging that Bennii Weldy's Facebook statements to Barry thwarted their access to courts, that claim is also dismissed.   Weldy's opinion about the prospects and potential consequences of Plaintiffs' lawsuit does not constitute interference under the First Amendment's right to access courts.

---

[20] In their briefing, however, Plaintiffs state that the Boone County Defendants provided the body camera footage to Plaintiffs on October 8, 2021.   [Filing No. 165 at 14.]

Therefore, the Court **GRANTS** the Zionsville Defendants' and the Boone County Defendants' Motions to Dismiss, [Filing No. 124; Filing No. 130], the access-to-courts claims in Count VII.

### C.   The Dismissals of the Federal Claims are With Prejudice

The Court finds that further amendments of the federal claims that the Court is dismissing would be futile as Plaintiffs have already amended their complaint twice in response to deficiencies, have not sought further leave to amend in response to the Motions to Dismiss, and have not otherwise offered factual allegations that they believe would fix the inadequacies.  *See, e.g.*, *Selyutin v. Bd. of Dirs. of Skokie Gardens Condo. Ass'n*, 818 F. App'x 535, 538 (7th Cir. 2020).  Plaintiffs' federal claims dismissed in whole (Counts IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV) and in part (Counts I and III) are **WITH PREJUDICE**.

## V.
### STATE-LAW CLAIMS

In their response briefs, Plaintiffs have relinquished their state-law claims of malicious prosecution (Count XV); abuse of process (Count XVI); frivolous litigation (XVII); and intentional infliction of emotional distress as it relates to the DCS Defendants (Count XXI) because the DCS Defendants are entitled to immunity under Indiana law.   [Filing No. 166 at 21.] Plaintiffs have also relinquished the false-imprisonment claim asserted by Barry in Count III except as to the Boone County Defendants and the Lebanon Defendants.   [Filing No. 169 at 5; Filing No. 172 at 4; Filing No. 171 at 5.]   Therefore, these claims are **DISMISSED WITH PREJUDICE**.

These dismissals leave the following state law claims: a false imprisonment claim related to the seizure of Barry against the Lebanon and Boone County Defendants (Count III); legal

malpractice claims against the Delamater Defendants and Camden Defendants (Counts XVIII and XIX); a defamation claim against Thomas Santelli for a Facebook post (Count XX); an intentional infliction of emotional distress claim against the Boone County Defendants, the Delamater Defendants, and the Camden Defendants (Count XXI); and medical malpractice and tort claims against Kathryn's medical-care providers (Counts XXII, XXIII, XXIV, XXV, XXVI, XXVII, and XXVIII).

### A.   Barry's False Imprisonment Claim (Count III)

Barry's false imprisonment claim is sufficiently pled as to Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, Sergeant Musgrave, and Sergeant Boling for the same reason his Fourth Amendment unreasonable seizure claim survives against these Defendants. [21] *See Row v. Holt*, 864 N.E.2d 1011, 1016 n.4 (Ind. 2007) (acknowledging that false imprisonment claim involves the same analysis as a Fourth Amendment seizure claim).  His false imprisonment claim is insufficiently pled with respect to all other Defendants for the same reasons his Fourth Amendment seizure claim fails against these individuals.

Therefore, the Boone County Defendants' Motion to Dismiss, [Filing No. 130], and the Lebanon Defendants' Motion to Dismiss, [Filing No. 134] are **DENIED** as to the false imprisonment claims asserted against Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, Sergeant Musgrave, and Sergeant Boling.   Chief Potts' Motion to Dismiss, [Filing No. 128], is **GRANTED** as to the false imprisonment claim, as is the

---

[21] Barry dismissed his false imprisonment claim against Officer Shook, the other defendant implicated in the Fourth Amendment seizure claim.   [Filing No. 172 at 4.]

Boone County Defendants' Motion to Dismiss, [Filing No. 130], as to claims concerning post-March 4, 2019 surveillance.

**B.   IIED Against Members of the BCSO (Count XXI)**

In Count XXI, Plaintiffs assert an intentional infliction of emotional distress ("IIED") claim against 31 members of the BCSO.[22]   The allegations provided in Count XXI are as follows:

> 779. Defendants' conduct was beyond any conduct acceptable so as to be regarded as atrocious.
> 780. Defendants' (sic) intentionally and recklessly engaged in extreme and outrageous conduct which caused the Plaintiffs severe emotional distress.

[Filing No. 122 at 97.]   The Court is unable to discern what conduct, among the 105 pages and 816 paragraphs of allegations, Plaintiffs are alleging gives rise to an IIED claim for the long list of Defendants named in Count XXI.   Plaintiffs' response brief provides some clues.   In relation to the IIED claim, Plaintiffs state that "[l]aw enforcement should not seize a family with a sniper team while driving an armored personnel carrier around them in order to determine the safety of young children when there were no allegations of past, imminent, or future abuse."   [Filing No. 165 at 20.]   Thus, the Court will reasonably interpret Plaintiffs' IIED claim to be related to the conduct underlying the alleged unreasonable seizure of Barry described in connection with Count III.   To the extent Plaintiffs are purporting to assert an IIED claim in connection with other conduct, the Court dismisses such claims as inadequately pled.   *See Bank of America*, 725 F.3d at 818 ("Each defendant is entitled to know what he or she did that is asserted to be wrongful.").

---

[22] Plaintiffs also list the Delamater Defendants and the Camden Defendants in Count XXI. However, as discussed below, the Court declines to exercise supplemental jurisdiction over these claims.

The Boone County Defendants ask the Court to dismiss the IIED claim, saying that their actions on March 4, 2019 "were reasonable and done in good faith" for the purpose of "determin[ing] the safety of two young children" and "pursuant to Court Order." [Filing No. 131 at 29.] Barry responds that the manner in which the Boone County Defendants seized him was excessive. [Filing No. 165.]

To state an IIED claim, a plaintiff must plausibly allege facts showing that the defendant was "(1) engage[d] in extreme and outrageous conduct (2) which intentionally or recklessly (3) cause[d] (4) severe emotional distress to another." *Ali v. Alliance Home Health Care, LLC,* 53 N.E.3d 420, 433 (Ind. Ct. App. 2016) (internal quotation marks omitted). For an IIED claim to survive a motion to dismiss, "one must read the allegations of the complaint and conclude that the conduct was truly outrageous." *Marnocha v. City of Elkhart,* 2017 WL 2645730, at *2 (N.D. Ind. June 19, 2017). "[O]nly conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' can support this cause of action." *Id.* (quoting *Bradley v. Hall,* 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999)).

The Court finds that at this early stage of the proceedings, Barry has sufficiently pled an IIED claim against those BCSO employees involved in his seizure as set forth in the Court's analysis of Count III: Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, and Sergeant Musgrave. Barry has not adequately pled an IIED claim with respect to the other Boone County Defendants listed in Count XXI. Nor has Kathryn pled an IIED claim related to law enforcement presence at her home on March 4, 2019 because she was hospitalized at that time and not present to witness the events giving rise to Barry's IIED claim.

Therefore, the Boone County Defendants' Motion to Dismiss, [Filing No. 130], is **DENIED** as to Count XXI as to Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, and Sergeant Musgrave and **GRANTED** as to all other Boone County Defendants and as to any IIED claim begin asserted by Kathryn.

### C.   Supplemental Jurisdiction

Federal courts may exercise supplemental jurisdiction over only those state-law claims that "are so related to claims in the action within [the court's] ordinal jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).   Thus, the supplemental state-law claims must "derive from a common nucleus of operative fact" as the federal claims. *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008) (internal quotation marks omitted). "Supplemental jurisdiction is not appropriate merely because the claims are 'tangentially related' or share a broad factual background." *Holloway v. City of Milwaukee*, 2020 WL 6870098, at *2 (E.D. Wis. 2020) (citing *Hernandez v. Dart*, 635 F. Supp.2d 798, 814 (N.D. Ill. 2009)).   "Instead the question is whether the proof necessary for the state claim overlaps with the proof necessary for the federal claim." *Id.* (quoting *Birdo v. Mathis*, 2015 WL 3948150, at *3 (S.D. Ill. June 26, 2015)).   The "standard case" for a court's exercise of supplemental jurisdiction is where a plaintiff alleges singular conduct which violates both state and federal law.   *See id.*

### 1.   *Legal Malpractice Claims (Counts XVIII, XIX, and XXI)*

Plaintiffs' malpractice claims against their lawyers set forth in Counts XVIII and XIX have nothing to do with the remaining Fourth Amendment claims related to the drone search of the home and the seizure of Barry on March 4, 2019.   Those claims concern whether Attorney Delamater's and Attorney Camden's representation met professional standards and will not overlap

with the evidence related to the Fourth Amendment claims.    In Count XXI, Plaintiffs also purport to assert an intentional infliction of emotional distress claim against the attorneys.    The conduct at issue for the claims relating to the performance of their attorneys is wholly distinct from the conduct underlying Plaintiffs' federal claims.  *See Holloway*, 2020 WL 6870098, at *2 (holding that plaintiff's legal malpractice claim against his attorney was not part of the same nucleus of operative facts giving rise to plaintiff's § 1983 for alleged police misconduct which resulted in a wrongful conviction).    Furthermore, Plaintiffs' federal constitutional claims will be unaffected by the absence of their malpractice claims.  *See Mourning v. Ternes Packaging, Ind., Inc.*, 2015 WL 13646940, at *3 (S.D. Ind. Aug. 24, 2015) ("[T]hat [plaintiff's] federal claims will remain unaffected by dismissal of the state tort law claims is another signal that supplemental jurisdiction does not exist.").

Having found that the exercise of supplemental jurisdiction over Plaintiffs' legal malpractice claims is not appropriate, the Court **DISMISSES WITHOUT PREJUDICE** Counts XVIII and XIX in full and Count XXI in part to the extent it asserts a claim against the Delamater Defendants and the Camden Defendants.

### 2.   *Claims Against Kathryn's Medical-Care Providers (Counts XXII, XXIII, XXIV, XXV, XXVI, XXVII, and XXVIII)*

Likewise, the Court finds supplemental jurisdiction over Kathryn's claims against her medical-care providers is inappropriate.    These claims relate to the standard of care that Kathryn received during her hospitalization and commitment.    Such claims have nothing to do with the claims of constitutional deprivations during the March 4, 2019 standoff.    Indeed, Kathryn is currently pursuing a medical malpractice complaint before a medical review panel under Indiana's Medical Malpractice Act.    [Filing No. 122 at 72.]

Therefore, the Court **DISMISSES WITHOUT PREJUDICE** Counts XXII, XXIII, XXIV, XXV, XXVI, XXVII, and XXVIII.

### 3. *Defamation Claim Against Thomas Santelli (Count XX)*

Also not part of the same nucleus of facts underlying the federal claims is Plaintiffs' defamation claim against Thomas Santelli. The alleged false statement—that at some unknown time Barry shot out Mr. Santelli's truck windows—was made more than a 1½ years after the events on March 4, 2019 giving rise to the federal claims. The Court finds supplemental jurisdiction is not appropriate for this claim as well.

Therefore, the Court **DISMISSES WITHOUT PREJUDICE** Count XX.

## VI.
### CONCLUSION

After sorting through the many motions and 816-paragraph SAC against 107 defendants,[23] only the following ten individual defendants and four claims remain pending before the Court: (1) Count I's illegal search claim against Chief Potts, Sheriff Nielsen, and Major Stevenson for the drone search on March 4, 2019 (the "Drone Claim"); (2) Count III's unlawful seizure claim for Barry's seizure at his home on March 4, 2019 against Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, Sergeant Musgrave, Sergeant Boling, and Officer Shook (the "Standoff Claim"); (3) the false imprisonment claim directly related to the Standoff Claim against Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain

---

[23] As the Court's discussion in this Order reveals, the disparate nature of Plaintiffs' claims would not meet the standard for joining claims and defendants in a single lawsuit under Fed. R. Civ. P. 18 and Fed. R. Civ. P. 20. *See George*, 507 F.3d at 607. If any claims unrelated to the standoff on March 4, 2019 had survived, the Court would have been obligated to sever such claims as improperly joined.

Keller, Sergeant Burcham, Sergeant Musgrave, and Sergeant Boling; and (4) Count XXI's IIED claim related to the Standoff Claim against Sheriff Nielsen, Major Stevenson, Deputy Barnes, Corporal Dunn, Captain Keller, Sergeant Burcham, and Sergeant Musgrave.

In light of the rulings contained in this Order, the remaining claims listed below are **DISMISSED WITH PREJUDICE**:

- Count I (all claims contained within except for the Drone Search claim);

- Count III (all claims contained within except for the Standoff Claim and the false imprisonment claim described above);

- Count IV;

- Count V;

- Count VI;

- Count VII;

- Count VIII;

- Count IX;

- Count X;

- Count XI;

- Count XII;

- Count XIII;

- Count XIV;

- Count XV;

- Count XVI;

- Count XVII; and

- Count XXI (all claims contained within except for: (1) the IIED claim for actions related to the Standoff Claim and (2) the IIED claim against the Delamater Defendants and the Camden Defendants).

The following claims are **DISMISSED WITHOUT PREJUDICE**:

- Count II;

- Count XVIII;

- Count XIX;

- Count XX;

- Count XXI (only as to the IIED claims against the Delamater and Camden Defendants);

- Count XXII;

- Count XXIII;

- Count XXIV;

- Count XXV;

- Count XXVI;

- Count XXVII; and

- Count XVIII.

In light of the rulings contained in this Order, the Motions to Dismiss are granted and denied as follows:

- The Zionsville Defendants' Motion [124] is **GRANTED in part and DENIED in part**.

- The Delamater Defendants' Motion [126] is **GRANTED in full**.

- Chief Potts' Motion [128] is **GRANTED in part and DENIED in part**.

- The Boone County Defendants' Motion [130] is **GRANTED in part and DENIED in part**.

- The Whitestown Defendants' Motion [132] is **GRANTED in full**.

- The Lebanon Defendants' Motion [134] is **GRANTED in part and DENIED in part**.

- The Anonymous Doctor Defendants' Motion [135] is **GRANTED in full**.

- The DCS Defendants' Motion [139] is **GRANTED in full**.

- The Thorntown Defendants' Motion [141] is **GRANTED in full**.

- The Medical Defendants' Motion [147] is **GRANTED in full**.

No partial judgment shall issue at this time.

The Clerk is **DIRECTED to terminate all Defendants from the docket EXCEPT the following Defendants:** (1) Jason Potts; (2) Michael Nielsen; (3) Brian Stevenson; (4) Jonathon Barnes; (5) Brad Dunn; (6) Jeffrey Keller; (7) Christopher Burcham; (8) Ryan Musgrave; (9) Ted Boling; and (10) Aaron Shook.

The following claims **SHALL PROCEED as limited by this entry**:

- Count I Fourth Amendment Illegal Search (Barry and Kathryn's Drone Claim);

- Count III Fourth Amendment Illegal Seizure (Barry's Standoff Claim and False Imprisonment claim); and

- Count XXI (Barry's State law IIED claim related to the actions giving rise to the Standoff Claim).

Finally, the Camden Defendants' Motion for Summary Judgment, [187], and Plaintiffs' related Motion to Defer Consideration, [196], are **DENIED AS MOOT** because of the rulings contained in this Order dismissing the Camden Defendants from this lawsuit.  In light of the rulings the Court has made, which significantly narrow the issues presented in this litigation, the Court requests that the Magistrate Judge confer with the parties as soon as practicable regarding a resolution of the remaining claims short of trial and/or the implementation of a case management

plan addressing only the remaining claims.   The Court notes that while partial summary judgment motions are usually disfavored, the issue of qualified immunity, focused on the question of clearly established law for some or all of the remaining claims in this case, may warrant departure from the general rule.


Date: 3/11/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana




**Distribution via ECF to all counsel of record**


**Distribution via U.S. Mail to:**

Ms. Kathryn Dircks
7650 S. 50 E.
Lebanon, IN 46052

Mr. Barry Dircks
7650 S. 50 E.
Lebanon, IN 46052