UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

KATHRYN DIRCKS and BARRY DIRCKS,        )
                                        )
                    *Plaintiffs*,       )
                                        )
          v.                            )        No. 1:21-cv-00451-JMS-MG
                                        )
JOHNATHON BARNES, ET AL.,               )
                                        )
                    *Defendants*.       )

## ORDER

On March 4, 2019, local law enforcement and officials from the Indiana Department of Child Services ("DCS") visited the home of *pro se* Plaintiffs Barry Dircks ("Barry") and Kathryn Dircks ("Kathryn") to check on the welfare of their two minor children.  After Barry refused to cooperate, law enforcement remained near—but not on—the Dircks' property for hours until the children were ultimately produced and removed from the premises.  Barry and Kathryn later filed this lawsuit, which initially included more than 28 claims against 107 different defendants, though at this juncture only a few of those claims and 10 of those defendants remain.  Presently pending before the Court are four Motions for Summary Judgment filed by: (1) Jason Potts, Division Chief of the Zionsville, Indiana Fire Department, [Filing No. 252]; (2) Officer Aaron Shook of the Zionsville Police Department, [Filing No. 255]; (3) Deputies Johnathon Barnes, Christopher Burcham, Brad Dunn, Jeffrey Keller, and Ryan Musgrave, as well as Major Brian Stevenson and then-Sheriff Michael Nielsen, of the Boone County, Indiana Sheriff's Office ("BCSO") (collectively, "the Boone County Defendants"), [Filing No. 258]; and (4) Officer Ted Boling of the Lebanon, Indiana Police Department, [Filing No. 261].  All of these Motions are fully briefed and ripe for the Court's decision.

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)). Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).

Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS[1]

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence—as supported by the record—are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

---

[1] At the outset, the Court notes that most of the Defendants failed to comply with the Court's Practices and Procedures, which explicitly provide that, when citing electronically filed exhibits, parties must "cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document." [Filing No. 237 at 3-4.] Failure to utilize this citation form has made the Court's review of the evidence unnecessarily cumbersome. Counsel is cautioned that the Practices and Procedures are not optional and must be followed in this case and in all other cases going forward.

**A.  DCS Receives a Report of Potential Neglect**

On the morning of March 4, 2019, DCS received a report concerning allegations of neglect. [Filing No. 284-1 at 26-27.]  Specifically, a source ("the Source") reported that Kathryn had been brought to the hospital by her aunt at approximately 3:00 that morning, had not eaten, drank, or slept in three days, and was exhibiting paranoid and aggressive behavior.  [Filing No. 284-1 at 27.] Kathryn was detained and ultimately committed.  [*See* Filing No. 284-1 at 21-24; Filing No. 284-1 at 27.]

The Source contacted Barry to inquire about the status of the Dircks' two children, a 14-month-old and a 4-year-old.  [Filing No. 284-1 at 27.]  According to the Source, Barry "was very paranoid," stated that Kathryn's "parents sent the military and government after them," advised that "the family keeps a small artillery in the home[,] . . . do[es] not sleep unless two people are guarding the home with rifles[,] . . . [and] barricades the door when someone knocks at the door." [Filing No. 284-1 at 27-28; *see also* Filing No. 262-3 at 8 (listing over 60 firearms that were present in the Dircks home on the date of the incident).]  The Source described Barry as "delusional," stated that Barry "thinks [Kathryn] is possessed and he discusse[d] Satan when talking about her," and reported that "the parents have been this way for about a week."  [Filing No. 284-1 at 27-28.] The Source told DCS that the Dircks children were at home with Barry, although the Source did not know if anyone else was at the home, whether the children had eaten, whether the children were hurt or injured, or whether the children were in immediate danger.  [Filing No. 284-1 at 27.] The Source was unaware of any threats being made to harm the children, and "did not feel the police needed to be contacted."  [Filing No. 284-1 at 27.]

4

**B.  The Initial Visit to the Dircks' Property and the Order to Compel**

In response to the report of potential neglect, two DCS employees, accompanied by BCSO Deputies Barnes and Williams, traveled to the Dircks' home at 7650 South 50 East in Lebanon, Indiana ("the Property") to conduct a welfare check to verify the wellbeing of the children. [Filing No. 258-2 at 1-2; Filing No. 292 at 45.]  At approximately 10:00 a.m. on March 4, 2019, Deputy Barnes knocked on the door, but he received no immediate response. [Filing No. 258-2 at 2.] Eventually, Barry acknowledged Deputy Barnes and told him through a window that he and his companions needed to leave the Property. [Filing No. 258-2 at 2.]  Barry refused to allow the Deputies to enter his residence and refused to allow the DCS employees to see the children. [Filing No. 258-2 at 2.]  The Deputies and the DCS employees left the Property, although they remained "in the area with a visual of the house but off of the [P]roperty." [Filing No. 292 at 118.]

Shortly thereafter, BCSO Deputy Keller arrived at the scene. [Filing No. 258-5 at 2.] Footage captured by Deputy Keller's dashboard camera shows that his vehicle remained parked in the road[2] for approximately two hours. [Plaintiffs' Exhibit 40 (Keller Dash Camera).[3]]  At various times, other law enforcement vehicles were on the road near Deputy Keller's vehicle. [*See* Plaintiffs' Exhibit 40.]  Eventually, law enforcement, including Deputy Barnes, set up a roadblock to close the intersection  of South 50 East and County Road 800 South near the Property. [Filing

---

[2] Plaintiffs assert in their briefing that Deputy Keller's vehicle was parked "in the road near Plaintiffs' residence." [Filing No. 293 at 5.]  But it is not clear from the dashboard camera video or any other evidence exactly how far from the Property Deputy Keller was parked.

[3] All video evidence submitted by Plaintiffs is cited using the exhibit numbers and names listed in Plaintiffs' Notice of Manual Filing, [Filing No. 287].

No. 292 at 118.] The Court takes judicial notice of the fact that this intersection is approximately 0.3 miles from the Property.[4]

Deputy Keller obtained Barry's cell phone number and called him, but Barry did not answer, so Deputy Keller left a voicemail identifying himself and asking Barry to contact him. [Filing No. 258-5 at 2.] Deputy Keller then sent Barry three text messages containing the same information, to which Barry responded: "Please stop harassing us. Once my lawyers arrive and [I] have time to talk with them, then they will talk to you." [Filing No. 258-11 at 1.] Deputy Keller responded: "We [are] just concerned about [you] and the kids. Just need a few minutes to talk to you face to face[.]" [Filing No. 258-11 at 2.] He then asked Barry three more times to briefly speak with law enforcement, but Barry never responded. [Filing No. 258-11 at 2.] This exchange took place between 11:02 a.m. and 11:33 a.m. [Filing No. 258-11 at 1-2.]

Deputy Keller also spoke on the phone with an individual familiar with Barry, who reported that Barry likely had "some weapons, if not quite a few." [Plaintiffs' Exhibit 41 at 06:35-06:45 (Keller Body Camera 1).]

Deputy Keller subsequently discussed the situation with Major Stevenson and Sheriff Nielsen, who had arrived on the scene. [Filing No. 258-5 at 2; Filing No. 292 at 139.] Deputy Keller, Major Stevenson, and Sheriff Nielsen initially gathered at the end of a driveway of an abandoned property located at 7355 South 50 East, [Filing No. 292 at 45-46; Filing No. 292 at 139; *see also* Plaintiffs' Exhibit 40], which the Court takes judicial notice is approximately 0.3 miles north of the Property. Because they were concerned that Barry might have weapons, they ultimately relocated to a nearby property at 228 West 700 South to set up a command post, [Filing

---

[4] The Court utilized Google Maps to approximate the distance between locations discussed in this Order. *See United States v. Julius*, 14 F.4th 752, 756 (7th Cir. 2021) ("We and other courts have taken judicial notice of distance estimates from Google Maps.").

No. 292 at 45-46; Filing No. 292 at 139], which the Court takes judicial notice is approximately 1.4 miles away from the Property in driving distance, or approximately 0.5 miles away from the Property as the crow flies.  Several law enforcement vehicles assembled at the command post, including a BCSO mobile command bus.  [*See* Plaintiffs' Exhibit 43 at 10:00-11:30 (Keller Body Camera 3); Filing No. 292 at 46.]

Between 12:33 p.m. and 1:21 p.m., Sheriff Nielsen sent several text messages to Barry, Barry's brother, and others, indicating that law enforcement only wanted to verify the safety of the children and attempting to convince Barry to speak with him.  [Filing No. 258-11 at 2-3.]  Barry did not respond.  [Filing No. 258-11 at 2-3.]

Considering the information known about Kathryn and her statements, "Barry's hostility to the deputies at initial approach, and the understanding that Barry may have numerous guns and weapons at the residence," Sheriff Nielsen, Major Stevenson, and other members of BCSO leadership decided to activate the Special Response Team ("SRT") and the Crisis Negotiation Team ("CNT") to assist with the situation.  [Filing No. 258-5 at 2-3; Filing No. 258-7 at 2-3; Filing No. 258-8 at 2.]

Meanwhile, DCS employees had filed a Motion to Compel in the Boone Circuit Court, seeking an order compelling production of the two Dircks children.  [Filing No. 258-7 at 2.]  The Boone Circuit Court issued an order ("the Order to Compel"), which read:

The Court having reviewed the Verified Motion to Compel and the Affidavit attached thereto, now GRANTS the Motion to Compel.

Father, Barry Dircks and/or Mother, Kathryn Dircks are ordered to allow the Boone County Sheriff's Department and the Indiana Department of Child Services Family Case Managers to enter the home and the property located at 7650 S. 50 E, in Lebanon, Boone County Indiana to determine the welfare and safety of all individuals, including all children in the home and are further ordered to produce the child(ren) A. Dircks and B. Dircks for interview.
Law enforcement and DCS are authorized to enter onto the property to verify the safety and well being of the child(ren) any all means necessary and appropriate.

So ordered this     **March 4, 2019**                                            .

RECOMMENDED:                                              APPROVED:

_signature_                                               _signature_

Magistrate Sally E. Berish                               The Honorable Lori Shein
                                                         Judge, Boone Circuit Court

[Filing No. 258-1 at 1.]  As soon as the Order to Compel was issued, just after 2:00 p.m., the DCS

employees conveyed that information to law enforcement.  [Filing No. 258-8 at 3; *see also* Filing

No. 292 at 139 (a timeline of events stating: "1414 hours, Writ to enter the house and property was

delivered to command.").]  However, law enforcement did not immediately inform Barry about

the Order to Compel.  [*See* Plaintiffs' Exhibit 44 at 02:51:00-02:57:00 (Keller Body Camera 4)

(showing several law enforcement officials, several hours into the incident, discussing the fact that

Barry did not know about the Order to Compel but that he would find out about it from his

attorney).][5]

---

[5] Although the body camera footage does not contain any sort of timestamp, based on a comparison of the footage to a timeline of events prepared by law enforcement, [Filing No. 292 at 139-43], the Court deduces that this conversation occurred around 5:00 p.m. and that Barry was unaware of the Order to Compel at that time but found out shortly thereafter.  [*See also* Plaintiffs' Exhibit 44 at 03:11:10-03:11:30 (law enforcement discussing that they still had not informed Barry of the Order to Compel but that his attorney may have told him about it).]

### C.  The SRT and CNT Response

Additional personnel and equipment associated with the SRT and CNT began to arrive at the scene at approximately 1:30 p.m.  [Filing No. 258-5 at 3; Filing No. 258-7 at 3.]  Among those who responded to the scene were: BCSO Deputies Burcham, Dunn, and Musgrave, [Filing No. 258-3 at 1-2; Filing No. 258-4 at 1-2; Filing No. 258-6 at 1-2]; Zionsville Fire Department Division Chief Potts, [Filing No. 253-1 at 1]; Zionsville Police Department Officer Shook, [Filing No. 256-4 at 1]; and Lebanon Police Department Officer Boling, [Filing No. 262-2 at 1].

No personnel or equipment entered the Property when reporting to the scene.  [Filing No. 258-5 at 3; Filing No. 258-7 at 3; Filing No. 258-8 at 3.]  Aside from Deputies Barnes and Williams, who initially approached to knock on the door, none of the Boone County Defendants entered the Property or had physical contact with Barry, and none discharged any weapons of any kind on or near the Property.  [Filing No. 258-2 at 3; Filing No. 258-3 at 2; Filing No. 258-4 at 2-3; Filing No. 258-5 at 3; Filing No. 258-6 at 2; Filing No. 257-7 at 4; Filing No. 258-8 at 4.]

Officer Boling also never entered the Property.  [Filing No. 262-2 at 1-2.]  Instead, he responded to a "staging area" approximately a block away from the Property and "sat in a box truck-style law enforcement vehicle" awaiting further instruction, until it became clear that his assistance would not be needed, and he was permitted to leave the scene.  [Filing No. 262-2 at 1-2; Filing No. 294 at 6.]  He denies pointing a sniper rifle or any other weapon at the Property.  [Filing No. 262-2 at 2.]  Barry cannot recall whether he saw Officer Boling pointing a sniper rifle.  [Filing No. 262-3 at 4.]

Deputy Dunn acted as the primary crisis negotiator and attempted several times to contact Barry via telephone calls and text messages between 2:33 p.m. and 4:18 p.m.  [Filing No. 258-4 at 2; Filing No. 258-11 at 4-8; Filing No. 292 at 32-33.]  Barry repeatedly told Deputy Dunn to leave

him alone, go away, and stop harassing him.  [Filing No. 258-4 at 2; Filing No. 258-11 at 4-8; Filing No. 292 at 32-33.]  Deputy Dunn repeatedly told Barry that law enforcement was only there to check on the welfare of the children and would leave as soon as they could verify that the children were safe.  [Filing No. 258-11 at 4-8.]  Deputy Dunn never entered the Property or had physical contact with Barry.  [Filing No. 258-4 at 2-3.]

**D.  Use of Snipers and Sniper Rifles**

Officer Shook served as a "rotational sniper" for the SRT.  [Filing No. 290 at 5.]  He responded to "a surveillance point" near the Property and was instructed to "act[] in an observational role as to persons coming and going from the [P]roperty during the incident," and to remain "on standby for further assistance if it was needed by other law enforcement in control of the situation."  [Filing No. 290 at 5-6; Filing No. 290 at 11.]  Officer Shook denies ever pointing his sniper rifle at the Property and states that he was never instructed to do so.  [Filing No. 256-4 at 1; Filing No. 290 at 6.]  He states that he left his sniper rifle inside a parked BCSO vehicle for the duration of the incident.  [Filing No. 290 at 11.]  Officer Shook never entered the Property or had any interaction with Barry.  [Filing No. 256-4 at 1.]  Barry acknowledges that he never had any interactions with Officer Shook, and cannot remember whether he ever saw Officer Shook point a sniper rifle in the direction of the Property.  [Filing No. 256-2 at 3-4; Filing No. 256-3 at 2.]

Deputies Burcham and Musgrave were also part of the "observer/sniper element," and were stationed at a residence north of the Property to monitor any movement on the Property and provide protection for other law enforcement on scene.  [Filing No. 292 at 18; Filing No. 292 at 59.]  Both Deputies admit that they pointed their sniper rifles in the direction of the Dircks residence during the incident.  [Filing No. 292 at 26; Filing No. 292 at 66.]  However, they never entered the

10

Property, had physical contact with Barry, or discharged their weapons.  [Filing No. 258-3 at 2; Filing No. 258-6 at 2.]

Law enforcement's timeline indicates that, at approximately 2:53 p.m., all three snipers were moved "to the house north of the Dircks" to see if they could use that location "to surveil the Dirck's (sic) house," and that the snipers were in place at that property by approximately 4:00 p.m. [Filing No. 292 at 140-41.]  The Court takes judicial notice of the fact that the next property to the north of the Dircks' Property is approximately 1,000 feet (0.19 miles) away.

**E.  Use of the Drone**

Chief Potts also responded to the scene along with the SRT.  [Filing No. 253-1 at 1.]  He was "asked to operate the Zionsville Fire Department's drone by the Boone County Sheriff in order to obtain an aerial view" of the Property.  [Filing No. 253-1 at 1.]  According to Chief Potts, "[t]here is nothing special about the drone," and "it is the type of drone that can be purchased by anyone, over the internet or otherwise, and it was not equipped with thermal or infrared capabilities, nor any other device that would permit viewing through walls."  [Filing No. 253-1 at 1.]  The drone was equipped with a camera with 30x optical zoom and 180x digital zoom.  [Filing No. 288 at 6.]  Chief Potts operated the drone between 230 and 265 feet above ground level, along "one circular path from the command vehicle location around the outside perimeter of the [Property]," but "[a]t no point did the drone enter the airspace in, on, or above the [Property]." [Filing No. 253-1 at 2; *see also* Filing No. 258-7 at 4; Filing No. 258-8 at 4; Filing No. 288 at 5.] Although Sheriff Nielsen requested Chief Potts' assistance in operating the drone, neither he nor Major Stevenson provided Chief Potts with any specific orders concerning how the drone was to be used.  [Filing No. 258-7 at 4; Filing No. 258-8 at 4.]   None of the other Boone County Defendants had any involvement in the operation of the drone.  [Filing No. 258-2 at 3; Filing No.

258-3 at 2; Filing No. 258-4 at 2; Filing No. 258-5 at 3; Filing No. 258-6 at 2.]  The drone was deployed sometime around 4:40 p.m.  [*See* Filing No. 292 at 141 ("1640 hours, The ZFD drone is flying and transmitting photos to command.").]

Barry and Kathryn submitted as evidence the video footage captured by the drone during its flight, which is approximately 18 minutes long.  [*See* Plaintiffs' Exhibit 49 (Drone Footage).] The footage is consistent with Chief Potts' account of the drone's path, and shows the drone taking off from the parking lot of the command post, circling the Property from afar, and returning to the command post.  [*See* Plaintiff's Exhibit 49.]  At various times, the drone camera zooms in on the Dircks' home and another building on the Property, apparently attempting to record through the windows, which all appear to be covered with curtains.  [*See* Plaintiffs' Exhibit 49.]  The drone footage was viewed by law enforcement officials on the scene shortly after it was recorded.  [*See* Plaintiffs' Exhibit 44 at 02:21:00-02:28:00.]

### F.  Resolution of the Incident

After several hours of negotiations—both directly with Barry via telephone and text message and through various family members and Barry's attorney—Barry agreed to produce the children to DCS.  [Filing No. 292 at 118; *see generally* Plaintiffs' Exhibit 44.]  Just after 7:00 p.m., Barry's brother and sister—who had been on the Property inside the residence for the duration of the incident—took the children off the Property and surrendered them to law enforcement personnel at the intersection where Deputy Barnes had previously set up a roadblock.  [Filing No. 292 at 118; Filing No. 292 at 143.]  After DCS secured the children, all law enforcement personnel and equipment left the area.  [Filing No. 258-5 at 3; Filing No. 258-7 at 4.]  Barry was never arrested or taken into custody.  [Filing No. 258-7 at 4.]

### G.  This Lawsuit

Kathryn and Barry filed the operative Second Amended Complaint, asserting numerous claims against over one hundred defendants purportedly involved in the events that began on March 4, 2019.  [*See* Filing No. 122.]  On March 11, 2022, the Court issued an Order ("the March 2022 Order") addressing ten motions to dismiss filed by various groups of defendants and dismissing a majority of the claims and defendants named in the Second Amended Complaint. [Filing No. 211.]  However, the Court concluded that the following claims could proceed based on the allegations of the Second Amended Complaint:

- A Fourth Amendment search claim asserted pursuant to 42 U.S.C. § 1983 by Barry and Kathryn against Chief Potts, Sheriff Nielsen, and Major Stevenson relating to the use of the drone ("the Drone Claim");

- A Fourth Amendment seizure claim asserted pursuant to § 1983 by Barry against the Boone County Defendants, Officer Boling, and Officer Shook relating to the police presence near the Property, including the use of sniper rifles ("the Seizure Claim");

- A state law claim for false imprisonment asserted by Barry against the Boone County Defendants ("the False Imprisonment Claim");[6]

- A state law claim for intentional infliction of emotional distress ("IIED") asserted by Barry against the Boone County Defendants relating to the police presence near the Property ("the IIED Claim").

[Filing No. 211.]  The remaining Defendants now seek summary judgment in their favor on all of these claims.

---

[6] Prior to the March 2022 Order, Plaintiffs dismissed the False Imprisonment Claim against Officer Shook.  [*See* Filing No. 211 at 88 n.1 (citing Filing No. 172 at 4).]  Plaintiffs subsequently indicated in their Statement of Claims that they are "not pursuing any state law claims against [Officer] Boling."  [Filing No. 249 at 3.]  Accordingly, the False Imprisonment Claim remains pending only as to the Boone County Defendants.

# III.
## DISCUSSION

### A.  The Drone Claim

#### 1.  *Chief Potts' Arguments*

In support of his Motion for Summary Judgment, Chief Potts argues that his operation of the drone did not violate the Fourth Amendment because: (1) the drone operated in publicly navigable airspace and never encroached upon Plaintiffs' property; and (2) the drone used common technology that is available to the public.  [Filing No. 253 at 2-5.]  Accordingly, he argues, the drone did not violate Plaintiffs' subjective or objective expectation of privacy.  [Filing No. 253 at 2-5.]  Chief Potts further contends that, even if his operation of the drone violated the Fourth Amendment, he is entitled to qualified immunity because—as the Court recognized in the March 2022 Order—there is no clearly established precedent demonstrating that operating a drone under the circumstances presented in this case is unconstitutional.  [Filing No. 253 at 5-8.]

In response, Plaintiffs argue that the use of the drone violated the Fourth Amendment because: (1) Chief Potts did not comply with federal or state aerial regulations; (2) the drone was flown over neighboring private property without permission of the property owners; (3) the drone provided views of the Property not otherwise accessible to the general public; and (4) the drone utilized technology not in general public use, including enhanced zoom and thermal imaging.  [Filing No. 289 at 6-12.]  Plaintiffs further argue that Chief Potts is not entitled to qualified immunity, and they point to *Florida v. Riley*, 488 U.S. 445 (1989), *Kyllo v. United States*, 533 U.S. 27 (2001), and *Florida v. Jardines*, 569 U.S. 1 (2013), which they contend constitute "established precedent that should have alerted [Chief] Potts that his utilization of the drone without a warrant, exigent circumstances, or probable cause constituted a search in violation of the Fourth Amendment."  [Filing No. 289 at 12-15.]  Plaintiffs also point out that Indiana law requires law

enforcement officers to obtain a warrant before using a drone to conduct a search of private property and that the Order to Compel did not authorize any such search.  [Filing No. 289 at 15-16 (citing Ind. Code § 35-33-5-9).]  Finally, Plaintiffs argue that Chief Potts' "utilization of the drone was so egregious and unreasonable that, even without relevant caselaw, a reasonable official could not have thought he was acting lawfully."  [Filing No. 289 at 16-17.]

In reply, Chief Potts maintains that his operation of the drone did not violate any laws, but regardless, "mere unlawfulness" does not amount to a constitutional violation.  [Filing No. 302 at 1.]  He also reiterates that drones like the one he used are available to the general public and that no thermal imaging technology was attached to the drone at the time of its flight.  [Filing No. 302 at 1-3.]  Chief Potts argues that Plaintiffs lack standing to assert any claims on behalf of other landowners who did not give permission for the drone to be operated on or above their property, and by focusing on those landowners, Plaintiffs essentially "admit that the drone was never in air space above their residence."  [Filing No. 302 at 3.]  Chief Potts also maintains that Plaintiffs had no reasonable expectation of privacy in the areas observed by the drone and that "nothing of the house was visible other than the outside of it - something anyone looking at the house could see from anywhere."  [Filing No. 302 at 3.]

### 2. The Boone County Defendants' Arguments

In support of their Motion for Summary Judgment, the Boone County Defendants argue that the use of the drone did not violate the Fourth Amendment, and therefore Plaintiffs' claims against Sheriff Nielsen and Major Stevenson fails.  [Filing No. 259 at 16-20.]  Specifically, the Boone County Defendants emphasize that the drone never entered the airspace above the Property and was only used to observe things that were visible from a public vantage point.  [Filing No. 259 at 16-20.]  They also assert that Sheriff Nielsen and Major Stevenson are entitled to qualified

immunity because Plaintiffs cannot point to any case clearly establishing that using a drone under the circumstances presented in this case amounts to a constitutional violation.  [Filing No. 259 at 16.][7]

In response, Plaintiffs incorporate by reference all of their arguments made in response to Chief Potts' Motion for Summary Judgment.  [Filing No. 293 at 33-34.]  They also argue that Sheriff Nielsen and Major Stevenson are not entitled to qualified immunity.  [Filing No. 293 at 34.]

---

[7] The Boone County Defendants also make the following argument:

> Further, the scenario begs the question as to what harm did the drone search even cause such that it could be considered unreasonable?  Barry was not charged with any crimes and the drone gathered no information used against him.  Fourth Amendment "unreasonable search" law is overwhelmingly and understandably the province of criminal law – did the government illegally obtain evidence used to charge someone with a crime?  Nothing of the sort happened here.  Information was gathered about someone who had refused to comply with a welfare check and was understood to be paranoid and have access to a "small artillery" in his home.  Under these circumstances, the drone search did not violate any established Fourth Amendment standards.

[Filing No. 259 at 19-20.]  The Court acknowledges this argument only to point out that it reflects a fundamental (and, frankly, concerning) misunderstanding of the law.  To be sure, the exclusionary rule provides an important remedy to a criminal defendant whose Fourth Amendment rights have been violated in the government's pursuit of a case against him.  But, as the Supreme Court acknowledged many years ago, "[t]o say that a man suspected of crime has a right to protection against search of his home without a warrant, but that a man not suspected of crime has no such protection, is a fantastic absurdity." *Ohio ex rel. Eaton v. Price*, 364 U.S. 263, 269 (1960) (quoting *D.C. v. Little*, 178 F.2d 13, 17 (D.C. Cir. 1949)).  The Fourth Amendment provides important protections to individuals regardless of whether they are suspected of or charged with crimes, and there is, of course, a civil remedy under § 1983 for individuals whose Fourth Amendment rights have been violated by state actors, even where such violation does not cause actual injuries. *See, e.g.*, *Guzman v. City of Chicago*, 689 F.3d 740, 748 (7th Cir. 2012) (explaining that nominal damages may be "an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury," but warning that "a court should use caution in giving the [nominal damages] instruction because an unlawful search or seizure will often produce, at a minimum, a compensable claim for loss of time").

In reply, the Boone County Defendants assert that the video captured during the drone's flight demonstrates that it did not enter the Property or the airspace above it. [Filing No. 303 at 14-15.] They reiterate that a "single pass by the drone, at [a] distance, and outside of the property boundary did not violate Barry's [or Kathryn's] rights" and "is not enough to subject Sheriff Nielsen and [Major] Stevenson to liability under the Fourth Amendment or otherwise deny them qualified immunity for the drone's use." [Filing No. 303 at 15.]

    3.  *Analysis*

The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Edwards*, 769 F.3d 509, 513 (7th Cir. 2014) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). A search under the Fourth Amendment occurs "either when the government physically intrudes without consent upon a constitutionally protected area in order to obtain information," or "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Tuggle*, 4 F.4th 505, 512 (7th Cir. 2021). The home and the area "immediately surrounding and associated with the home," also known as the "curtilage," are afforded the broadest protections from searches. *Florida v. Jardines*, 569 U.S. 1, 6-7 (2013) (citations and quotation marks omitted). That is so because the "curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (citations and quotations omitted).

In the March 2022 Order, the Court addressed Plaintiffs' claim that the use of the drone was unconstitutional, acknowledging in relevant part that there are "no bright-line rules about

17

drone use under the Fourth Amendment" and concluding that whether a search occurred in this case "is a fact-intensive inquiry" that "depends on the analytical 'touchstone' of whether Plaintiffs had a 'reasonable expectation of privacy' in the areas accessed by the drone." [Filing No. 211 at 37.] At that stage in the proceeding, no discovery had been conducted and no evidence adduced, so the Court found that "Plaintiffs ha[d] plausibly alleged that the drone search intruded upon their reasonable expectation of privacy as to the curtilage surrounding their home with allegations that the drone was able to provide views of Plaintiffs' windows and around their home and outbuildings in a manner not otherwise accessible to the public" but that determining "[w]hether Plaintiffs can ultimately prove that a Fourth Amendment search and violation occurred will depend on the evidence, including heights and locations achieved by the drone during its flight." [Filing No. 211 at 37.] The footage recorded by the drone largely refutes Plaintiffs' allegations that the drone was able to provide law enforcement with information not otherwise accessible to the public, because it shows a view of the Property that is essentially the same as what could be seen by any passerby on the public street. Regardless, the Court need not determine whether the operation of the drone in this case violated the Fourth Amendment, because even if it did, Plaintiffs' claims are barred by qualified immunity.

Notably, the Court did not have occasion in the March 2022 Order to address the issue of qualified immunity, because no Defendant properly raised it. [*See* Filing No. 211 at 33 n.15.] Police officers and other state officials "'are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Pierner-Lygte v. Hobbs*, 60 F.4th 1039, 1044 (7th Cir. 2023) (quoting *District of Columbia v. Wesby*, --- U.S. ----, 138 S. Ct. 577, 589 (2018)). "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment."

*Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (emphasis omitted).  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"To counter the defense of qualified immunity, a plaintiff must show that the constitutional right at issue was clearly established at the time of the alleged violation." *Greene v. Teslik*, 2023 WL 2320767, at *3 (7th Cir. Mar. 2, 2023) (quotation and citation omitted).  In order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 138 S. Ct. at 590.  While a plaintiff "need not produce a case directly on point, . . . the 'legal principle [must] clearly prohibit the officer's conduct in the particular circumstances before him.'" *Pierner-Lytge*, 60 F.4th at 1044 (quoting *Wesby*, 138 S. Ct. at 590). The clearly established law "must share specific details with the facts of the case at hand." *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022).  A plaintiff cannot escape the application of qualified immunity by defining in a general manner the constitutional right that he claims was violated.  *See City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).  As the Seventh Circuit has explained, defeating qualified immunity "sounds like a high bar because it is—qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Alternatively, in the absence of clearly established precedent, a plaintiff may overcome qualified immunity by establishing that "the unlawfulness of the officer's conduct is sufficiently

19

clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590. Although there may be circumstances under which a defendant's conduct "is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully," *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013), such "obvious case[s]" are "rare," *Wesby*, 138 S. Ct. at 590.

Here, as the Court has already pointed out, there are "no bright-line rules about drone use under the Fourth Amendment." [Filing No. 211 at 37.] Nevertheless, Plaintiffs point to three cases—*Riley*, *Kyllo*, and *Jardines*—in support of their contention that the right to be free from drone searches like the one at issue in this case was clearly established as of March 4, 2019. In *Riley*, a law enforcement official flew a helicopter in navigable airspace 400 feet above the defendant's property, and with his naked eye, looked through openings in a greenhouse roof and observed what he believed to be marijuana growing inside. 488 U.S. at 448. The Supreme Court—relying on its earlier decision in *California v. Ciraolo*, 476 U.S. 207 (1986))—concluded that no Fourth Amendment violation occurred, reaffirming that "the home and its curtilage are not necessarily protected from inspection that involves no physical invasion," and that "[a]s a general proposition, the police may see what may be seen from a public vantage point where [they have] a right to be." *Riley*, 488 U.S. at 449 (internal quotations omitted, second alteration original). Specifically, the Court found that the helicopter was lawfully flying in the publicly navigable airspace above the defendant's property and there was no evidence suggesting that helicopters flying at that height were sufficiently rare to create a reasonable expectation of privacy. *Id.* at 450-52.

Plaintiffs no doubt rely on *Riley* because they believe that the drone was not operated in compliance with federal and state aviation regulations—namely, that Chief Potts did not have the

proper registration and certificates, that the drone was not constantly within Chief Potts' visual line of sight as required by law, and that Indiana law requires a warrant to conduct a search using a drone. And it is true that the Supreme Court in *Riley* acknowledged that it "would have [been] a different case if flying at [an altitude of 400 feet] had been contrary to law or regulation." 488 U.S. at 451. But it is clear, given the context of this acknowledgment, that the legality of the helicopter's flight path was not determinative, but instead was only relevant to the extent that it impacted the reasonableness of the defendant's expectation of privacy. Specifically, the Court wrote:

> Any member of the public could legally have been flying over Riley's property in a helicopter at the altitude of 400 feet and could have observed Riley's greenhouse. The police officer did no more. This is not to say that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law. But it is of obvious importance that the helicopter in this case was *not* violating the law, and there is nothing in the record or before us to suggest that helicopters flying at 400 feet are sufficiently rare in this country to lend substance to respondent's claim that he reasonably anticipated that his greenhouse would not be subject to observation from that altitude. Neither is there any intimation here that the helicopter interfered with respondent's normal use of the greenhouse or of other parts of the curtilage. As far as this record reveals, no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind, dust, or threat of injury. In these circumstances, there was no violation of the Fourth Amendment.

*Riley*, 488 U.S. at 451-52 (emphasis original).

*Riley* does not stand for—or clearly establish—the proposition that the illegal operation of an aircraft in all circumstances constitutes a search under the Fourth Amendment. Instead, it suggests that if an aircraft is operated in airspace where aircrafts are not legally allowed to be, that might be relevant to the question of whether an individual has a reasonable expectation of privacy in the areas observed from or by the aircraft. Put differently, it may be reasonable for an individual to believe that his land will never be observed by an aircraft if no aircraft is legally permitted to

21

fly over the land.  But there is no evidence in this case that the drone was operated in airspace in which drones are not legally permitted to be.  The alleged violations of law Plaintiffs point to— assuming they did occur, which Chief Potts disputes—do not demonstrate that drones in general are not permitted to operate in the airspace around the Property.  In other words, whether Chief Potts obtained the proper certifications or whether he maintained a visual line of sight on the drone during its flight is not relevant to the Fourth Amendment question of whether Plaintiffs had a reasonable expectation that the Property would remain out of view of drones or other aircraft.  [*See* Filing No. 211 at 36 (the Court acknowledging in the March 2022 Order that ("[a]lthough noncompliance with federal aviation regulations does not itself establish a Fourth Amendment violation, such regulations are relevant to what a person might reasonably expect to occur overhead").]  This is especially true given that the footage actually captured by the drone, although captured from a higher altitude, is not meaningfully different than what a person on the street could see.[8]  Accordingly, the Court finds that *Riley* does not clearly establish that flying a drone in the circumstances presented in this case violates the Fourth Amendment.

In *Kyllo*, law enforcement acting without a warrant used a thermal-imaging device to scan a private home and, based on the relatively high heat detected by the device, concluded that the defendant was using halide lamps to grow marijuana inside.  533 U.S. at 29-30.  The Supreme Court held that "obtaining by sense-enhancing technology any information regarding the interior

---

[8] Further, the Indiana statute cited by Plaintiffs states that a law enforcement officer must obtain a warrant to conduct a search or obtain videos or photographs of private property or of "individuals, items, or structures located on private property" without the consent of the owner of the affected property, but states that "a warrant is not required for use of an unmanned aerial vehicle if a warrant would not be required for a search not using an unmanned aerial vehicle." Ind. Code § 35-33-5-9. The statute itself does not indicate that a warrant was required in the circumstances presented in this case, and in any event, "[m]ere violation of a state statute does not infringe the federal Constitution." *Archie v. City of Racine*, 847 F.2d 1211, 1216 (7th Cir. 1988) (quoting *Snowden v. Hughes*, 321 U.S. 1, 11 (1944)).

of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area, constitutes a search—at least where (as here) the technology in question is not in general public use." *Id.* at 34 (internal quotations and citation omitted). Later cases have acknowledged that, "[u]nder *Kyllo*, however, even an extremely invasive technology can evade the warrant requirement if it is 'in general public use,'" meaning "both widely available and routinely used by the general public." *Naperville Smart Meter Awareness v. City of Naperville*, 900 F.3d 521, 526-27 (7th Cir. 2018).

A concurring opinion written by Justice Kagan in *Jardines*, on which Plaintiffs also rely, applied the principles established in *Kyllo* to the use of a drug-sniffing police dog on the front porch of the defendant's home. 569 U.S. at 12-16 (Kagan, J., concurring).[9]  In addition to agreeing with the reasoning of the majority opinion—that the use of the drug-sniffing dog constituted a search because the dog and its handler physically intruded into the curtilage of the defendant's home by stepping onto the porch—Justice Kagan opined that an alternative basis for finding that a search occurred was that the police used a device not in general public use (a trained drug-detection dog) to obtain information (the fact that illegal substances were located inside) that would otherwise not be knowable without physical intrusion into the home. *Jardines*, 569 U.S. at 14-15 (Kagan, J., concurring).[10]

---

[9] The Court acknowledges that this concurring opinion is not controlling and therefore is insufficient to constitute clearly established law, especially given that only three of the Justices adopted the proposition for which Plaintiffs cite the concurrence while the other six expressly rejected it. *See Jardines*, 569 U.S. at 11 (majority opinion stating that the "implication" of the rule announced in *Kyllo* "is that when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant"); *Jardines*, 569 U.S. at 25-26 (Alito, J., dissenting) (joined by three other Justices and expressly rejecting "[t]he concurrence's *Kyllo*-based approach"). Nevertheless, in the interest of addressing all of Plaintiffs' arguments, the Court includes the *Jardines* concurrence in its discussion.

[10] Plaintiffs also cite *Jardines* for the proposition contained in the dissenting opinion written by Justice Alito that "[a] visitor cannot traipse through the garden, meander into the backyard, or take

While *Kyllo* and its progeny (including Justice Kagan's concurrence in *Jardines*) may put law enforcement on notice of the general rule that the use of sense-enhancing technologies not widely available and routinely used by the public may violate the Fourth Amendment when used to obtain information that otherwise would not be obtainable absent physical intrusion into a space protected by the Fourth Amendment, these cases do not clearly establish that the use of a drone like the one used in this case, under the circumstances presented here, violates the Fourth Amendment.  Indeed, Plaintiffs have not pointed to any binding precedent addressing drones at all, and they have not produced any evidence in support of their conclusory assertion that the drone was equipped with any sort of thermal imaging technology that might make this situation more closely analogous to *Kyllo* itself.  Furthermore, the drone did not obtain "any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area."  *See Kyllo*, 533 U.S. at 34.  The Supreme Court has instructed lower courts "not to define clearly established law at a high level of generality," *Ashcroft*, 563 U.S. at 742, and the Court concludes that none of the cases cited by Plaintiffs clearly establish that the use of the drone was unconstitutional in this case.

Finally, the Court rejects Plaintiffs' argument that qualified immunity should not apply because the use of the drone in this case was so egregious that a reasonable officer would have known it was unlawful.  As the Court's review of the caselaw above and in the March 2022 Order demonstrates, it is not clear whether the use of the drone was unlawful.  And there are no

---

other circuitous detours that veer from the pathway that a visitor would customarily use." *Jardines*, 569 U.S. at 19 (Alito, J., dissenting).  It is unclear what relevance this statement has to this case, as there is no evidence that anyone on the scene, during the initial approach or otherwise, walked on the Property using a path other than what a visitor would customarily use, and neither the drone nor Chief Potts physically entered the Property.

circumstances present rendering this a "rare" or "obvious" case justifying the denial of qualified immunity absent the existence of clearly established precedent.

For the foregoing reasons, the Court finds that Chief Potts, Sheriff Nielsen, and Major Stevenson are entitled to qualified immunity from Plaintiffs' claim that the use of the drone constituted an unlawful search in violation of the Fourth Amendment.  Accordingly, Chief Potts' Motion for Summary Judgment, [Filing No. 252], is **GRANTED**, and the Boone County Defendants' Motion for Summary Judgment, [Filing No. 258], is **GRANTED** as to the Drone Claim against Sheriff Nielsen and Major Stevenson.

### B. The Seizure Claim

#### 1. Officer Boling's Arguments

In support of his Motion for Summary Judgment, Officer Boling argues that there is no evidence demonstrating that he pointed a sniper rifle at the Property, and that his conduct—namely, sitting in a truck at a location outside of the Property—"was completely innocuous" and cannot support a Fourth Amendment claim against him.  [Filing No. 263 at 4-5.]  He argues that even if he had pointed his weapon at the Property, he is entitled to qualified immunity because there is no clearly established law demonstrating that pointing a sniper rifle at a residence under the circumstances presented in this case violates the Fourth Amendment.  [Filing No. 263 at 5-9.]

In response, Plaintiffs[11] argue that Office Boling was personally involved in the seizure of Barry to the extent that he was present on the scene in a truck that was visible to Barry and formed part of the law enforcement presence surrounding the Property.  [Filing No. 295 at 1-3; Filing No.

---

[11] In the interest of simplicity, and because Barry and Kathryn jointly filed many of the documents in this case, the Court refers to Plaintiffs collectively when summarizing the parties' arguments throughout this Order.  However, as the Court determined in the March 2022 Order, given that Kathryn was not present at the Property on March 4, 2019, the Seizure Claim, the False Imprisonment Claim, and the IIED Claim can be raised solely by Barry.

295 at 8.] Plaintiffs contend that Barry was seized within the meaning of the Fourth Amendment because "[w]hen a person is in a confined area, encircling the area in an intimidating fashion contributes to a reasonable belief that ignoring the law enforcement presence is not an option." [Filing No. 295 at 4.] They further argue that "Barry's actions constituted passive acquiescence" to law enforcement's show of authority. [Filing No. 295 at 5.] In support of their argument that Barry was seized, Plaintiffs rely principally on *Shroyer v. United States*, 904 F. Supp. 2d 914 (N.D. Ind. Oct. 23, 2012). [Filing No. 295 at 5-7.] Plaintiffs also maintain that the seizure of Barry was unreasonable for all the reasons outlined in their response to the Boone County Defendants' Motion for Summary Judgment, which the Court summarizes below. [Filing No. 295 at 7.] Plaintiffs argue that Officer Boling is not entitled to qualified immunity because "Barry had the clearly established right not to be subjected to an unreasonable seizure in response to law enforcement's erroneous belief that he was a cult member, while concomitantly knowing the children at issue were not in danger of being hurt; and, that right was obvious such that no reasonable official could have thought he was acting lawfully." [Filing No. 295 at 11.] Plaintiffs point to *Shroyer*, which they contend should have put Officer Boling on notice that it is unconstitutional to seize someone without a reasonable belief that the children or anyone in the home were in danger. [Filing No. 295 at 11-12.] Finally, Plaintiffs acknowledge that Officer Boling "was bored" during the incident, and assert that "[b]eing bored for six hours during the seizure does not afford him the benefit of qualified immunity." [Filing No. 295 at 12.]

In reply, Officer Boling argues that Plaintiffs cannot change the factual basis of their claim from relying on the allegations that Officer Boling pointed a sniper rifle at the Property, to relying on allegations that Officer Boling was sitting in a truck on the scene and that Barry could see the truck and was intimidated by its presence. [Filing No. 304 at 1-3.] In any event, he argues,

Plaintiffs have not supported their assertion that Barry could see the truck with a sworn affidavit or any other evidence, and have not produced evidence that any truck seen by Barry was the truck in which Officer Boling was sitting.  [Filing No. 304 at 6-7.]  Officer Boling maintains that even if Barry felt that he was seized in light of law enforcement's presence, Plaintiffs have produced no evidence that Officer Boling personally did anything that violated Barry's Fourth Amendment rights.  [Filing No. 304 at 7.]  Further, Officer Boling reiterates that he is entitled to qualified immunity, asserting that the *Shroyer* case is inapposite.  [Filing No. 304 at 7-10.]  Finally, Officer Boling argues that no claim based on the failure to intervene has been properly pleaded or supported by evidence.  [Filing No. 304 at 8.]

### 2.  Boone County Defendants' Arguments

The Boone County Defendants argue that Deputies Burcham, Musgrave, Keller, and Dunn were not personally involved in any constitutional violation and therefore cannot be liable under § 1983.  [Filing No. 259 at 13.]  They further argue that no seizure occurred within the meaning of the Fourth Amendment because they repeatedly explained to Barry that they would leave as soon as he let authorities verify the wellbeing of the children, and at all times law enforcement acted reasonably in response to the circumstances presented.   [Filing No. 259 at 20-21.]   In addition, the Boone County Defendants contend that they are entitled to qualified immunity because there is no clearly established law addressing an alleged seizure like the one at issue here, where Barry was free to terminate the encounter at any time by producing the children.  [Filing No. 259 at 15-16.]  They also contend that, in light of Indiana Code § 31-33-7-7[12] and the Order

---

[12] This statute requires in relevant part that, whenever a law enforcement agency receives an initial report that a child may be a victim of neglect, the agency shall "conduct an immediate, onsite assessment of the report along with [DCS] whenever the law enforcement agency has reason to believe that an offense has been committed." Ind. Code § 31-33-7-7(a)(2).

to Compel, they had no reason to believe that their conduct was unlawful.  [Filing No. 259 at 15-16.]

In response, Plaintiffs argue that Deputies Burcham and Musgrave were personally involved to the extent that they both admit to being part of the sniper unit, including planning the locations for the sniper team and pointing rifles at the Property.  [Filing No. 293 at 15-17.]  They contend that Deputy Keller was personally involved because he was present at the scene and "continued to make jokes throughout the incident."  [Filing No. 293 at 17-18.]  They further argue that Deputy Dunn was personally involved as a CNT negotiator.  [Filing No. 293 at 18.]  In addition, Plaintiffs argue that Barry was seized because his freedom of movement was restricted without probable cause and against his will, and he was not shown the Order to Compel.  [Filing No. 293 at 18-19.]  Plaintiffs argue that the seizure of Barry was unreasonable because it was not authorized by the Order to Compel and was not supported by probable cause or exigent circumstances.  [Filing No. 293 at 20-24.]  Specifically, they contend that the report received by DCS did not suggest that the children were in immediate danger, there was no evidence that Barry was a danger to himself or others, he submitted to law enforcement's commands as soon as he was notified of the Order to Compel, and he was never charged with any crime as a result of the incident.  [Filing No. 293 at 22-23.]  In addition, Plaintiffs argue that none of the evidence submitted "provides any justification for believing it was reasonable or necessary to seize Barry, let alone seize Barry with a[n] SRT/CNT, which included an armored personnel carrier, a box truck, snipers, drones, and road blockades."  [Filing No. 293 at 23-24.]  Plaintiffs also argue that the Boone County Defendants are not entitled to qualified immunity because: (1) Seventh Circuit precedent clearly establishes that Barry was unlawfully seized and that pointing weapons at the Property constituted excessive force; (2) there is a clear trend in other circuits recognizing that law

enforcement may not use excessive force—including deploying SWAT teams and brandishing weapons—where there is no apparent threat; and (3) no reasonable official could have thought that the Boone County Defendants' conduct was lawful, given that the Order to Compel did not authorize the seizure of Barry by unreasonable means or excessive force and § 31-33-7-7 does not apply because DCS, not law enforcement, received the initial report of neglect.  [Filing No. 293 at 24-31.]  Plaintiffs also point out that Barry had no obligation to open the door or speak with officers, there was no indication that the children were in immediate danger, and the fact that the Boone County Defendants "sat around for hours after the Order to Compel was issued, eating pizza, and making jokes" undermines any claim that law enforcement believed the children were in danger.  [Filing No. 293 at 32-33.]  Plaintiffs contend that these facts, coupled with the lack of available body camera footage and BCSO's failure to preserve all correspondence from the incident, "leads to the conclusion that the [Boone County] Defendants' actions were egregious" and qualified immunity is not appropriate.  [Filing No. 293 at 32-33.]

In reply, the Boone County Defendants maintain that Deputies Burcham, Musgrave, Dunn, and Keller were not involved in any alleged seizure, and they point out that Barry remained inside his house for the duration of the incident, could not have seen the snipers, and did not see or hear anything captured on the body camera videos.  [Filing No. 303 at 8-9.]  The Boone County Defendants further argue that Plaintiffs "do not and cannot dispute" that Defendants' presence was justified by § 31-33-7-7 and a valid court order.  [Filing No. 303 at 9.]  They contend that "Barry needlessly escalated the situation," and their actions were a reasonable response to his behavior.  [Filing No. 303 at 10-12.]  In addition, the Boone County Defendants reiterate that they are entitled to qualified immunity and argue that "[n]one of the cases Plaintiffs cite to are even close to what happened on March 4, 2019, and none support a denial of qualified immunity."  [Filing No. 303 at

29

13-14.] They also argue that Plaintiffs' arguments concerning body camera footage are irrelevant because Plaintiffs designated hours of body camera footage as evidence, even more body camera footage was produced to Plaintiffs during discovery, and there is no evidence suggesting that any footage that would support Plaintiffs' claims is missing or has been withheld. [Filing No. 303 at 3-4.]

### 3. Officer Shook's Arguments

In support of his Motion for Summary Judgment, Officer Shook argues that "there is no evidence that [he] actually did the only thing [Plaintiffs] have alleged against him (pointing a sniper rifle at [P]laintiffs' home)," and therefore he cannot be liable for a constitutional violation. [Filing No. 256 at 4.] He argues that any claims for excessive force or failure to intervene are not properly before the Court because they were not pled in the operative Second Amended Complaint. [Filing No. 256 at 4 n.2.] He further contends that, even if he pointed a sniper rifle at the residence, that would not amount to a seizure for purposes of the Fourth Amendment because it did not involve physical contact with Barry or Barry submitting to a show of authority. [Filing No. 256 at 4-5.] In addition, he argues that even if the presence of law enforcement constitutes a seizure, he was not personally involved in or responsible for such a seizure because he did not interact with Barry or point a weapon at the Property, and although he "was present at the standoff, from afar, . . . there is no evidence of any kind that he participated in anything resembling a seizure." [Filing No. 256 at 5-6.] Officer Shook also asserts that he is entitled to qualified immunity because there is no clearly established caselaw suggesting that an officer's mere presence at a standoff, without active participation, constitutes a seizure in violation of the Fourth Amendment. [Filing No. 256 at 6-8.]

In response, Plaintiffs argue that Barry was seized within the meaning of the Fourth Amendment, and incorporate by reference all arguments made in response to Officer Boling's Motion for Summary Judgment.  [Filing No. 291 at 3-4.]  He argues that he did submit to law enforcement's authority by ultimately surrendering the children, and that Officer Shook personally participated in the seizure by forming part of the perimeter of law enforcement officials surrounding the Property.  [Filing No. 291 at 3-5.]  He further contends that Officer Shook failed to intervene to prevent other officers from seizing Barry unreasonably and using excessive force, and that such allegations are legal theories that were not required to be specifically pled in the Second Amended Complaint.  [Filing No. 291 at 5-7.]  Finally, Barry contends that Officer Shook is not entitled to qualified immunity, incorporating by reference all of the qualified immunity arguments he made in response to the Boone County Defendants' Motion for Summary Judgment. [Filing No. 291 at 7.]

In reply, Officer Shook reiterates that he never pointed his rifle and was not sufficiently involved to support liability against him for any constitutional violation, and that no claim for failure to intervene is properly before the Court.  [Filing No. 301 at 1-2.]  He also argues that, even if the Court were to consider a claim based on failure to intervene, there is no evidence to support such a claim, as "there are no facts highlighted or evidence tendered by Plaintiff[s] to suggest what [they] think[] Officer Shook should have done, other than to cease existing at the location of the standoff (which for Officer Shook was off-site)."  [Filing No. 301 at 2.]

    *4.  Analysis*

       a.  <u>Scope of Plaintiffs' Claim</u>

In connection with the Seizure Claim, Plaintiffs assert at various times that some Defendants failed to intervene to prevent other Defendants' misconduct and that some used

excessive force.  However, neither a failure-to-intervene claim nor an excessive force claim are currently before the Court.  Instead, the March 2022 Order determined that Plaintiffs had stated a claim for unlawful seizure under the Fourth Amendment based on "a robust law enforcement presence, roadblocks leading up to the house, and pointing sniper guns in the direction of the home as part of a saga that lasted for hours."  [Filing No. 211 at 54.]  Accordingly, the Court will address the Seizure Claim as it relates to the law enforcement presence near the Property on March 4, 2019, and will not consider any independent claims for failure to intervene or excessive force.

      b.  Personal Involvement

In an action under § 1983, a plaintiff must establish individual liability against each defendant by demonstrating each defendant's personal involvement in the alleged constitutional deprivation.  *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019).  This means the plaintiff must demonstrate a causal connection between the sued officials and the alleged misconduct.  *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

Here, it is undisputed that Deputies Burcham, Musgrave, Dunn, and Keller were all present at the scene, that Deputies Burcham and Musgrave were part of the "observer/sniper element" and actually pointed their rifles in the direction of the Property, and that Deputy Dunn acted as the primary crisis negotiator and attempted several times to contact Barry via telephone calls and text messages.  It is also undisputed that Officer Boling sat in a law enforcement vehicle at the "staging area" approximately a block away from the Property, and that Officer Shook was present at "a surveillance point" near the Property.  Although other courts in some circumstances have concluded that an officer's "mere presence at the scene fails to provide the requisite personal involvement to support a false arrest claim," *Ortiz v. City of Chicago*, 2010 WL 3833962, at *8 (N.D. Ill. Sept. 22, 2010), Defendants' presence at the scene is itself the basis for Barry's Seizure

Claim in this case.  Put differently, Plaintiffs contend that the totality of the law enforcement presence around the Property constituted a seizure of Barry; they do not assert individual seizure claims against any particular Defendant.  With the Seizure Claim framed in this way, the Court declines to find that Deputies Burcham, Musgrave, Dunn, and Keller and Officers Boling and Shook were not personally involved in the alleged seizure.  To be clear, had Plaintiffs pursued individual seizure claims against particular Defendants for particular actions, no Defendant would be liable for the actions of others in which he was not personally involved, *see, e.g.*, *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (noting that "[l]iability depends on each defendant's knowledge and actions"), and the Court acknowledges that the role some of these Defendants played in the incident is small and likely insufficient to constitute a seizure in isolation. Nevertheless, because Plaintiffs' seizure claim is based on the collective law enforcement presence near the Property, the Court declines to find that any Defendants are entitled to summary judgment on the Seizure Claim based on a lack of personal involvement.

c.  <u>Whether a Seizure Occurred</u>

As discussed above, the Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S. Const. amend. IV.  A seizure "can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person."  *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968)) (alteration original).  For Fourth Amendment purposes, "[a] seizure occurs when, considering all of the circumstances, a reasonable person would not feel free to leave, decline the officers' requests, or otherwise terminate the encounter."  *United States v. Palomino-Chavez*, 761 F. App'x 637, 642 (7th Cir. 2019) (citing *Florida v. Bostick*, 501 U.S. 429, 436, 439 (1991)).  "If a reasonable person would feel free 'to disregard the police and go about his business,' no seizure has occurred."  *United*

*States v. Ahmad*, 21 F.4th 475, 479 (7th Cir. 2021) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).  In order to prevail on an unlawful seizure claim pursuant to § 1983, the plaintiff must establish: (1) that the government actor's conduct constituted a seizure; and (2) that the seizure was unreasonable.  *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009).

Whether a seizure occurred is "a highly fact-bound inquiry" that depends on the totality of the circumstances.  *Ahmad*, 21 F.4th at 479 (citation omitted).  Relevant circumstances include: (1) whether the encounter occurred in a public place or a private location; (2) whether the officers told the person that he was free to leave; (3) whether the police limited the person's movement via physical touching, restraint, or other coercive conduct; (4) whether the officer informed the person that he was the target of an investigation; (5) whether the person was deprived of identification or other vital documents "without which he could not leave"; (6) "whether there was a threatening presence of several officers and a display of weapons"; and (7) "whether the officers' tone of voice was such that their requests would likely be obeyed."  *Id.* (internal quotations and citations omitted).  This multi-factor analysis is sometimes referred to as the "*Mendenhall* test," as it originated in *United States v. Mendenhall*, 446 U.S. 544 (1980).

As the Court recognized in the March 2022 Order, "[a] home standoff situation like that at issue here does not fit neatly into the free-to-leave and submission paradigms because: (1) the individual at the center of the standoff has no intention of leaving the home; and (2) the refusal to acquiesce to orders to leave the home suggests the individual has not 'submitted' to authority." [Filing No. 211 at 51-52.]  Nevertheless, the Court considered caselaw from the Seventh Circuit and other District Courts and concluded that while this caselaw "unfortunately does not provide clear answers," Plaintiffs had plausibly alleged that Barry was seized within the meaning of the

Fourth Amendment based on the allegations made in the Second Amended Complaint.  [Filing No. 211 at 52-55.]

Among the relevant caselaw surveyed by the Court in the March 2022 Order was *Kernats v. O'Sullivan*, 35 F.3d 1171, 1173 (7th Cir. 1994), in which a landlord obtained an order of possession from a state court and ordered the tenants to leave the premises.  When they failed to leave, the landlord called police and an officer arrived at the premises and ordered the tenants to leave by the end of the day or face arrest.  *Id.*  Fearing arrest, the tenants complied, but filed a civil suit alleging that the officer unreasonably seized them.  *Id.*  The Seventh Circuit concluded that the tenants' claim for unlawful seizure was barred by qualified immunity, because no clearly established law dictated that the tenants were seized within the meaning of the Fourth Amendment.  *Id*. at 1180-81.

In reaching that conclusion, however, the *Kernats* Court made several important observations that are instructive in this case.  Most importantly, the Court emphasized the Supreme Court's directive indicating that "when a person has no desire to leave the scene of an encounter with police, 'the degree to which a reasonable person would feel he or she could leave is not an accurate measure of the coercive effect of the encounter,'" but instead "'the appropriate inquiry is whether a reasonable person would feel free to decline the officer's request or otherwise terminate the encounter.'"  35 F.3d at 1177 (quoting *Florida v. Bostick*, 501 U.S. 429, 435-36 (1991)).  To answer this question, courts apply the *Mendenhall* test.  *See Kernats*, 35 F.3d at 1177-78.  The Seventh Circuit further observed that, because the question of whether a seizure occurred is "one of degree," "when the factual setting is unique in non-trivial aspects, with no clear parallel in other cases, the relevant constitutional factors must point strongly in the direction of constitutional transgressions before [qualified] immunity is lost."  *Id*. at 1178.  The Court also pointed out that

"time and space are significant factors in determining whether a seizure has taken place" and concluded that "a seizure typically involves an almost complete restriction of movement—either a laying of hands or a close connection (both temporally and spatially) between the show of authority and the compliance." *Id*. at 1179-80. On that point, the Court explained:

> In the instant case, we find that temporal and spatial aspects of [the officer's] alleged threat are much looser than those that typically characterize Fourth Amendment seizures. Though [the officer] was clear as to who would be arrested and where they would be taken, he was vague as to when the arrest might take place, stating only that [the tenants] must comply by some indeterminate time that evening. Thus, the lapse of time between the making and the execution of [the officer's] threat would have been at least a matter of a few hours. In addition, [the officer] departed the scene immediately after issuing his command (never to return). Acknowledging that compliance with [the officer's] demand that they move out was an onerous task, we still think it clear that the [tenants] . . . did not have to make an instantaneous judgment whether to submit or resist. Especially in view of the fact that the [tenants] had previously received conflicting advice about the authority of anyone other than the Cook County Sheriff to carry out an eviction, we find it at least plausible that a reasonable person would have sought further clarification (perhaps from the Chief of Police, the State's Attorney, or even a private lawyer).

*Id*. at 1180.

As the Court further noted in the March 2022 Order, District Courts within the Seventh Circuit have reached differing conclusions regarding whether a standoff situation amounts to a seizure when an individual does not attempt to leave the home. In *Escobedo v. City of Fort Wayne*, 2008 WL 1971405, at *3 (N.D. Ind. May 5, 2008), law enforcement responded to a 911 call made by an individual who was under the influence of drugs, experiencing delusions, stated that he was armed, and threatened to shoot himself. Applying the *Mendenhall* test with the modification recognized by *Kernats*, the court concluded that a seizure had occurred because "[a] reasonable person would certainly have been threatened by the presence of snipers, armor-clad [emergency response team] officers carrying shotguns, pistols, or submachine guns, a mobile command center next to the apartment building, and numerous uniformed officers in the area around the building."

*Id*. at *21.  The court also noted other circumstances indicating that the individual was not free to leave his home or otherwise go about his business, including: "more than one 'display of a weapon'"; repeatedly requesting and ordering that the individual surrender; firing tear gas grenades into the individual's apartment; breaching the door; the "high number of deployed officers, particularly officers from the [emergency response team]"; and the fact that law enforcement officers "were surrounding [the individual's] apartment." *Id*. at *21-23.

In *Price v. Marion Cnty. Sheriff's Dep't*, 2013 WL 5321260, at *6-9 (S.D. Ind. Sept. 23, 2013), the court reached a different result.  In that case, law enforcement traveled to an individual's residence, acting on an arrest warrant.  *Id*. at *1.  Upon seeing the officers, the individual ran inside the house, at which point officers "set up a perimeter outside the house."  *Id*.  Eventually, the individual came out onto the front porch, attempted to douse an officer with lighter fluid, shouted expletives at officers, and then proceeded to light the house on fire before barricading himself in the home.  *Id*. at *1-3.  A SWAT team, including an armored vehicle, was called to the scene to assist firefighters in safely approaching the home to extinguish the fire, and the individual was eventually found deceased in the basement.  *Id*. at *3-4.  The court found that the individual was not seized within the meaning of the Fourth Amendment, noting that he never submitted to the officers' show of authority but instead: "(1) attempted to flee the scene upon the officers' arrival; (2) shouted obscenities at the officers; (3) refused many commands to exit the house; (4) sprayed lighter fluid at an officer; (5) lit the [r]esidence on fire; and (6) threw a potted plant at the officers." *Id*. at *7.  The court further noted that the individual "was 'restricted' to the entire [r]esidence and its surrounding curtilage" and that "instead of being directly outside [the individual's] location, officers were stationed much farther away because of the safety risks [the individual] posed," which "is a critical distinction because the Seventh Circuit explained that '[a]s the extent of the

limitation on a person's desired movement decreases, so too does the likelihood that even coercive police action will give rise to a seizure.'"  *Id.* (quoting *Kernats*, 35 F.3d at 1180) (final alteration original).

Finally, in *Shroyer*, on which Plaintiffs rely, law enforcement had arrested the plaintiff's husband, who was suspected of being involved in the white supremacist movement and had reported to officers that "his people" were in possession of C-4 military explosives.  904 F. Supp. 2d at 917.  Believing that the plaintiff might have relevant information about her husband's crimes and that the explosives might be located inside her residence, law enforcement "approached the house and situated themselves on three sides." *Id.* at 918.  At least three officers were carrying firearms, either "in the low ready position" or pointed at the ground. *Id.*  The plaintiff denied that there were explosives in the home and refused to allow police to enter, but for a period of one to two hours, "the officers stayed outside the residence attempting to gain the [p]laintiff's consent to search the home," with at least five different officers speaking to her at various times. *Id.* at 919. One officer threatened to take the plaintiff to jail for obstructing the investigation, some officers threatened that they would throw "flash bombs" into the house, one officer threatened to shoot the plaintiff's dog if it was not controlled, and at least one officer "spoke in derogatory terms about the [p]laintiff's husband within hearing of her children." *Id.*  When one occupant of the house attempted to leave, officers prevented him, asked him to empty his pockets, and patted him down. *Id.*  Because one officer threatened that child protective services would be called to take the plaintiff's children away, the plaintiff directed her cousin to remove the children from the home and take them to a relative's house. *Id.*  After the plaintiff again refused to let law enforcement enter her home, the plaintiff and an officer got into a verbal altercation, during which the officer "was close enough to the [p]laintiff that she felt his saliva spray on her face as he yelled at her."

38

*Id*. at 919-20.  Eventually, after the officers "did not get anywhere" trying to convince the plaintiff to let them in and she "was becoming more upset and agitated," law enforcement left the scene. *Id*. at 920.

The *Shroyer* court found that there was evidence from which a reasonable jury could conclude that the plaintiff was seized within the meaning of the Fourth Amendment.  *Id*. at 922. Specifically, the court considered the totality of the circumstances—including "the presence of seven law enforcement officers around the front, side, and back of the house, a displayed firearm near the front window and the back of the house, a raised and agitated tone of voice, calling the [p]laintiff's husband derogatory names, stating that CPS was getting involved to take the [p]laintiff's children, threatening that the FBI would return with flash bangs to run the occupants out of the house, and a warning to put her dog in a secure place or police would shoot him"—and determined that there was a triable issue as to whether a reasonable person would have felt free to terminate the encounter in light of these circumstances.  *Id*. at 922-23.  The court further observed that the plaintiff "submitted to the Defendants' show of authority when she adjusted her behavior to respond to the presence of the officers," by engaging in conversations with them, arranging for her children to be taken elsewhere, and calling a friend for advice regarding whether she should permit the officers to search the home.  *Id*. at 923.

Here, Plaintiffs allege that Barry was seized by the law enforcement presence around his home, which consisted of: (1) law enforcement vehicles blocking an intersection approximately 0.3 miles from the Property; (2) law enforcement personnel and vehicles gathered at the command center approximately 1.4 miles away from the Property in driving distance, or approximately 0.5 miles away from the Property as the crow flies; (3) an unspecified number of law enforcement personnel and at least one "box-truck style law enforcement vehicle" at a "staging area"

approximately a block away from the Property; (4) an "observer/sniper element" stationed at a residence approximately 1,000 feet north of the Property; and (5) a drone that flew around the perimeter of the Property.[13]

As an initial matter, Plaintiffs did not submit any evidence detailing what personnel or equipment Barry or anyone else on the Property was able to observe from the house. The drone footage, although it captures only about 18 minutes of an hours-long situation, is telling on this issue, especially given that the drone flight seems to have occurred after all law enforcement was present and in place. The video shows the Property and surrounding area, but the Court cannot discern (and no party has pointed out) any police roadblock or obvious collection of police personnel or vehicles, other than those assembled at the command post a substantial distance away. The Court is not suggesting that the roadblock, personnel, or vehicles were not in place as outlined above, but is merely acknowledging that their visibility and proximity to the Property (or the apparent lack thereof) are relevant to the seizure analysis. As *Kernats* indicates, temporal and spatial proximity between the show of authority and submission is an important factor. *See Kernats*, 35 F.3d at 1179-80. Defendants' actions can only amount to a "show of authority," and Barry can only be said to have submitted to such a show of authority, to the extent that Barry was aware of and responded to Defendants' actions. Regardless, because the seizure inquiry is an objective one, and because the summary judgment standard requires all inferences to be drawn in

---

[13] This is likely a broader definition of the alleged seizure than is required. It is undisputed that the Order to Compel authorized Defendants to enter the Property and verify the wellbeing of the children by "any and all means necessary." Had the parties taken the time to present evidence concerning the timing of certain events and actions relative to the issuance of the Order to Compel (versus when it was delivered), it may well have been dispositive of the reasonableness of any alleged seizure. However, the record suggests that at least some of these actions took place prior to the issuance of the Order to Compel, and therefore pursuant to the standard of review, which requires all inferences to be drawn in favor of Plaintiffs, the Court considers the totality of the alleged seizure without regard to the timing of the issuance of the Order to Compel.

favor of Plaintiffs, the Court assumes for purposes of this Order that Barry was indeed aware of the full scope of law enforcement's presence at the time of the incident, although the Court finds that the distance between the Property and the law enforcement on scene weighs against concluding that a seizure took place and distinguishes this case from both *Escobedo* and *Shroyer*, which involved law enforcement immediately surrounding the properties in view of the plaintiffs in those cases.

Other factors similarly weigh against finding that a seizure occurred. After their initial approach to knock on the door, the Deputies and the DCS employees were asked to leave the Property and they did so. Thereafter, no Defendant entered the Property or had any physical contact with Barry, nor did anyone speak with him face-to-face. All communications with Barry were made by phone or text message, either directly or through various intermediaries, and Barry was repeatedly told that law enforcement would leave, and the encounter would terminate, if he produced the children and verified their safety. Although Barry repeatedly refused to comply with these requests, he was not the subject of a criminal investigation and was not told that he was.

In addition, Plaintiffs point to no evidence that Barry's movements were restricted. There is no evidence suggesting that he did not, or did not feel free to, move about the Property while law enforcement was present nearby. Although it is now known that a number of officers were present on the scene, some carrying weapons and some driving law enforcement vehicles, there is no evidence that any of these officers displayed their weapons to Barry or his family members. To the extent that Deputies Burcham and Musgrave pointed their sniper rifles in the direction of the Dircks' residence, there is no evidence that they pointed the weapons directly at Barry or that Barry saw the weapons. He does not recall seeing anyone else point weapons at the Property. Throughout the entire ordeal, Barry took the time to consult with family members and with a

lawyer; he "did not have to make an instantaneous judgment whether to submit or resist." *Kernats, 35 F.3d at 1180*.

This case is distinguishable from *Escobedo*, *Shroyer*, and even *Price* in that law enforcement did not immediately surround the Property brandishing their weapons, but instead were stationed a significant distance away.  Deputy Keller's body camera footage shows that a number of the Defendants spent most of their time gathered inside the mobile command bus discussing the situation, talking on the phone, and eating pizza.  [*See* generally Plaintiffs' Exhibit 44.]  Unlike the officers in *Escobedo* and *Shroyer*, Defendants never threatened to enter the Property, and they repeatedly advised Barry that they would not do so if he produced the children.  They never threatened violence against any person, pet, or property.  And although Barry ultimately negotiated a resolution that included surrendering his children, he himself never left the Property or surrendered to law enforcement custody.  It is also important that Barry's most significant submission to law enforcement's demands—allowing his brother and sister to turn his children over to authorities—undisputedly occurred in response to his learning of the Order to Compel.  The fact that Barry repeatedly refused to produce the children before learning of the Order and only did so after being told about it suggests that he was convinced by the Order, not coerced or compelled by law enforcement's conduct or presence, which was the same both before and after Barry was told about the Order to Compel.

In sum, although the parties and the Court have heretofore referred to the March 4, 2019 encounter between law enforcement and Barry as a "standoff," the evidence shows that the situation was significantly less dramatic and dire than that term suggests.  Law enforcement merely waited at a distance—weapons accessible but largely not in use—while various people tried to

convince Barry to produce the children.  The Court concludes as a matter of law that Barry was not seized within the meaning of the Fourth Amendment.

### d.  Qualified Immunity

Even if Barry were seized within the meaning of the Fourth Amendment, Defendants are entitled to qualified immunity.  As the above discussion shows—and as the Court already pointed out in the March 2022 Order—there is no binding precedent clearly establishing that Defendants violated the Fourth Amendment in this case.  In addition to relying on *Shroyer*—which is not binding and is distinguishable as outlined above—Plaintiffs point to what they assert is a "clear trend" in the caselaw of other Circuits, which they believe supports their Seizure Claim.

Where there is no controlling authority, a plaintiff can defeat qualified immunity by showing that there "was such a clear trend in the caselaw that [the court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017).  This is a lofty standard, and the Supreme Court has stressed that:

> [t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority.  It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that every reasonable official would know.

*Wesby*, 138 S. Ct. at 589-90 (quotation and citation omitted).

Here, Plaintiffs point to *Estate of Smith v. Marasco*, 318 F.3d 497, 518 (3d Cir. 2003); *Bellotte v. Edwards*, 629 F.3d 415, 423 (4th Cir. 2011); *Jackson v. Stair*, 944 F.3d 704, 710 (8th Cir. 2019); *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001); and *Corbitt v. Vickers*, 929 F.3d 1304 (11th Cir.

2019).  [Filing No. 293 at 28-30.]  Several of these cases are of no apparent relevance to the issues before the Court, the few that involve similar issues are readily distinguishable, and collectively they fall far short of establishing a "robust consensus" sufficient to defeat qualified immunity in this case.

In *Marasco*, the court assumed without deciding that a seizure occurred when law enforcement established a perimeter around an individual's home, but ultimately concluded that no Fourth Amendment violation had occurred because any seizure was justified by probable cause and exigent circumstances.  318 F.3d at 518 ("Even assuming that there was a seizure because Smith was still in the house when the police formed a perimeter around his property, the Smiths cannot establish a Fourth Amendment violation based on the officers' conduct following observation of the red dot by Marasco. . . . [A]s we already have pointed out there was probable cause here to believe a crime had been committed. . . . Inasmuch as the officers had reason to believe that a laser-sighted weapon was being pointed at them, they had reason to fear for their own safety. Consequently, there were exigent circumstances and establishment of a perimeter did not constitute an unreasonable seizure."); *see also id.* at 515 (noting that "the defendants do not contest that there was a seizure in this case").  Because the *Marasco* court did not actually analyze the seizure question, that case does not lend support to Plaintiffs' position.

*Bellotte* involved a no-knock entry into an individual's home, and the Fourth Circuit explained that the mere fact that the homeowners had concealed carry permits, without more, was insufficient to create a reasonable suspicion of danger justifying the officer's failure to knock and announce their presence.  629 F.3d at 423.  Plaintiffs cite this case for the proposition that "a reasonable officer would have known that guns do not fire themselves, and that a justifiable fear for an officer's safety must include a belief, not simply that a gun may be located within a home,

but that someone inside the home might be willing to use it." [Filing No. 293 at 28 (citing *Bellotte*, 629 F.3d at 423).]  It is true that Defendants were aware that the Dircks may have firearms in their home, and while that may be relevant to why law enforcement personnel behaved the way they did in this case, it is not relevant to the question of whether a seizure occurred, and this case does not support Plaintiffs' position.

Plaintiffs cite *Jackson* only for the proposition that it is "clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."  944 F.3d at 711 (internal quotations and citations omitted).   That proposition is settled law in this Circuit too, *see, e.g.*, *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects."), but it is a general proposition that does not have any relevance to the facts of this case, which involve no use of force at all.

Similarly, Plaintiffs acknowledge that *Deorle* "is distinguishable" on the facts as it involved an individual suffering an emotional disturbance being shot in the face with a beanbag round, [Filing No. 293 at 29], but they cite it for the proposition that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining . . . the reasonableness of the force employed" by law enforcement, *Deorle*, 272 F.3d at 1283.   Again, that proposition has no apparent relevance to the facts of this case, where no force was used.

Plaintiffs cite the dissent in *Corbitt* for the proposition that the Eleventh Circuit has "consistently denied qualified immunity when the defendant-officer exhibited excessive force in the face of no apparent threat." [Filing No. 293 at 30 (citing *Corbitt*, 929 F.3d at 1325 (Wilson,

J., dissenting)).]  But this again is a general Fourth Amendment principle, and the facts of the present case are not similar to the facts of *Corbitt*, which involved officers holding individuals at gunpoint and one officer discharging his weapon twice at a dog, missing the dog both times and inadvertently shooting a child in the leg.  929 F.3d at 1308.  Notably, the majority opinion in *Corbitt* concluded that the defendant officer was entitled to qualified immunity because "there was no clearly established law making it apparent to any reasonable officer in [the defendant officer's] shoes that his actions in firing at the dog and accidentally shooting [the child] would violate the Fourth Amendment."  *Id.* at 1323.  *Corbitt* therefore is not helpful to Plaintiffs.

In *Holland*, law enforcement executed search and arrest warrants at an individual's home, where several other individuals (including minor children) who were not subjects of the warrants happened to be present.  268 F.3d at 1183-85.  Several uniformed officers, as well as "[s]even SWAT Team members dressed in green camouflage clothing with no identifying markings and hoods showing only their eyes approached the residence," brandishing weapons, pointing weapons at various individuals outside the home, and ordering those individuals to lie on the ground.  *Id.* at 1183-84.  Officers then entered the residence and ordered all occupants to the ground at gunpoint. *Id.* at 1184.  All individuals on the scene "were held in the living room by SWAT deputies until a 'wants and warrants' check was completed on each one," and then they were released.  *Id.*  The individuals sued, claiming that their Fourth Amendment rights were violated when the SWAT team "seized each of them using excessive force."  *Id.* at 1186.  The Tenth Circuit concluded that the individuals were seized within the meaning of the Fourth Amendment because "[p]hysical force was intentionally applied" by the SWAT team and "each of the plaintiffs submitted to that show of authority" for a brief period until they were told they could leave.  *Id.* at 1188.  However, the Court determined that:

> While the SWAT Team's initial show of force may have been reasonable under the circumstances, continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation outside the residence was not justified under the circumstances at that point. This rendered the seizure of the children unreasonable, violating their Fourth Amendment rights.

*Id*. at 1193. The Court went on to conclude that the SWAT team's conduct violated the plaintiffs' Fourth Amendment rights to the extent it amounted to the use of excessive force. *Id*. at 1194-95. Finally, the Court determined that the defendant officers were not entitled to qualified immunity, stating:

> We can find no substantial grounds for a reasonable officer to conclude that there was legitimate justification for continuing to hold the young people outside the residence directly at gunpoint after they had completely submitted to the SWAT deputies' initial show of force, or for training a firearm directly upon a four-year-old child at any time during the operation.

*Id*. at 1197.

*Holland* is readily distinguishable from the present case. Although Defendants had weapons with them when they responded to the scene, and Deputies Burcham and Musgrave pointed their rifles at the residence for an unspecified duration at an unspecified time, there is no evidence indicating that any Defendant brandished their weapons in an intimidating fashion in view of any person or pointed weapons directly at any individual. As the *Holland* Court acknowledged, "it may be excessive and unreasonable to continue to aim a loaded firearm directly at [a] person, in contrast to simply holding the weapon in a fashion ready for immediate use." *Id*. at 1193. Unlike the officers in *Holland*, Defendants did not enter Plaintiffs' residence or hold anyone at gunpoint. It is not enough that, in theory, a SWAT team may be similar to the SRT or CNT teams that were deployed in this case. In light of the significant differences between the conduct at issue in *Holland* and the circumstances presented here, *Holland* does not suggest that

Defendants' conduct in this case was unlawful.  And these cases, taken together, do not show a consensus sufficient to prohibit the application of qualified immunity in this case.

Finally, Plaintiffs assert that Defendants' conduct was so egregious that, despite the lack of applicable precedent, Defendants should have known that they were acting unlawfully.  But there is nothing about the circumstances of this case that would meet that standard.  Furthermore, Indiana law requires law enforcement to "conduct an immediate, onsite assessment" of any report of child abuse or neglect, Ind. Code § 31-33-7-7(a)(2), and the Order to Compel (eventually) authorized Defendants to verify the wellbeing of the children by whatever means necessary.  Considering these facts and the reasons supporting the above conclusion that no seizure occurred, the Court cannot conclude that Defendants' conduct was egregious or that they should have known they were acting unlawfully.

For all of the foregoing reasons, the Court finds that Barry was not seized within the meaning of the Fourth Amendment, but even if he was, Defendants are entitled to qualified immunity.  Accordingly, Officer Boling's Motion for Summary Judgment, [Filing No. 261], is **GRANTED**; the Boone County Defendants' Motion for Summary Judgment, [Filing No. 258], is **GRANTED** with respect to the Seizure Claim; and Officer Shook's Motion for Summary Judgment, [Filing No. 255], is **GRANTED**.

### C.  The False Imprisonment Claim

The Boone County Defendants argue that Barry's state law False Imprisonment Claim fails for the same reasons the Seizure Claim fails.  [Filing No. 259 at 22.]  They contend that Barry was never arrested and cannot show that any of the Boone County Defendants intentionally restrained his freedom of movement without his consent or that they were not acting pursuant to a court order.  [Filing No. 259 at 22-23.]  In a footnote, the Boone County Defendants also assert that, pursuant

to Indiana Code § 34-13-3-5, they cannot be held individually liable for actions taken within the scope of their employment with the BCSO.  [Filing No. 259 at 22.]

Plaintiffs address their Fourth Amendment Seizure Claim and their state law False Imprisonment claim in a single section of their brief, [*see* Filing No. 293 at 18-24], and therefore the Court applies the arguments outlined with respect to the Seizure Claim above to the False Imprisonment claim as appropriate.

In reply, the Boone County Defendants assert that "Indiana courts consistently rely upon arrest and physical contact to establish the basis of a state law false imprisonment claim" but "[n]either happened here."  [Filing No. 303 at 10.]

"The standards for false imprisonment in Indiana are remarkably similar" to the standards for a Fourth Amendment claim for illegal seizure. *Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009).  Under Indiana law, "[f]alse imprisonment is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002).  "False imprisonment may be committed by words alone, or by acts alone, or by both and by merely operating on the will of the individual, or by personal violence, or both." *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 967 (Ind. Ct. App. 2001) (internal quotations and citations omitted).

Although the Boone County Defendants assert that a false imprisonment claim is not cognizable absent physical contact or arrest, they do not cite any authority in support of that proposition.  Regardless, for the reasons articulated above with respect to the Seizure Claim, Plaintiffs' claim that Barry was falsely imprisoned fails.  They have not shown that Barry's freedom of movement was restrained or that he was deprived of liberty without consent.

Further, the Court acknowledges that, "[u]nder the Indiana Tort Claims Act, there is no remedy against the individual employee so long as he was acting within the scope of his employment." *Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) (citing Ind. Code § 34-13-3-5(b)). Accordingly, Plaintiffs cannot recover from the Boone County Defendants for any claim of false imprisonment under Indiana law, because they were acting within the scope of their employment on March 4, 2019.

Based on the foregoing, the Boone County Defendants' Motion for Summary Judgment, [Filing No. 258], is **GRANTED** as to the False Imprisonment Claim.

### D.  The IIED Claim

In support of their Motion for Summary Judgment, the Boone County Defendants argue that their actions on March 4, 2019 "were reasonable and done in good faith, performed in order to determine the safety of two young children and, most importantly, done pursuant to a Court order." [Filing No. 259 at 25.] Accordingly, they argue, none of their conduct meets Indiana's "very high bar" for extreme and outrageous conduct supporting a claim for IIED. [Filing No. 259 at 25.]

Plaintiffs respond that "it is egregious and outrageous that the Boone County Defendants seized [Barry] with a sniper team, box truck, and roadblocks while driving an armored personnel carrier around him and his family in order to determine the safety of his two children and siblings." [Filing No. 293 at 35.] Plaintiffs contend that the Boone County Defendants knew the children were not in immediate danger and acted in a way that "may have deleterious long-term consequences" for the family. [Filing No. 293 at 35 (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1130-1131 (9th Cir. 2000)).]

The Boone County Defendants reiterate their initial arguments in reply.  [Filing No. 303 at 16.]

Under Indiana law, the elements of an IIED claim are that the defendant (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another.  *E.g.*, *Lachenman v. Stice*, 838 N.E.2d 451, 456 (Ind. Ct. App. 2005) (citations omitted).  It is the intent to harm the plaintiff emotionally that constitutes the basis for this tort, and the requirements are "rigorous."  *Id.* (citations omitted).

In order for a defendant's conduct to be extreme or outrageous, it is not enough that the "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."  *Id.* (citation omitted).  Instead, liability can be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," or where the "conduct exceeds all bounds usually tolerated by a decent society and causes mental distress of a very serious kind."  *Id.* at 456-57.  "In the appropriate case, the question [of whether a defendant's conduct was sufficiently extreme and outrageous] can be decided as a matter of law."  *Id.* at 457 (citation omitted).

Plaintiffs have pointed to no evidence from which a reasonable factfinder could conclude that the Boone County Defendants' conduct was sufficiently extreme or outrageous to support liability on a claim for IIED.  There is also no evidence suggesting that Barry suffered severe emotional distress as a result of the events on March 4, 2019.  The Court acknowledges that those events were likely unpleasant, and perhaps anxiety-inducing or frightening, but the evidence

adduced is not sufficient as a matter of law to meet Indiana's "rigorous" standard for IIED. Accordingly, the Boone County Defendants' Motion for Summary Judgment, [Filing No. 258], is **GRANTED** as to the IIED Claim.

## IV.
### Conclusion

Based on the foregoing, Chief Potts' Motion for Summary Judgment, [252], Officer Shook's Motion for Summary Judgment, [255], the Boone County Defendants' Motion for Summary Judgment, [258], and Officer Boling's Motion for Summary Judgment, [261], are all **GRANTED**. Final judgment shall issue accordingly.


Date: 7/26/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution via ECF only to all counsel of record**


Distribution by U.S. Mail to:

KATHRYN DIRCKS
7650 S. 50 E.
Lebanon, IN 46052

BARRY DIRCKS
7650 S. 50 E.
Lebanon, IN 46052